UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JONATHAN BEIJAR                                    Civil Action No. 04-10233-RCL

       Plaintiff

v.

STANLEY FASTENING SYSTEMS, L.P.
       Defendant

### STANLEY FASTENING SYSTEMS, LP's MEMORANDUM
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Stanley Fastening Systems, L.P. ("Stanley") is entitled to summary judgment in this product liability action because plaintiff Jonathan Beijar ("Beijar") can prove no facts to support his theory of liability. *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). According to eyewitness testimony, Beijar pulled the air hose of a pneumatic nailer that was resting on an overhead scaffold, causing the nailer to fall towards his chest. Beijar grabbed the nailer by the handle, pulled it towards his chest, and depressed the trigger as the tip of the nailer hit his chest, causing the tool to drive a nail into himself. (Ex. 1, Deposition of Wayne Pinard ("Pinard Dep."), at 11; Ex. 2, Statement of David Santos ("Santos Stmt."), dated February 1, 2001; Ex. 3, Statement of Ryan Cordeiro ("Cordeiro Stmt."), undated.) In so doing, Beijar violated the express instructions of the manufacturer not to pull the nailer by the hose (ex. 4, Operation and Maintenance Manual for N79WW/N80SB Pneumatic Stick Nailers ("N79WW Operation Manual"), Stanley bates nos. 016 Stan 000003-000004), something Beijar, himself, admitted was a misuse of the tool. (Ex. 5, Deposition of Jonathan Beijar ("Beijar Dep."), at 27-28.)

Beijar, however, offered a completely different version of events. He testified that the nailer fell off of the scaffold for no apparent reason, and that he caught it by the air hose as it moved towards him. Beijar swore that he never touched the handle or the trigger after he

grabbed the air hose about 18 inches above the handle and held his elbow straight out away from him, but the tool cycled and drove a nail anyway. (*Id*. at 37, 61.)

Beijar has retained an "expert," Igor Paul, who, in deposition, admitted that Beijar's story is impossible. (Ex. 6, Deposition of Igor Paul ("Paul Dep."), at 33.) Paul tested the product and found that it could not drive a nail unless both a safety on the tip of the tool was depressed and the trigger was pulled – precisely as designed by Stanley. (*Id*. at 15-18; Ex. 7, Expert Report of Igor Paul, dated July 30, 2005, at 3.) Paul admits that the accident could not have occurred unless Beijar both pulled the trigger and depressed the safety on the tip of the tool against his chest. (Ex. 6, Paul Dep. at 15-18.)

In an attempt to resurrect this case, Paul fashioned his own version of the accident that is unsupported by any of the facts or witnesses. Essentially, Paul admits that the accident could not have happened as described by Beijar, but he rejects, also, the version of the other eyewitnesses because their version does not support a finding for the plaintiff. (*Id*. at 33, 46-47.) But the law is clear that an expert cannot base his opinion on speculation or unsupported hypotheses. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137 (1999); *Cipollone v. Yale Indus. Products, Inc.*, 202 F.3d 376 (1st Cir. 2002). Without Paul's theories, even the plaintiff admits his case against Stanley must fail.

I.    **BACKGROUND**

    A.    <u>PROCEDURAL BACKGROUND</u>

Beijar commenced this action against Stanley in Bristol Superior Court on January 22, 2004. Stanley timely removed the case to federal court on January 30, 2004, and answered the complaint on February 17, 2004. Beijar filed an Amended Complaint dated April 29, 2004, which Stanley answered. In his Amended Complaint, Beijar asserted the following counts: negligence (First Cause of Action), breach of implied warranty of merchantability (Second

Cause of Action), breach of implied warranty of fitness for a particular purpose (Third Cause of Action), and violations of the Massachusetts Consumer Protection Act, M.G.L. ch. 93A (Fourth through Sixth Causes of Action).

      B.      <u>CONFLICTING VERSIONS OF THE ACCIDENT</u>

Beijar alleged that on or about February 1, 2001, he sustained a personal injury while working for Care Free Homes, Inc. ("Care Free"), as a laborer at a home construction site at Lot 14-5 Pirates Cove Road, Osterville, Massachusetts.  (Ex. 8, Amended Complaint at ¶¶ 9-10; Ex. 9, Plaintiff Jonathan Beijar's Answers to Defendant's Interrogatories No. 2a.)  More specifically, Beijar alleges that he was "severely injured, when a nail gun … fell from an overhead staging plank as the Plaintiff was walking on the ground in the area below the staging.  As the Plaintiff attempted to avoid being struck by the nail gun, the barrel of the nail gun struck the Plaintiff's chest and spontaneously discharged, firing a three and a half inch roofing nail through his sternum, piercing his right ventricle, and lodging into his heart."  (Ex. 8 at ¶ 10; Ex. 9, Answer No. 2b.)  The pneumatic nailer that Beijar alleges caused his injury on February 1, 2001 incident, incorrectly referred to by Beijar (and others) as a "nail gun," is a model N79WW-1, serial no. 0357 047, manufactured by Stanley on December 22, 2000 (the "nailer").[1]  (Ex. 10, Stanley's Answers to Interrogatories, Ans. No. 10.)

The true cause of Beijar's injury is quite different from what he described in his answers to interrogatories and in his deposition testimony.  According to the job's foreman, Wayne Pinard, Beijar had been instructed to move the nailer, which was close to falling off the side of a plank located about ten feet above the ground on a scaffold, further toward the center of the plank to ensure it would not fall.  (Ex. 1, Pinard Dep., at 10.)  Instead, with his left hand Beijar

---

[1] Beijar admitted at his deposition that he could not confirm the nailer referred to in this matter is the one that caused his injury. (Ex. 5, Beijar Dep., at 38-39.)  For purposes of this Motion only, Stanley proceeds as if Beijar properly identified the nailer.

pulled the nailer off the plank by grabbing the air hose connected to the nailer and pulling it down.  (*Id*. at 11; Ex. 2, Santos Stmt.; Ex. 3, Cordeiro Stmt.)  Beijar admitted at his deposition that he knew it was unsafe to pull a nailer down by its air hose.  (Ex. 5, Beijar Dep. at 27-28.)  As the nailer fell off the plank, Beijar "caught it like a football" and pulled it towards his chest, causing the tip of the nailer to contact his chest.  (Ex. 1, Pinard Dep. at 11.)  Either before the tip of the nailer hit Beijar or just after, Beijar depressed the trigger of the nailer with his thumb, causing the nailer to cycle and discharge a nail into his chest.  (*Id*. at 39-41.)  Pinard had a clear view of the accident and the tool and is certain that Beijar's right thumb hit the trigger.  (*Id*.)

C.     THE MODEL N79WW-1 PNEUMATIC NAILER

This tool has a contact trip activating device.  It requires both that the trigger be pulled and that a spring-loaded trip at the tip of the tool to be depressed before the tool will cycle and drive a nail.  Contact trip tools will cycle and drive a nail each time the tip is pressed against a hard surface, as long as the user's finger remains on the trigger.  Thus, it is a useful tool for "bump firing" when doing jobs like decking, sheathing and pallet construction.  Stanley offers another type of trigger, known as the "sequential trip" trigger, which is available on all models of nailers.  Unlike the contact trip, the user must remove his finger from the trigger of a sequential trip device, then press the tip of the tool against one work piece, then pull the trigger before the tool will cycle - and it will cycle only once. (Ex. 4, N79WW Operation Manual at pp. 4 and 7, Stanley bates no. 016 Stan 000003-000004.)

Prior to Beijar's accident, Stanley included sequential trip triggers with all contact trip tools, including this nailer, and gave easy instructions for converting contact trip to sequential trip tools.  The process does not require special tools and can be done quickly, in about two minutes. (Ex. 11, Deposition of Matthew Ponko ("Ponko Dep."), at 54-55, 116; Ex. 12, Expert Report of Matthew Ponko ("Ponko Rpt."), at 3; Ex. 13, Expert Report of Robert Olmstead

("Olmstead Rpt.") at 4.) Pinard testified that when this nailer was purchased new, it came with a

sequential trip conversion kit, but he chose not to make the conversion, as the contract trip

application is more efficient for the type of work Care Free does than the sequential trip.  (Ex. 1,

Pinard Dep. at 20.)  He testified that he had once converted a sequential trip nailer to a contract

trip nailer in about two minutes.  (*Id*. at 19.)  Thus, the decision as to which trigger to use rests

with the user.

Under the heading **AIR SUPPLY AND CONNECTIONS**, the N79WW Operation

Manual states:

> !WARNING : Always disconnect air supply: … 4.) When
> tool is not in use; 5.) When moving to a different work area,
> as accidental actuation may occur, possibly causing injury.

(*Id*. at 3, bates no. 016 Stan 000002.)   On page 8, additional warnings and instructions appear,

including the following:

> **IN ADDITION TO THE OTHER WARNINGS
> CONTAINED IN THIS MANUAL OBSERVE THE
> FOLLOWING FOR SAFE OPERATION**
>
> • **Use the BOSTITCH pneumatic nailer only for
> the purpose for which it was designed . . .**
> • **Always carry the tool by the handle.  Never carry
> the tool by the air hose . . .**
> • **Always be aware that misuse or improper handling
> of this tool can cause injury to yourself and others . . .**
> • **Never leave a tool unattended with the air hose
> attached . . .**

D.    BEIJAR KNEW HOW TO USE NAILERS PRIOR TO THE ACCIDENT AND
WAS AWARE OF SAFETY ISSUES AND CONCERNS

Beijar testified that he had used pneumatic nailers prior to working for Care Free and was

comfortable using them.  (Ex. 5, Beijar Dep. at 6-7, 9-10.)  He knew was important to follow

instructions, and that a nailer could be dangerous if safety instructions were not followed. (*Id*. at

9-10.)  He had read an Operator's Manual for a Bostitch nailer several months before the accident.  (*Id*. at 75.)  He testified that he understood what he had read in the manual.  (*Id*. at 75.)

Beijar knew that if a nailer was hooked to an air compressor, it could discharge a nail. (*Id*. at 24.)  He knew prior to the accident that if the trigger was compressed and the tip of the nailer contacted something hard, a nail would cycle. (*Id*. at 25.)  He knew that one safety warning was that the air hose should never be used to pull or drag the nailer. (*Id*. at 27-28.)  He knew there was a danger that if the air hose was pulled, it could result in the discharge of a nail from the nailer, causing an injury. (*Id*.)  He knew that pulling on a nailer's air hose was a misuse prior to joining Care Free.  He understood that the safe practice was to disconnect the nailer from the air hose when not in use. (*Id*. at 76.)  He knew prior to the accident that the air should be disconnected from the nailer prior to moving the nailer to a different work location, or when it was not in use, and that a nailer still connected to the air hose should not be left unattended (*id*. at 78-81), as it could potentially discharge a nail.  (*Id*. at 24.)  He testified that it was "common knowledge" that it was wrong to pick up tools via cords as he could either hurt himself or damage the tool, and he knew that prior to beginning work at Care Free. (*Id*. at 93-94.)  While he disputed the findings in the OSHA report prepared immediately after the accident, he agreed that if the accident had happened as described in that report (that a person had tugged on the air hose, pulling the nailer down and catching it), that would be a plain misuse of the nailer. (*Id*. at 109; Ex. 14, Citation and Notification of Penalty ("OSHA Report") issued June 22, 2001 at 2.)

E.    BEIJAR CANNOT PROVE ANY EVIDENCE OF A DEFECT

Despite the allegation in the Amended Complaint that the tool "spontaneously discharged," Beijar has failed to produce any evidence of a defect.  In fact, Beijar's deposition testimony and that of his expert, Igor Paul, reveals the nailer worked properly and as designed, and that it was not defective.  Beijar agreed that there is nothing wrong with a contact trip nailer

that activates after the tip is depressed and the trigger is then depressed. (Ex. 5, Beijar Dep. at 89.) Paul agreed that the nailer complies with all applicable ANSI industry standards, and he could not identify a single standard, regulation, law with which the nailer did not comply. (Ex. 6, Paul Dep., at 11-12.) When Paul tested this nailer in 2005, he found:

> My inspection and testing of the Bostitch nailer … showed that although the accident nailer was well used, the "contact trip" firing mechanism operated as designed and intended over the full range of air supply pressure and the "trigger" had to be physically depressed to allow the nailer to fire a nail. A nail could be fired by holding down the trigger and impacting the "contact tip," or a nail could be fired if the trigger was even instantaneously touched or hit while the "contact tip" was [sic] Drop tests producing dynamic impacts to the "contact tip" significantly exceeding those that could have been produced when it hit Mr. Beijar's chest, showed that the nailer would not fire a nail unless the trigger was depressed when the impact occurred. This was also confirmed by an analysis of the dynamic forces produced on the pneumatic head valve (which releases the nailing piston) when the tool is impacted on the nailing tip…

(Ex. 7, Paul Rpt., at 3; see also Ex. 6, Paul Dep., at 15-18, concluding that the nailer operated as designed.)

F.    THE NAILER WORKED PROPERLY ON THE DATE OF THE ACCIDENT, AND AFTERWARDS, FOR CARE FREE

Pinard, the foreman of the Care Free crew, testified that he used the nailer the morning of the accident, and that it worked properly. (Ex. 1, Pinard Dep. at 13-14.) He testified that Bostitch nailers are "beautiful guns … great nailers, work the best." (*Id*. at 16.) Following the accident, Care Free pulled the nailer from use for six to eight months. It was not serviced or examined during that period. Care Free then resumed using it, and used it until notified of the lawsuit in the spring of 2004. From the time it was put back into service in mid- to late-2001, to 2004, Care Free personnel used the nailer virtually every day, without any problems. (*Id*. at 17.)

G.    BEIJAR'S EXPERT, IGOR PAUL, CONSCIOUSLY DISREGARDS AND DISCARDS BEIJAR'S OWN TESTIMONY

Beijar did not use the nailer prior to the accident, as he was working at the site as a laborer. (*Id*. at 44.) Beijar testified that the accident occurred as he was walking by the plank on some staging on which the nailer had been placed. (Ex. 5, Beijar Dep. at 36.) The staging was high enough, perhaps ten feet off the ground, that he could not touch it from the ground. (*Id*. at 63.) He testified he heard someone yell "look out!" (*Id*. at 36.) He first looked to his left, then his right, and he suddenly found the nailer swinging down at him from the plank. (*Id*. at 36, 60-61.) According to Beijar's sketch of the plank and nailer, the nailer was not located at the far end of the plank, but more toward the middle of the plank. (Ex. 15, Beijar Dep. Ex. No. 3.)

Beijar testified that in an effort to ward off the nailer, he touched the hose with his right hand, about 18"-24" above the nailer itself. (Ex. 5, Beijar Dep. at 37.) His left hand remained at his side. (*Id*.) When he first saw the nailer, the trigger was level with his eyes. (*Id*. at 40.) It was within 12" of him, with the tip pointing down. He claims that he never touched the nailer prior to impact, only the air hose. (*Id*. at 41-42, 73.)

Paul completely and deliberately disregards Beijar's account of the accident. (Ex. 7, Paul Rpt. at 3; Ex. 6, Paul Dep. at 33.) Paul claims that as the nailer descended, it contacted Beijar's right arm. More specifically, he claims that the trigger hit Beijar's right arm "probably near the elbow." (Ex. 7, Paul Rpt. at 3; Ex. 6, Paul Dep. at 35-36.) This directly contradicts Beijar's deposition testimony: Beijar clearly stated that his arm was "up and out to the right" as the nailer was descending. (Ex. 5, Beijar Dep. at 61.) Paul further claims that Beijar's right arm kept the trigger depressed as the "contact tip" compressed against his chest. (Ex. 7, Paul Rpt. at 3; Ex. 6, Paul Dep. at 36.) This factual assertion is impossible, as it directly contradicts Beijar's emphatic testimony, offered twice, that he never contacted the nailer prior to its impact against his chest (ex. 5, Beijar Dep. at 41-42, 73), as well as his testimony that his right arm was "up and out to

the right." (*Id.* at 61.)  Paul bases his findings, which contradict all accounts of the incident, on

"the laws of physics and where the nail entered [Beijar's] chest."  (Ex. 6, Paul Dep. at 33.)  Paul

stated, without any basis from an eyewitness, that when Beijar repeatedly denied touching the

nailer before it hit his chest, that it was only Beijar's "perception" that he did not touch it with

his right arm as the nailer descended.  In effect, Paul testified that the accident scenario involved

the nailer falling towards Beijar, Beijar grabbed the nailer by the air hose, bent his arm so that as

the nailer came toward him, his elbow not only touched the trigger but remained on the trigger

until the contact tip hit Beijar's sternum.  (*Id.* at 51.)  This acrobatic feat is completely unrelated

to any eyewitness testimony, including Beijar's.

## H.     BEIJAR'S EXPERT, IGOR PAUL, IGNORES THE INCONVENIENT TESTIMONY OF THE THREE CARE FREE EYEWITNESSES

The three other Care Free workers on site at the time of the accident contradict Beijar's

account of the accident.  They all state that Beijar caused the accident himself by pulling the

nailer down by the air hose from the plank with his left hand, catching it and cradling it with his

right hand, which contacted the trigger as the nailer came toward his body, discharging a nail as

the contact tip hit his chest.  The Care Free foreman, Pinard, witnessed the accident.  He had

instructed Beijar to move the nailer from the plank, as it was leaning over the edge and was

being jostled as several workers laid long wooden rafters up against the plank for use on the

home.  (Ex. 1, Pinard Dep. at 34-35.)  Pinard testified that Beijar attempted to reach up to push

the nailer back further onto the plank, but was not tall enough. (*Id.* at 36-37.)  Pinard reported

that the nailer was on the middle of the plank, with the air hose running underneath the middle of

the plank.  (Ex. 16, Pinard Dep. Ex. Nos. 3-5.)  Pinard stated that Beijar could have pushed the

nailer further in by using a rafter, or by using an available six-foot stepladder to climb up.  (Ex.

1, Pinard Dep. at 36-37.)  Instead, Pinard observed Beijar pull on the nailer with his left hand,

causing the nailer to fall off of the plank sideways.  (*Id.* at 38.)  The nailer fell a distance of four

or five feet, and Beijar caught it like a football. (*Id.* at 39.)  Pinard observed Beijar to grab the nailer by the handle with his thumb on the trigger. (*Id.* at 40.)  Pinard could not determine whether Beijar's thumb hit the trigger before or after the contact tip hit Beijar's chest. (*Id.* at 41.) Although Pinard was facing Beijar's back, he was able to see the nailer and trigger clearly. (*Id.* at 47.)

The two other Care Free workers on the job site that day corroborated Pinard's deposition testimony in their written statements.  David Santos stated that Care Free workers, including Beijar, were leaning rafters against the staging plank.  When Beijar leaned a rafter against the plank,

> he started to knock the gun off and Wayne [Pinard] the foreman
> asked him to move the gun back on the plank so it didn't fall.  He
> then pulled on the hose and when he did, the gun fell landing into
> his hand while pulling the gun towards his chest while depressing
> the trigger and the gun fired a 3½ inch spike into his chest.

(Ex. 2, Santos Stmt.)  The fourth Care Free worker present that day, Ryan Cordeiro, prepared a handwritten statement that stated:

> We were standing up rafters and laying them up against the wall.
> Wayne asking [sic] him [Beijar] to move the the [sic] gun off of
> the plank.  John [sic] then pulled the air hose from the gun.  When
> he did that the gun fell off the plank he then caught the gun by the
> handle as he did that the gun went off as it hit his chest.

(Ex. 3, Cordeiro Stmt.)

As noted above, Paul rejects the sworn deposition testimony and the statements of the three witnesses present at the time of the accident.  There is no basis in this testimony for a finding that Beijar hit the nailer with his right arm or elbow to depress the trigger, as Paul claims. (Ex. 7, Paul Rpt. at 3; see Ex. 6, Paul Dep. at 36, acknowledging that there is no eyewitness source for the conclusion that Beijar's elbow hit the trigger.)  Paul testified that "this accident happened differently from either what Mr. Beijar says or what the two [sic] eyewitnesses say.

The reasons for that are essentially the laws of physics and where the nail entered [Beijar's] chest." (Ex. 6, Paul Dep. at 33.) Paul took other liberties with the facts. First, he tried to posit that the nailer must have gotten caught on a bracket supporting the plank (ex. 6, Paul Dep. at 40, 44-45, and ex. 17, sketches of nailer superimposed over photographs of scaffold, part of Paul Dep. Ex. No. 3), but his unfounded speculation is flatly contradicted by Pinard's testimony and sketches (ex. 16) and Beijar's own sketch (ex. 15). Then, Paul attempts to create the impression that Beijar inadvertently stepped on the air hose while walking by it, causing the nailer to fall. (Ex. 6, Paul Dep. at 46.) Paul was forced to admit, however, that there is no basis in any eyewitness testimony that this scenario occurred. (*Id*. at 46.)

I.    THE ACCOUNT OF THE ACCIDENT PROVIDED BY BEIJAR'S EXPERT, IGOR PAUL, IS BASED UPON CONJECTURE AND IS UNRELIABLE

Paul admits that the hypotheses he offers are inconsistent with the deposition testimony of Beijar, Beijar's post-accident statements, Pinard's deposition testimony, and the witness statements of the two other Care Free eyewitnesses. He acknowledges that none of the scenarios he offers – that Beijar's elbow contacted the trigger all the way to his chest, or that Beijar stepped on an air hose – are supported by any testimony whatsoever. (*Id*. at 33, 46.)

J.    NO MANUFACTURING DEFECT HAS BEEN IDENTIFIED FOLLOWING THE ACCIDENT

Pinard put the nailer back into service six to eight months after the accident and never had any problem with it until the parties to this litigation took the nailer in 2004. (Ex. 1, Pinard Dep. at 17.) Paul himself admits that there is nothing wrong with the nailer, that it works properly and as designed, and that it conforms to all applicable industry standards. (Ex. 7, Paul Rpt. at 3; Ex. 6, Paul Dep. at 15-18.) Matthew Ponko, Senior Project Engineer at Stanley, performed a series of tests on the nailer on April 22, 2004. (See Ex. 18, Stanley Fastening Systems Engineering Laboratory Test Procedure, Instructions, and Work Request Form, Test

Lab No. 08815-00, Bates nos. 016 Stan 0000109 – 0000126.)  Stanley's testing concluded that despite physical external wear,

> There were no unintentional actuations or incidents produced.  The tool functioned as was intended by design.

(*Id.* at page 3, bates no. 016 Stan 0000111.)  Mr. Ponko confirmed this in his Expert Disclosure. (Ex. 12, Ponko Rpt. at 3.)   He further confirmed that the nailer conformed to all applicable industry standards and regulations.  (*Id*. at 3.)  Robert Olmstead, Stanley's former Chief Engineer and current consultant, also concluded that the nailer worked properly and as designed, and conformed to all applicable industry standards and regulations.  (Ex. 13, Olmstead Rpt. at 3.)

K.    BEIJAR'S LATE NOTICE OF HIS CLAIM HAS PREJUDICED STANLEY

Beijar did not notify Stanley of the accident at the time it happened.  Stanley propounded the following interrogatory to Beijar:

> Q. 23   Please state the basis for the contention in Paragraph 24 of your Complaint that "due notice" of "any and all breaches or [sic] warranty" was provided to Stanley, including in your answer:
>
> > a.    The nature of the "due notice;"
> > b.    By and to whom the "due notice" was provided; and
> > c.    The date(s) on which "due notice" was provided.
>
> A.    On January 21, 2004, my attorney wrote to Stanley Fastening Systems, L.P.'s General Partner detailing the February 1, 2001 incident, describing the nailer, and identifying my resulting injuries.

(Ex. 9, Beijar's Answer to Int. No. 23.)  Thus, Beijar waited nearly three full years to provide "due notice" to Stanley of the allegedly defective nailer.  Yet, it is clear that within days of the accident, Beijar was contemplating legal action against Stanley.  In an article published in the Cape Cod Times on February 7, 2001 – just six days after the accident – Beijar recounted the accident.  The article then went on to state:

> Beijar is considering legal action against the nail gun
> manufacturer, because the gun is supposed to discharge only when
> pressure is applied to the trigger and the nose of the gun.  But the
> gun discharged upon hitting his chest, with no pressure applied to
> the trigger, he [Beijar] said.

(Ex. 19, "Man shot in heart with nail gun leaves hospital after surgery," by Cynthia McCormick and Noelle Barton, Cape Cod Times, pages A-1, A-9, February 7, 2001.)  Stanley was denied the opportunity to investigate the matter for over three years, despite Beijar's clear intention following the accident to file suit.

II.    **ARGUMENT**

A.    STANDARDS

Summary judgment is designed "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (*quoting Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)).   In cases such as this one where the moving party does not have the burden of proof at trial, that party nevertheless must offer sufficient evidence to support its motion.  *Celotex,* 477 U.S. at 325. Once the moving party has satisfied its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue.  *Id.* at 324.   The Court must view the entire record in the light most favorable to the nonmoving party and indulge all reasonable inferences in that party's favor.  *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993).  Because this case is before this court on diversity jurisdiction, and the parties' actions or inactions occurred in Massachusetts, Massachusetts law applies.  *Cipollone*, 202 F.3d at 378.

B.    PAUL'S OPINIONS, WHICH DISMISS BEIJAR'S TESTIMONY IN FAVOR
        OF CONJECTURE AND HYPOTHOSIS, ARE NEITHER RELEVANT NOR
        RELIABLE AND SHOULD BE EXCLUDED

Paul's proposed expert testimony does not conform to any of the admissible evidence. (Ex. 6, Paul Dep. at 28-29, 33, 35-36, 44-45.)  As Paul's opinion does not make the sequence of

events claimed by Beijar any more likely and cannot demonstrate that a differently designed

nailer would have prevented the accident, it lacks probative value and is inadmissible.

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho*

*Tire*, 526 U.S. at 157 (citing *G.E. v. Joiner*, 522 U.S. 136, 146 (1997)).  Thus, Paul's testimony

fails the test for the admissibility of expert testimony, and he should not be permitted to testify.

1.    Expert Testimony is Neither Relevant Nor Reliable if it is Based Upon
       Conjecture or Assumptions That Have No Support in Admissible
       Evidence

The court, as the "gatekeeper" of expert testimony, must ensure that the expert's opinion

has "a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at

592.  The reliability standards governing the admissibility of expert testimony apply to all expert

testimony, even that based upon personal observations and experience.  *Kumho Tire*, 526 U.S. at

147-49  (no distinction should be made for evaluation of expert testimony based upon "scientific

knowledge" or "technical knowledge" or "skill- or experienced-based observation").

As "gatekeeper," the trial judge must determine whether reliability exists through "a

preliminary assessment [1] of whether the reasoning or methodology underlying the testimony is

scientifically valid and [2] of whether that reasoning or methodology properly can be applied to

the facts in issue." *Daubert*, 509 U.S. at 592-93.  This two-pronged assessment of reliability

examines not only methodological validity, but also whether particular reasoning or methods

properly can be applied to the facts in issue, an analysis of relevance or "fit."  *Id.* at 591.  This

"'[f]it' is not always obvious, and scientific validity for one purpose is not necessarily scientific

validity for other unrelated purposes."  *Id.* (testimony about phases of the moon would "fit" a

case involving visibility at night, but not one involving a person's rationality).  Consequently,

not only must experts establish the methodological validity of their opinions but also they must

14

establish that their opinions can reasonably be applied (1) to facts observed by the expert, (2) to evidence already in the record, (3) evidence to be admitted which the witness is asked to assume to be true, or (4) to facts or data not in evidence, provided the facts or date are independently admissible and constitute a permissible basis for an expert to consider in formulating an opinion. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591-92.

Thus, the "gatekeeper" must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is … valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. When an expert opines as to what caused a particular incident without an attempt to apply the particular admissible facts at issue, the statement is one of pure conjecture and is "sheer *ipse dixit*," insufficient as a matter of law to establish that the actions of the defendant caused injuries to the plaintiff. *See Cipollone*, 202 F.3d at 378. An expert opinion as to how the accident might have happened does not relieve the plaintiff of the burden of showing that a defect attributable to the manufacturer caused the injury. *Id.* at 380. The goal of expert witness testimony, to assist the trier of fact in determining a fact in issue or in understanding the evidence, is not advanced by an expert opinion that rests upon conjecture and speculation.

2.    Paul's Opinion Assumes Facts Not In Evidence And Must Be Excluded

Courts properly reject expert testimony that assumes a state of facts not based on actual evidence. Rejecting the sequence of events identified by Beijar, and the contradictory testimony of the three Care Free workers, Paul instead offers unsubstantiated hypotheses of what he concludes must have happened. (Ex. 6, Paul Dep. at 35-36, 46.) He rejects what the lay witnesses say happened as impossible, yet offers nothing but speculation in its place. The First Circuit, in a similar case, excluded the plaintiff's expert testimony and granted summary

judgment on all counts to the defendant. In *Cipollone*, the plaintiff's expert attempted to testify

that the space between two guardrails was insufficient and dangerous. Specifically, the expert

attempted to testify that the space was too small for a person carrying something in his hand, as it

created a shearing hazard. *Id*. at 380. However, the plaintiff never offered a scintilla of evidence

that he was carrying anything in his hand at the time of his accident. *Id*. Because the expert

described a scenario that did not cause the injury, and the plaintiff described an accident that did

not result from what the expert described, the expert's testimony was irrelevant and properly

excluded by the trial judge. *Id*. Paul's opinions, based on facts that according to the

eyewitnesses and plaintiff could not have happened, should be excluded for the same reason.

        3.      <u>Paul's Opinion Is Not Founded Upon Evidence Of Actual Conditions And</u>
                <u>Must Be Excluded</u>

        Paul disregards the actual conditions present here: the scenario of a falling nailer offered

by Beijar, and the scenario of the grabbing of the air hose and the cradling catch of the nailer. In

another First Circuit case in which a plaintiff's expert "assumed" something happened, the

opinion was properly excluded. In *Bogosian v. Mercedes-Benz of North America, Inc.*, 104 F.3d

472 (1st Cir. 1996), the theory of defect was "false park detent," meaning that a person shifting

from drive to park would falsely believe the car was in park when in fact it was just short of it.

The plaintiff suffered an injury when the car rolled back over her foot after she thought she had

put it in park. *Id*. at 475. The plaintiff's expert "assumed" that the plaintiff had shifted the gear

selector rapidly. He stated that there could be no defect if the plaintiff had in fact observed the

selector lever in latched park. *Id*. at 479. The expert's opinion was rejected, as it did not rest

upon "a reliable factual and methodological foundation," on two grounds *Id*. First, the plaintiff

offered no evidence as to the speed at which she shifted the lever. "More importantly, Bogosian

repeatedly testified that she looked at the console shift before existing the vehicle and saw the

selector lever in latched park. She steadfastly maintained this position, even after prompting

from a generously worded question by her counsel on redirect examination." *Id.* This directly contradicted the expert's assumed facts. The Court noted, "[t]he district court appropriately found it very odd that Bogosian would present an expert witness who would testify that her own unwavering testimony was incorrect." *Id.* This is precisely the scenario that Beijar and Paul find themselves in. Beijar steadfastly maintains he did not touch the nailer with his right arm, and Paul just as strongly argues that he must have. Similarly, Paul's opinions directly contradict the other three eyewitnesses to the incident. Because Paul's "expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brook Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

C. SUMMARY JUDGMENT IS PROPER BECAUSE BEIJAR LACKS COMPETENT AND RELIABLE EXPERT TESTIMONY TO PROVE HIS CASE

Beijar cannot sustain his burden of proof in this product liability action on either defective design or causation because he lacks the competent and reliable expert testimony that is required to prove his case. In cases such as this involving allegations of the defective design or manufacture of a product, competent expert testimony is required. *See Cipollone*, 202 F.3d at 379 (*citing Enrich v. Windmere Corp.*, 416 Mass. 83, 87 (1993) ("The presence of such a defect [that some defect in the fan caused the fire or that, if such a defect existed, it was present at the time the fan was sold] cannot be inferred in the absence of expert testimony.")

1. Summary Judgment Must Enter On The Second And Third Causes of Action (Breaches of Warranty)

To succeed on a breach of warranty claim, the plaintiff must "prove a defect in the product or an unreasonably dangerous condition which existed at the time the product left the defendant's control." *Cipollone*, 202 F.3d at 379 (*citing Enrich*, 416 Mass. at 89). The opinion testimony offered by Paul, however, is neither competent nor reliable to meet Beijar's burden of

proof on the essential elements of his breach of warranty claims. Paul latches onto a scenario he thinks might help Beijar get to a jury and rejects other scenarios that would prove devastating to Beijar's case. He has no scientific or technical basis for choosing his own version of the accident over those offered by actual eyewitnesses. Such testimony, even for a professional witness, cannot sustain Beijar's burden of proof.

Paul's guesswork cannot substitute for a reliable application of a sound forensic methodology that would determine what actually happened and how the actual events would have been prevented with a differently designed tool. See *Kumho*, 526 U.S. at 151-52, 153-57 (no error to exclude engineering expert's opinion based upon general methodology which could not determine distance tire had traveled as applied to particular matter to which expert testimony had to be directly relevant.) Lacking competent and reliable expert testimony that fits the facts of this case, Beijar has no reasonable expectation of proving an essential element of his case to the satisfaction of a fair minded jury and summary judgment is warranted.

> 2.     Summary Judgment Must Enter On The Second and Third Causes of Action (Breach of Warranty) Because Stanley Was Prejudiced By Late Notice Of Beijar's Warranty Claims

Stanley is entitled to judgment on the warranty counts (the Second and Third Causes of Action) for another reason: Beijar failed to give notice of the claim to Stanley until almost **three full years** after the accident. Beijar's failure to give Stanley timely notice of the claim is yet another reason compelling judgment for Stanley as to the warranty counts. Mass. Gen. Laws c. 106 § 2-318. Under Massachusetts law, Beijar must have given reasonably prompt notice of his warranty claim to Stanley in order to maintain a cause of action for breach of warranty. Failure to provide notice of a breach of warranty claim may result in prejudice when evidence that reasonably could have been developed by prompt investigation has been lost. *Sacramona v.*

*Bridgestone/ Firestone, Inc.*, 106 F.3d 444, 448-49 (1st Cir. 1997); *Castro v. Stanley Works*, 864 F.2d 961 (1st Cir. 1989).

In *Sacramona*, the plaintiff's delay of nearly three years (precisely the same delay as in this case) was considered unreasonable. *Sacramona*, 106 F.3d at 449. Once that determination had been made, the First Circuit stated:

> And assuming an unreasonable delay in notice, the prejudice showing is relatively easy: it is enough that the delay may well have deprived the defense of useful evidence. No showing is required that lost evidence would inevitably have altered the outcome. *Castro*, 864 F.2d at 964. In short, the notice requirement has real teeth.

*Id*.

It is undisputed that Beijar never provided notice to Stanley of Beijar's accident or the fact that Beijar blamed the Stanley nailer for causing his injury until nearly three years had passed. Beijar admitted in his answer to interrogatory no. 23 that the first time he provided "due notice" of the accident was January 21, 2004 – the accident occurred on February 1, 2001. (Ex. 2, Answer no. 23.) Beijar has no reasonable excuse for failing to notify Stanley promptly, as it is clear that by February 7, 2001, the date an article ran on page 1 of the Cape Cod Times, that "Beijar [was] considering legal action against the nail gun manufacturer." (Ex. 19.)

Beijar's failure to promptly notify Stanley deprived Stanley of useful evidence, such as the opportunity to conduct a prompt investigation, and most critically, denied Stanley the opportunity to locate and examine the nailer that allegedly caused the plaintiff's injury. As noted above, Beijar cannot positively identify the nailer involved in the accident. (Ex. 5, Beijar Dep. at 38-39.) Accordingly, Beijar's warranty claims are barred, and Beijar's breach of warranty claims must be dismissed. *Sacramona*, 106 F.3d at 448-49; *Castro*, 864 F.2d at 963-64.

 3.    Summary Judgment Must Enter On The Plaintiff's First Cause of Action
       (Negligence)

Because judgment must enter on Stanley's behalf on the warranty claims, summary

judgment is justified on Beijar's first cause of action for negligence against Stanley. *Cipollone*,

202 F.3d at 379, n.3 (*citing Hayes v. Ariens Co.*, 391 Mass. 407, 462 N.E.2d 273, 275 (Mass.

1984) ("A defendant in a products liability case in this Commonwealth may be found to have

breached its warranty of merchantability without having been negligent, but he reverse is not

true.  A defendant cannot be found to have been negligent without having breached the warranty

of merchantability.")).

 4.    Stanley Is Entitled To Summary Judgment On The Plaintiff's Fourth
       Through Sixth Causes of Action (M.G.L. ch. 93A)

As Beijar's breach of warranty and negligence claims cannot survive, Stanley is entitled

to summary judgment on his claims brought pursuant to M.G.L. ch. 93A.  *See, e.g., Cipollone*,

202 F.3d at 378 n.1.

III.    **CONCLUSION**

For the reasons set forth above and in its Motion, Affidavit and Statement, Stanley

respectfully requests that judgment be entered in its favor on all counts of Beijar's Amended

Complaint pursuant to Federal Rule of Civil Procedure 56.

 Respectfully submitted,

 Stanley Fastening Systems, L.P.
 By its Attorneys,

 */s/ Christopher A. Duggan*
 Christopher A. Duggan, BBO No. 544150
 David G. Braithwaite, BBO No. 634013
 Smith & Duggan LLP
 Lincoln North
 55 Old Bedford Road
 Lincoln, MA  01773
 (617) 228-4400

Dated:  October 21, 2005

CERTIFICATE OF SERVICE

    The undersigned certifies service of the foregoing on October 21, 2005 in accordance with Federal Rule of Civil Procedure 5(b)(2) and United States District Court for the District of Massachusetts Electronic Case Filing Administrative Procedure § E(2) as to all parties, having appeared in this action through counsel admitted to practice before this Court, identified by the Clerk as receiving Notice of Electronic Filing.

*Counsel for Defendant Stanley Fastening Systems, L.P.*

                                        */s/ David G. Braithwaite*
                                        David G. Braithwaite
                                        BBO #634013