# EXHIBIT 5

# ORIGINAL

PAGES 1 - 113

EXHS. 1 - 11

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Jonathan Beijar    \*

v.         \*  Civil Action

Stanley Fastening Systems, \* No. 04-10233-RCL

L.P.        \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Deposition of Jonathan Beijar

Tuesday, April 27, 2004

Smith & Duggan LLP

Lincoln North - 3rd Floor

55 Old Bedford Road

Lincoln, Massachusetts 01773

---------- *J. EDWARD VARALLO, RMR, CRR* -----------

*COURT REPORTER*

*FARMER ARSENAULT BROCK LLC, BOSTON, MASS.*

*617.728.4404*

Jonathan Beijar                                6

1     A.     Yes.

2     Q.     Would that have been in December of 2000?

3     A.     I really can't remember, but it sounds

4  about right, yes.

5     Q.     Prior to becoming employed with Care Free

6  Homes, had you used pneumatic tools?

7     A.     Yes.

8     Q.     In what capacity?

9     A.     I built a couple of additions with my

10  stepfather and have used his nail guns before.

11     Q.     And where was that?

12     A.     In Rochester.

13     Q.     Rochester, Massachusetts, or Rochester,

14  New York?

15     A.     Rochester, Massachusetts.

16     Q.     What is your stepfather's name?

17     A.     Timothy Westgate.

18     Q.     Where does he live?

19     A.     In Rochester.

20     Q.     Do you know the address?

21     A.     Yes.  It's 7 Randall Road.

22     Q.     Is that the location of the two additions

23  that you built?

24     A.     Yes.

Jonathan Beijar                    7

1    Q.    Could you describe for me the additions
2  you built?
3    A.    The one is, I guess you would say it would
4  be a bigger family room and then an extra bathroom
5  and bedroom.
6    Q.    And you used pneumatic nailers on that
7  project?
8    A.    Yes, sir.
9    Q.    What kind of pneumatic nailers, do you
10  know?
11    A.    I don't recall what kind.
12    Q.    Do you recall who manufactured them?
13    A.    No.
14    Q.    You don't know if they were Hitachi or
15  Stanley or DeWalt?
16    A.    No, I don't remember.
17    Q.    Had you used pneumatic tools on any other
18  occasion prior to becoming employed by Care Free
19  Homes?
20    A.    Yes.  I used them a couple of times with a
21  friend that redid basements.
22    Q.    Who was that?
23    A.    His name was Jamie.  I'm not sure of his
24  last name.  He was just someone that my wife at the

Jonathan Beijar                                    9

1    in the basement job?

2         A.    A framing nailer.

3         Q.    Did you drive nails -- What size nails did

4    it drive?

5         A.    I believe it's three-inch.

6         Q.    And was the tool, the cartridge a stick or

7    a cylinder?

8         A.    I don't understand.

9         Q.    How did it blow the nails?  Was it in a

10   stick form, straight --

11        A.    Yes.

12        Q.    -- or was it in a cartridge, round?

13        A.    It was straight.

14        Q.    Was it a Stanley tool?

15        A.    I can't remember.  I don't -- I didn't

16   really pay attention then.

17        Q.    Did you use pneumatic nailers on any other

18   projects before going to work for Care Free Homes in

19   December of 2000?

20        A.    I'm sure I have.  But to remember, I can't

21   really think of any other times.

22        Q.    Would it be fair to say that prior to

23   coming to work for Care Free Homes you were fairly

24   comfortable using pneumatic tools?

Jonathan Beijar                                    10

1       A.      Yes.

2       Q.      And you understood how they worked?

3       A.      Yes.

4       Q.      And you understood the purpose of a

5   pneumatic nailer?

6       A.      Yes.

7       Q.      Would it also be fair to say you

8   understood that if they were not used properly, they

9   could create a danger?

10      A.      Correct.

11      Q.      So it's important to read the instructions

12  and the safety manual and follow them?

13      A.      Correct.

14      Q.      Because if you don't, you could get hurt

15  even if the tool is perfect.  Right?

16      A.      Correct.

17      Q.      And that's something you knew back in

18  December of of 2000 and January of 2001?

19      A.      Yes.

20      Q.      Did you receive any training on pneumatic

21  tools with Care Free Homes?

22      A.      No.

23      Q.      Can you tell me a little bit about your

24  educational background, please?

Jonathan Beijar                              24

1        A.      Correct.  The nailer is connected to a

2   hose which is connected to a compressor, yes.

3        Q.      And that's where the power comes from to

4   drive the nail, from the compressor?

5        A.      Yes, the air, yes.

6        Q.      And as long as that compressor is

7   connected to the tool, it is possible to drive a

8   nail under the right set of circumstances.  Right?

9        A.      I believe so, yes.

10        Q.      And you knew that it would be possible for

11   a nail to be driven by a pneumatic nailer as long as

12   it was connected to that compressor even if you

13   didn't intend to drive a nail if the tool wasn't

14   properly handled.  Right?

15        A.      I don't understand what you mean.

16        Q.      Bad question.  I don't blame you.

17             You knew, did you not, that the purpose of

18   the pneumatic nailer was to make it easier to drive

19   nails into wood?

20        A.      Yes.

21        Q.      And to make it faster for the carpenter to

22   drive nails?

23        A.      Yes.

24        Q.      And you knew that the tool operates by

*FARMER ARSENAULT BROCK LLC*
*617.728.4404*

Jonathan Beijar                    25

1    compressing the tip of the tool against something

2    hard and pulling the trigger.  Right?

3         A.    Yes.

4         Q.    And that will cause a ram to cycle and

5    push the nail into the wood.  Right?

6         A.    Yes.

7         Q.    And you knew also that if you had your

8    finger on the trigger and then touched the trip

9    against something hard, that would also cause the

10   tool to cycle?

11        A.    Yes.

12        Q.    That's something that carpenters

13   particularly like.  Right?

14        A.    I've seen people do it before, yes.

15        Q.    They like to bump-fire?

16        A.    Yes.

17        Q.    By keeping their finger on the trigger and

18   bumping down, particularly when you're framing or

19   you're putting up sheetrock or something?

20        A.    Yes, I've seen people do it before, yes.

21        Q.    And the tool obviously can't tell the

22   difference between a piece of wood and your body,

23   can it?

24             MS. DAVIS:   Objection.

Jonathan Beijar                            27

1   Right?

2       A.    Yes.

3       Q.    Okay.  Now, one of the instructions, I

4   take it, that you knew was not to pull the tool by

5   the airhose.  Right?

6       A.    Yes.  But I never pulled a nailer by the

7   hose.

8       Q.    I understand that.  But you knew you were

9   not supposed to pull the tool by the airhose,

10  particularly while it was connected to the

11  compressor.  Right?

12      A.    Yes, sir.  And I never did.

13      Q.    And you wouldn't do that, would you?

14      A.    No.

15      Q.    Because if you did, it might swing and hit

16  you and hurt you.  Right?

17      A.    Well, you're not supposed to pull anything

18  by its cord.

19      Q.    Sure.  And particularly the reason you

20  don't want to pull a pneumatic tool like the nailer

21  by the airhose while it is under compression is that

22  it might go off.  Right?

23      A.    I guess.

24      Q.    And it might cause you serious injury.

Jonathan Beijar                              28

1    Right?

2         A.    I guess so.

3         Q.    And that's one of the reasons why you

4    would never pull a tool by the airhose, would you?

5         A.    I never did.

6         Q.    Right.  And you wouldn't do it, would you?

7         A.    No.

8         Q.    And you knew that prior to January of

9    2001, didn't you?

10        A.    Yeah.

11        Q.    All right.  Because to do something like

12   that would be to misuse this tool, wouldn't it?

13        A.    Yes.

14        Q.    To use the tool in a way it was never

15   intended to be used.  Isn't that true?

16              MS. DAVIS:  Objection.

17        A.    Yes.

18        Q.    Did you read the operator's manual before

19   you started using the tools that were on the

20   jobsite?

21        A.    No.

22        Q.    Were you given the opportunity to do so?

23        A.    No.

24        Q.    Did you ask to do so?

Jonathan Beijar                              30

1    Q.    All right.  So that's why I'm calling it a

2    pneumatic tool or a nailer, because it's not

3    technically a gun.  Okay?  Just so we understand

4    we're talking about the same tool.  Right?

5    A.    Yes.

6    Q.    You say you understood prior to going to

7    work for Care Free Homes how to use a nailer.

8    A.    Yes.

9    Q.    And you understood how they operated?

10   A.    Yes.

11   Q.    What was your understanding?

12   A.    I know I just knew how to use them.

13   Q.    If you wanted to drive a nail, what would

14   you do?

15   A.    Well, you'd grab the nail gun, you would

16   have your finger on the trigger, you would push down

17   on I believe it's a foot depress, you push it down,

18   then you would pull the trigger.

19   Q.    When you say the foot depress, are you

20   talking about the trip at the end of the tool?

21   A.    I believe that's the name of it.  I don't

22   really know.

23   Q.    So if you had your finger pulled on the

24   trigger and then pushed the tip of the tool against

Jonathan Beijar                                    36

1      A.    Well, we were working on this one side of

2    the house.  We were cutting truss boards to finish

3    the roof off so we could put plywood on the top of

4    the roof because the roofers were there that day.

5    We were working on the side of the house.  I can't

6    remember most of the people's names that I was

7    working with.  I know there was a Wayne and there

8    was somebody else.  I just can't remember their

9    names.  One person was cutting boards and I was

10   bringing them over to the side and then putting them

11   up on the side of the house.

12            There was a lot of snow on the ground.

13   There was a big pile outside the window, because we

14   had shoveled the deck off.  I had walked around the

15   pile.  Someone said "Look out."  I thought it was

16   one of the boards that I had put up was coming back

17   down, so I turned around; and when I turned around

18   the opposite way, the nail gun was right in front of

19   me.  And just, that's basically all I can really

20   remember.

21      Q.    When you saw the nailer right in front of

22   you, did you put your hand up?

23      A.    Yes.  I tried to push it away.

24      Q.    You tried to deflect it?

Jonathan Beijar                                    37

1       A.      Yes.

2       Q.      Did you hit it?

3       A.      I touched the hose about a foot and a

4    half, two feet from where it connects to the nail

5    gun.

6       Q.      Did you hit any other part of the tool?

7       A.      No.

8       Q.      How do you know you didn't hit the

9    trigger?

10      A.      Because I know my left hand was down to my

11   side and my right hand had gone up and touched the

12   hose.

13      Q.      But as the tool was coming towards you,

14   you put your right hand up to deflect the tool.  Is

15   that right?

16      A.      Yes.

17      Q.      As you put your right hand up -- And the

18   tool was moving towards you.  Is that right?  Do I

19   have this right?

20      A.      It was right in front of me.

21      Q.      But it was moving towards you.  Correct?

22      A.      Correct.

23      Q.      As it was moving towards you and you put

24   your right hand up to deflect it and you hit the

Jonathan Beijar                                      38

1    hose, the hose was actually behind where the trigger

2    was, wasn't it?

3         A.    I don't recall.

4         Q.    Do you recognize what we have here?

5         A.    It's a nail gun.

6         Q.    Do you know if this is the tool that you

7    used on the day --

8         A.    I couldn't tell you if that's the one.

9    I haven't seen it since the day of the accident, so

10   I'm not even sure if they supplied the same nail gun

11   that hit me in the chest.

12        Q.    You don't know whether the tool that we

13   have here that I will now mark as Exhibit 2 is the

14   tool that injured you or not.  Is that true?

15        A.    I'm not sure.

16        Q.    Does it look the same?

17        A.    It looks similar.

18        Q.    Does it look different in any way?

19        A.    I know the nail gun that we were using was

20   fairly new.  This doesn't look fairly new.  It looks

21   like it's been worked on.

22        Q.    Yeah, this one's been through some wars,

23   hasn't it?

24              Any other way this looks different?

Jonathan Beijar                                    39

1      A.      Not that I know of.  It looks like a

2  regular nailer.  I'm not sure if it's the same one

3  or the same size, but it looks about the same.

4      Q.      Was the nailer that you saw in front of

5  you a stick nailer like this one, a stick cartridge?

6      A.      I believe so, yes.

7      Q.      And they look to be about the same size?

8      A.      Yes, about the same size.

9      Q.      Now, as the tool was coming toward you,

10  was it upright like this so that the tip of the tool

11  was on top, or was it down like this so that the tip

12  of the tool was towards the ground?

13      A.      When it fell and it hit me, it was facing

14  -- Could I see it?

15      Q.      Please.

16      A.      It was facing like this.  This is right

17  around where I saw it and I put my hand up to grab

18  it.  It was right around here.  It was basically

19  right in my face, but the foot depress was pointing

20  down.

21      Q.      The tip of the tool was pointing -- Oh,

22  okay.  Could you stand up for just a minute so I can

23  describe this?

24      A.      Yes.

Jonathan Beijar                    40

1      Q.    You have the tool now, Exhibit 2, in your

2  right hand.  Correct?

3      A.    Yes.

4      Q.    And you've got the tip of the tool

5  pointing down towards your sternum at about a

6  30-degree angle from your body.  Would that be

7  correct?

8      A.    I'm not exactly sure what angle it was at

9  but it was coming down this way.

10     Q.    With the tip pointed towards the ground?

11     A.    Correct.

12     Q.    And the back of the tool up towards your

13  head?

14     A.    Yes.

15     Q.    And then the cartridge went from the tip

16  off to the right at an angle of some sort.  Correct?

17     A.    Correct.

18     Q.    And the trigger is right in front of your

19  eyes?

20     A.    Correct.

21     Q.    And that was where it was when you saw the

22  tool.  Right?

23     A.    I'm sorry?  I don't know what you mean.

24     Q.    You've just described for me the position

Jonathan Beijar                                    41

1    of the tool when you first saw it on the day of your

2    accident.   True?

3         A.    Yes.

4         Q.    And how far was it away from you?

5         A.    I don't know.  It was right about here.

6    I'm not really sure of how close it was.  I mean, I

7    looked to my left and when I looked back to my

8    right, it was right here, right around eye level.

9         Q.    Right around eye level and within twelve

10   inches of you?

11        A.    Yes.

12        Q.    Pointing down?

13        A.    Pointing down.

14        Q.    And moving towards you?

15        A.    Yes.

16        Q.    And you put your right arm up?

17        A.    Yes.

18        Q.    What part of the tool did you hit with

19   your right arm?

20        A.    I didn't touch the tool, I touched the

21   airhose.

22        Q.    How do you know that you didn't brush the

23   trigger on the way by?

24        A.    I don't see how I could have when my left

Jonathan Beijar                    42

1    hand was down here and as soon as I turned to my

2    right, my right hand went up.  I don't see how I

3    could have even came close to the trigger.

4        Q.    Are you saying that you don't see how you

5    could have touched the trigger?

6        A.    I know I didn't touch the trigger.

7        Q.    All right.  How do you know you didn't

8    touch the trigger?

9        A.    Because I never touched the trigger.  I

10   know I didn't.

11       Q.    Was anything in your hands at the time?

12       A.    No.

13       Q.    Who was nearby you?

14       A.    The fellow workers.  I don't know exactly

15   who was right there because I went into shock as

16   soon as it hit me.  I don't remember their names.

17   I don't know -- I know there was at least one person

18   close to me.  I don't know if he was watching or....

19   I couldn't tell you.

20       Q.    But you don't know who it was?

21       A.    No.  I don't remember their names.

22       Q.    And the tool hit you, I take it?

23       A.    Yes.

24       Q.    After the tool hit you, did you ever see

Jonathan Beijar                    45

1  nailers and....

2  Q.    Which nailer did you use?

3  A.    The framing nailer.

4  Q.    And you said you used it two or three

5  times?

6  A.    Yes, a couple of times, yes.

7  Q.    Did you have any problems with it?

8  A.    No.

9  Q.    Did it operate as you expected it to?

10  A.    Yes.

11  Q.    As far as you were concerned, was that a

12  reasonably safe tool?

13  A.    Yes.

14  Q.    And it had the trigger that you and I have

15  discussed?

16  A.    Yes.

17  Q.    Which you could either press it down and

18  pull or pull and press and it would cycle?

19  A.    I believe so.  I never really pulled the

20  trigger and....  I can't remember the term that you

21  used, but banging it to fire, I never did that.

22  Q.    Bump-fire, all right.  But the trigger

23  operated the same way, the tool operated the same

24  way?

Jonathan Beijar                          60

1      A.     As I looked to my left, I started to look

2  back to my right and that's when the nail gun was

3  right in front of me.

4      Q.     The nail gun was right in front of you.

5  Was your torso still facing the wall with the window

6  in it?

7      A.     I honestly can't remember.

8      Q.     You had turned to the right and the tool,

9  if I'm following this correctly, was pointing

10  basically up and down?

11      A.     Yes.

12      Q.     So that the tip of the tool was pointing

13  almost directly down?

14      A.     Yes.

15      Q.     And the black part of the tool was facing

16  the staging?

17      A.     Yes.

18      Q.     And it was connected to a hose.  Correct?

19      A.     Yes.

20      Q.     And you put your hand up to the right.

21  Correct?

22      A.     Yes.

23      Q.     With the trigger almost directly in front

24  of you.  Correct?

Jonathan Beijar                          61

1       A.      About, yes.

2       Q.      Almost right in front of your nose.

3   Right?

4       A.      Yes.

5       Q.      That's where you were and it was twelve

6   inches away from you about?

7       A.      I'm guessing.  I'd say.  I'm not really

8   sure how far away it was.

9       Q.      That's where it was when you described it

10  to me earlier, though.   Correct?

11      A.      Yes.

12      Q.      And you moved your right hand up to try to

13  deflect the tool?

14      A.      Out.

15      Q.      Out to the right?

16      A.      Not really up but more (indicating).

17      Q.      Out to the right?

18      A.      Yes, up and out to the right.

19      Q.      Didn't touch the tool at all.  Is that

20  your testimony?

21      A.      No.

22      Q.      So is that correct?

23      A.      Correct.

24      Q.      When the tool hit you, did you hear

Jonathan Beijar                              63

1      A.    Sure.  (Witness complied.)

2            MR. DUGGAN:  And we'll mark that as

3   Exhibit 3.

4            (Beijar Exhibit 3 marked for

5   identification.)

6   BY MR. DUGGAN:

7      Q.    A couple more questions about the scene.

8   How high up was the staging?

9      A.    I couldn't begin to tell you.  I'm not

10  sure.

11     Q.    Could you touch it if you put your hand

12  up?

13     A.    I don't believe so.  I can't remember.  I

14  know it was overhead.  But how high, I don't believe

15  that you could've grabbed it, the staging or the

16  planks, by hand.

17     Q.    Would that be more than ten feet high?

18  Would that be a fair estimate?

19     A.    I'd say so, yes.

20     Q.    Mr. Beijar, you were kind enough, you were

21  about to draw another diagram and I stopped you, and

22  I don't mean to interrupt you.  What was the other

23  diagram you were going to draw?

24     A.    I was just going to show you from looking

Jonathan Beijar                              73

1    happened.

2         Q.    As you put your right arm up, is it

3    possible that you touched the trigger?

4         A.    No.

5         Q.    Absolutely not?

6         A.    No.

7         Q.    Have you ever told anybody that you did?

8         A.    No.

9         Q.    If you touched the trigger, sir, and the

10   tip of the tool then hit you, that would have caused

11   the tool to cycle, wouldn't it?

12        A.    Maybe.  But I never touched the trigger.

13        Q.    I understand that.  But my question to you

14   is, because the tool was connected to a compressor

15   and it was moving toward you -- Right?

16        A.    Yes.

17        Q.    -- if you had touched the trigger and then

18   the tip of the tool hit you, that would have caused

19   it to cycle.  Right?

20             MS. DAVIS:  Objection.

21        A.    I'm sure it would have.

22        Q.    Alternatively, if the tool touched your

23   chest and you hit the trigger at the same time, that

24   would also cause the tool to cycle.  Right?

Jonathan Beijar                          75

1      A.      I have seen one, yes.

2      Q.      A Stanley operating manual?

3      A.      A Stanley one?

4      Q.      One of these, Bostitch.

5      A.      Yes.

6      Q.      Oh, you have?

7      A.      Yes.

8      Q.      Had you seen it before the accident?

9      A.      Yes, but not by Care Free.

10     Q.      Where did you see it?

11     A.      My stepfather had one.

12     Q.      And did you read it then?

13     A.      I went through it.  I didn't really read

14   the whole thing.

15     Q.      Did you understand what was said there?

16     A.      Yes.

17     Q.      On the nailer that you did see on the

18   project there were warnings.  This one is sort of

19   beat up, Exhibit 2.  But there's a warning here on

20   the stick.  Right?

21     A.      Mm-hmm.

22     Q.      Correct?

23     A.      Correct.

24     Q.      And there's another warning here that's

Jonathan Beijar                                        76

1    now been worn off.  Right?

2        A.    I believe so, yes.

3        Q.    And there's actually warnings or

4    instructions on the housing too.  Right?

5        A.    I believe so, yes, to the best of my

6    knowledge.

7        Q.    And the one that we do have that's still

8    here says to prevent serious injury from fasteners

9    and flying items, the first thing is read operation

10   manual.  Right?

11       A.    Yes.

12       Q.    And you would agree that's a pretty good

13   practice, to read the manual?

14       A.    Yes.

15       Q.    And also over here on the same warning and

16   instruction where it talks about to prevent serious

17   injury from fasteners and flying items, disconnect

18   air when cleaning a jam, servicing, or tool not in

19   use.  Right?

20       A.    Yes.

21       Q.    Would you agree that that's a pretty good,

22   safe practice?

23       A.    Yes.

24       Q.    That is a practice that was not followed

Jonathan Beijar                                    78

1      Q.    Even though you were asked to use the

2   nailers?

3      A.    Yes.

4      Q.    And the very first thing it says is

5   "Before operating this tool, all operators should

6   study the manual."  Right?

7      A.    Yes.

8      Q.    Would you agree that that's a good, safe

9   practice?

10     A.    Yes.

11     Q.    Is that something you had read in the

12  manual that your father-in-law showed you?

13     A.    Yes.  My stepfather.

14     Q.    I'm sorry, your stepfather, right.

15           And on the third page of the manual it

16  talks about the air supply connections and then it

17  says "Warning:  Always disconnect air supply before

18  making adjustments, when servicing the tool, when

19  cleaning a jam, or when the tool is not in use."

20  Right?

21     A.    Yes.

22     Q.    And also when moving to a different work

23  area.  Right?

24     A.    Yes.

Jonathan Beijar                                    79

1       Q.      "As accidental activation may occur,

2   possibly causing injury."  Right?

3       A.      Yes.

4       Q.      Is that something you agree with?

5       A.      Yes.

6       Q.      Something you knew before your accident?

7       A.      Yes, somewhat.

8       Q.      You knew if you were moving a tool from

9   one area to another, you should disconnect the

10  airhose?

11      A.      Well, not really.  We never really did.

12      Q.      You never did?

13      A.      Well, I never hardly used the nail gun.

14  I used it a couple of times.

15      Q.      But you knew that if the tool was to be

16  moved from one area of the jobsite to another, you

17  should disconnect the airhose so you don't

18  accidentally drive a nail.  Right?

19      A.      Yes.

20      Q.      And that's what it says.  Right?

21      A.      Yes.

22      Q.      It's pretty straightforward, isn't it?

23      A.      Yes.

24      Q.      And over on page 8 it has additional

Jonathan Beijar                            80

1    warnings:  "In addition to other warnings contained

2    in this manual, observe the following for safe

3    operation."  Right?  There's a list of things.

4         A.    Yes.

5         Q.    And one of them, the fourth bullet, is

6    "Always carry the tool by the handle; never carry

7    the tool by the airhose."

8         A.    Yes.

9         Q.    Is that something you knew prior to your

10   accident?

11        A.    Yes, sir.

12        Q.    And what's the purpose of not carrying the

13   tool by the airhose?

14        A.    I'm not really sure.

15        Q.    Do you think it might have something to do

16   with safety?

17             MS. DAVIS:  Objection.

18        A.    Possibly.

19        Q.    And you knew that if you carried the tool

20   by an airhose and it was activated, it might go off?

21             MS. DAVIS:  Objection.

22        A.    I never carried it by the airhose.

23        Q.    Why wouldn't you?

24        A.    I never carried it by the airhose.

Jonathan Beijar                          81

1      Q.    Right.   Because you know that that might

2  cause you injury if you did it that way.   Right?

3      A.    It's just not how we carried it.   I never

4  really thought of it, you know, causing an injury.

5      Q.    But you knew it would be improper to do

6  it, in any event?

7      A.    Yes.

8      Q.    It also says "Always be aware that misuse

9  and improper handling of this tool can cause injury

10 to yourself or others."   True?

11     A.    Yes.

12     Q.    And you knew that before the accident.

13 Right?

14     A.    Yes.

15     Q.    It also says "Never leave the tool

16 unattended with the airhose attached."   Right?

17     A.    Right.

18     Q.    And you knew that before the accident.

19 Correct?

20     A.    Correct.

21     Q.    And that was something that Care Free

22 Homes did not follow.   Isn't that true?

23     A.    Correct.

24     Q.    Those are pretty easy instructions to

Jonathan Beijar                                    89

1    what happened.

2        Q.    But in fact that's how you had used the

3    tool before, pressing the tip first and then pulling

4    the trigger?

5        A.    And then pulling the trigger, yes.

6        Q.    And as long as the tool is under

7    compression, hooked up to a compressor, that's going

8    to drive the tool, will it not?

9        A.    Yes.

10       Q.    And there's nothing wrong with a tool

11   acting in that way, is there?

12             MS. DAVIS:   Objection.

13       A.    To my knowledge, that nail gun, I'm not

14   sure.  I never used that nail gun that day.

15       Q.    Right.  But my question is, if the tool

16   activates after the tip is depressed and the trigger

17   is pulled, there's nothing wrong with the tool, is

18   there?

19       A.    I wouldn't -- I mean, to the best of my

20   knowledge, no.

21       Q.    That's the way it's supposed to operate.

22   Right?

23       A.    Yes.

24       Q.    Where do you think the OSHA investigator

Jonathan Beijar                          93

1    A.    Yes.

2    Q.    Have you ever seen that before?

3    A.    No.

4    Q.    This is dated about twelve days after your

5  accident.  Correct?  February 12.

6    A.    Yes.

7    Q.    It says "The use of hoses and/or cords to

8  move any power tool is not and never has been

9  allowed and is not proper procedure in moving any

10 power tool."  Did I read that properly?

11   A.    Correct.

12   Q.    Is that an accurate statement?

13   A.    What you just said?

14   Q.    No.  First of all, did I read it

15 correctly?

16   A.    Yes.

17   Q.    All right.  Is that and was that the

18 policy of Care Free Homes?

19   A.    They never really said anything to anyone.

20   Q.    Prior to your accident they didn't inform

21 you of this policy?

22   A.    No.  It's just common knowledge.

23   Q.    Why do you say that?

24   A.    I mean, you don't pick things up by their

Jonathan Beijar                    94

1    cords.

2        Q.    Why not?

3        A.    Because you can hurt yourself or someone

4    else or you can break the tool.

5        Q.    So even though you were not instructed in

6    that by Care Free Homes, you knew that prior to your

7    accident?

8        A.    Correct.

9            MR. DUGGAN:  Off the record.

10           (Discussion off the record.)

11   BY MR. DUGGAN:

12       Q.    Mr. Beijar, can you take me through a

13   chronology of your treatment?  Where did you go

14   first?

15       A.    From the worksite I went to Cape Cod, I

16   think it was Cape Cod Medical Center.

17       Q.    Is that in Hyannis?

18       A.    I believe so.  After that, as soon as I

19   got there they gave me pain meds and they put me

20   out.  And the only thing I know of is that I got

21   flown to Boston, I think at -- I think it was Boston

22   Medical Center.

23       Q.    How long were you in the hospital?

24       A.    A couple days.  I'm not exactly sure how

Jonathan Beijar                                109

1      Q.    As far as you're concerned anyway.

2      A.    As far as I'm concerned, no.

3      Q.    And if the accident happened as described

4   in that OSHA report, there'd be nothing wrong with

5   this tool either.  Isn't that true?

6          MS. DAVIS:  Objection.

7      A.    I believe so.  That report's not right.

8      Q.    I understand.  But if that report was

9   accurate, there would be nothing wrong with this

10  tool that caused the injury.  Isn't that true?

11         MS. DAVIS:  Objection.

12     A.    I don't know about if there was anything

13  wrong with the nail gun, but....

14     Q.    My question, though, is a little different

15  than that.  My question was:  If an accident

16  happened, maybe not yours, somebody else's accident

17  happened as described in Exhibit Number 10, the

18  narrative portion, that would not be the fault of

19  the tool, would it?

20         MS. DAVIS:  Objection.

21     A.    I believe not.  I'm not sure.

22     Q.    Well, even as you testified before, that

23  would be a plain misuse of the tool, wouldn't it?

24     A.    Oh, yes.

WITNESS:   Jonathan Beijar

DATE:      April 27, 2004

CASE:      Jonathan Beijar v. Stanley Fastening

           Systems, L.P.


## SIGNATURE INFORMATION FOR COUNSEL


The original signature page/errata sheet has been
sent to Jennifer L. Davis, Esq., to obtain signature
from the witness.  When signed, please send original
to Christopher A. Duggan, Esq., who will supply a
copy of the signed errata sheet to other counsel
present.


## WITNESS INSTRUCTIONS


After reading the transcript of your deposition,
please note any change or correction and the reason
for it on the errata sheet.  Do not make any
notations on the transcript itself.  Use additional
sheets if necessary.  Sign and date the errata sheet
and return it, along with the transcript, to your
counsel.

# EXHIBIT 6

Pag

Exhibits:  1 - 11        Volume 1, Pages 1 - 81

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-10233-RCL

-----------------------------

JONATHAN BEIJAR

Plaintiff

vs.

STANLEY FASTENING SYSTEMS, L.P.

Defendant

-----------------------------

VIDEOTAPED DEPOSITION OF IGOR PAUL

Tuesday, September 6, 2005, 10:35 a.m.

Smith & Duggan LLP

Lincoln North

55 Old Bedford Road

Lincoln, Massachusetts


------- Reporter:  David A. Arsenault, RPR -------

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  fax 617.728.4403

WITNESS>
Volume VOLUME> - DATETEXT>

Page 10

1 because they were having some problems with their
2 trigger mechanism, particularly their sequential
3 trigger mechanism. So I essentially solved their
4 problem with respect to that.
5        I think that's really the only hands-on
6 design experience that I have in terms of pneumatic
7 nailers or pneumatic drive-type tools. I've
8 consulted on various other pneumatic tools, but one
9 that essentially has a hammer blow or piston
10 pneumatic drive with the associated controls, that's
11 been limited to that.
12        I've had about a dozen cases over the
13 years which were on the legal side, essentially, as
14 a consultant involving accidents with pneumatic
15 nailers; and also some, in addition to that,
16 involving electric staplers and nailers.
17    Q. But you never designed ground up a
18 pneumatic nailer. Is that true?
19    A. Certainly not.
20    Q. Have you ever worked as an employee of
21 pneumatic nailers?
22    A. No, other than as a consultant.
23    Q. But I said as an employee.
24    A. No.

Page 11

1    Q. What standards, if any, were applicable to
2 the pneumatic nailer that is involved in the case
3 that we have here today?
4    A. Well, there's an ANSI standard, which is
5 also the ISANTA standard or something like that.
6 Frankly, I don't remember the number. I think it is
7 in my references. That's the only one that I really
8 know of and/or have looked at.
9    Q. Did you review applicable ANSI or ISANTA
10 standards in coming to evaluate the tool which has
11 come to you in this matter?
12    A. I didn't specifically review them because I
13 was familiar with what the standards were relative
14 to the control and triggering mechanisms and use of
15 the tools. So I did actually look at the latest
16 version but found nothing new in it. I didn't
17 really use it in coming to my conclusions.
18    Q. Would I be correct, and tell me if I'm not,
19 that the tool that you examined at the behest of
20 Mr. Lang and Ms. Davis for Mr. Beijar complies with
21 all the applicable ANSI standards?
22    A. Yes, I do agree.
23    Q. Are you aware of any standard, regulation,
24 law or anything of the sort, industry practice, that

Page 12

1 the tool, as you examined it, did not comply?
2    A. No.
3    Q. Do you have any timesheets for the work
4 that you put in in this case?
5    A. I don't think I have actual timesheets. I
6 have itemized bills, copies of itemized bills.
7    Q. Do we have them here with us?
8    A. Yes, they are in the active folder.
9    Q. I didn't have a chance to look through it.
10 If you could pull them out for me.
11    A. (Witness complies.)
12    Q. You've shown me two documents from your
13 active folder.
14    A. Yes.
15    Q. They are both letters to Mr. Lang, one
16 dated March 24 of 2005 and the other August 8, 200?
17    A. That's correct.
18    Q. Do these fairly and accurately summarize
19 all of the work that you have done to date?
20    A. Except for preparing for this deposition
21 and organizing the file, yes.
22    Q. All the work that you did in evaluating the
23 tool and coming to your opinions and conclusions are
24 accurately summarized on these two invoices, true?

Page 13

1    A. Yes. Except that I think I read
2 Mr. Edwards' deposition after that bill, after the
3 last bill. So I think there's another hour and a
4 half of reviewing materials after that last.
5        MR. DUGGAN: I will mark these two as
6 Exhibits 2 A and B.
7        (Marked, Exhibits 2 A and B, invoices.)
8    Q. Dr. Paul, just a couple of questions about
9 the bills. I notice the first entry you have is
10 through October '03?
11    A. Yes.
12    Q. And that's for one hour?
13    A. Yes.
14    Q. Do I understand correctly that up until
15 October of '03 you had done just one hour worth of
16 review on this matter; is that true?
17    A. That's correct.
18    Q. Had you come to any opinions or conclusions
19 related to the design of this tool before or up
20 through October of '03?
21    A. Not as far as -- the answer is no.
22    Q. Okay.
23    A. I think at that stage I didn't even know
24 what tool it was.

WITNESS>
Volume VOLUME> - DATETEXT>

Page 14

1    Q. Can you tell me what work you did between
2  November 1st of 2003 and January 31st of 2004, if
3  any?
4    A. January 2004.
5    Q. In other words, the three months between
6  November 1st, this date here (indicating), and
7  January 31 of 2004.
8    A. I'm not sure I did any.
9    Q. Okay.
10   A. I don't think I did any.
11   Q. So would it be fair to say that as of
12 January 31st, 2004 you still did not have an opinion
13 as to whether or not this tool was reasonably safe,
14 properly designed or otherwise, true?
15   A. Okay, let me just look at what
16 correspondence I had at that stage.
17   Q. Sure.
18   A. As of January 1, 2004, no.
19   Q. January 31, 2004.
20   A. 31, 2004, not that I can recall.
21   Q. You hadn't come to any opinion as to the
22 design sufficiency of this tool as of that date,
23 true?
24   A. That's right, except I did, even before

Page 15

1  that, indicate to Mr. Lang that I don't think the
2  tool should have fired without touching the trigger,
3  any tool, any pneumatic nailer. So I had not
4  reviewed this particular tool. I think I still
5  didn't know what tool it was. This was based on the
6  OSHA report and a letter by Mr. Lang to me.
7    Q. And that's a letter that's in your file.
8    A. Yes.
9    Q. Your active file marked Exhibit 2?
10   A. Yes. So, you know, essentially at that
11 stage, that's where I was.
12   Q. Now, you've tested this tool, you've had it
13 in your possession and actually brought it with you
14 today?
15   A. Yes.
16   Q. And it is true, is it not, that this tool
17 will not drive a nail without both the tip of the
18 tool being depressed and the trigger being pulled?
19   A. Under the conditions of this accident, yes.
20   Q. So both of those things have to happen for
21 this tool to drive a nail, the tip has to be
22 depressed and the tool -- and the trigger has to be
23 pulled, true?
24   A. Yes, and the two have to overlap.

Page 16

1    Q. At the same time?
2    A. Yes. They don't have to happen at the same
3  time, but they have to overlap.
4    Q. All right. Did you try to make this tool
5  drive a nail without the trigger being depressed?
6    A. Yes.
7    Q. And you were unable to do that?
8    A. Yes.
9    Q. How did you try to do that?
10   A. Well, essentially three ways. One way I
11 was trying -- I changed the pressure. The inlet
12 pressure has an effect on the operation of both the
13 primary valve and the -- the trigger valve and the
14 hammer valve. So I went from 40 psi, shown in one
15 of those photographs, to 120 psi in steps of 20. I
16 essentially would depress the tip. And at one
17 point, after I tested, did the same tests on a
18 rental -- I had also rented an identical gun,
19 automatic nailer. After I had seen the scenario
20 from where the tool was falling and where it had
21 hit, I essentially said that a fall onto the tip
22 from a 2-foot height onto a 2-by-10 on a concrete
23 surface would provide a tip impact which would be
24 much more severe than you could possibly get from

Page 17

1  the impacting at the chest. So that's what I did.
2  I raised the tool 2 feet, dropped it on its tip. I
3  never got a misfire.
4    I mentioned three ways. The third way
5  is that I have the drawings of the pneumatic valves,
6  the triggering mechanisms in my file. Essentially,
7  impact firing of the tool would be due to component:
8  of the valves accelerating when the tool hits a
9  surface. Those components are essentially little
10 pistons that control the big piston. And when you
11 hit it on the tip, the impact accelerates the piston
12 in one direction. In the design that is on the
13 Bostitch nailer, pneumatic nailer, if you hit it on
14 its tip, the direction of acceleration on the
15 control components is opposite to that that will
16 cause essentially a misfire. Okay? The way this
17 tool is designed, if the impact occurs on the back
18 of the tool, that's what can cause an impact-related
19 misfire; if you drop it on the back of the tool, you
20 could possibly get a misfire without depressing the
21 trigger. And in fact, Stanley has a test procedure
22 for that, which they didn't do on this tool but they
23 do on other tools. So that's another reason why I
24 confirmed with the testing, but also just from basic

WITNESS>
Volume VOLUME> - DATETEXT>

Page 18

1   logic, physical principles, it wouldn't misfire
2   hitting on the tip.
3       Q. Okay. And that aspect of this design, by
4   the way, is entirely appropriate, is it not?
5       A. Sure.
6       Q. Do you have any notes, Doctor, of the
7   testing that you did in your file?
8       A. I do not; only the photographs.
9       Q. You didn't take any notes or measurements
10  or things like that?
11      A. No. If I had had a misfire, I would have.
12  Essentially, I found that it operated the way it was
13  supposed to operate, that it was designed to
14  operate. That was my conclusion.
15      Q. And when did you do your testing?
16      A. Well, it was between April 5 and April 10.
17  And I have a bill from the rental agency, but
18  apparently I don't have it on here.
19      Q. Okay.
20      A. I'd have to look it up. But it was in that
21  time period and it was over a period of two days.
22      Q. Am I correct in my mathematics that except
23  for the one hour you had or one and a half hours you
24  had reading the Edwards deposition, you had done

Page 20

1       Q. Have you ever worked with pneumatic nailers
2   building homes, woodworking or anything like that?
3       A. Yes, only on my two homes that I have
4   helped build.
5       Q. Which homes were they?
6       A. Well, one was in Andover, Massachusetts. I
7   forget the address, as I sit here. The one is the
8   one I live in now, five years ago.
9       Q. You actually did some of the construction
10  yourself?
11      A. Yes, quite a bit.
12      Q. What kind of pneumatic tools, pneumatic
13  nailers did you use?
14      A. Actually, the contractor had Hitachi tools.
15  I think he may have also had a Stanley tool. But at
16  the time I wasn't paying attention.
17      Q. Okay.
18      A. So, I'm not sure.
19      Q. Who is the contractor up in New Hampshire,
20  do you know?
21      A. Yes. That's horrible, because I still talk
22  to him. I'll have to get it to you.
23      Q. Would you do that?
24      A. Yes.

Page 19

1   seven hours' worth of work on this case, right?
2       A. Yes, it looks that way.
3       Q. How long did your testing take?
4       A. I would say a total of less than an hour,
5   but in between it wasn't -- I think in total it was
6   probably setting up and getting the rental tool and
7   so on, but the actually testing was less than an
8   hour.
9       Q. And you've done no other testing?
10      A. No.
11      Q. You said that you rented another, identical
12  tool?
13      A. Yes.
14      Q. What kind of tool was that?
15      A. Well, it was the same numbered tool, N79WW.
16      Q. Where did you rent that from?
17      A. From Ace Hardware store.
18      Q. Where?
19      A. In New London, New Hampshire. And I rented
20  a compressor from them.
21      Q. You don't have a compressor in your home or
22  workshop?
23      A. I have a compressor for blowing up tubes
24  and things, but not 120 psi.

Page 21

1       Q. The same contractor that built the house in
2   Andover?
3       A. No.
4       Q. You wouldn't remember that one, would you?
5       A. No. But I have all the building records.
6   I should -- I can get you that also.
7       Q. Do you remember if they used Stanley
8   pneumatic tools in that house?
9       A. I have no idea.
10      Q. So the Hitachis that you remember were on
11  the New Hampshire home?
12      A. Yes.
13      Q. Do you remember the models?
14      A. No.
15      Q. You actually used them yourself?
16      A. Yes.
17      Q. What did you do?
18      A. I did both framing and roofing.
19      Q. And when you were doing the roofing, did
20  you use it in a contact mode or sequential trip
21  mode?
22      A. Contact mode.
23      Q. When you did the framing, what mode did yo
24  have it in?

WITNESS>
Volume VOLUME> - DATETEXT>

Page 26

1    A. Not as I sit here, but I could probably
2    find out.
3    Q. If you would do that, I would appreciate
4    it.
5    A. Sure.
6    Q. Have you now told me, Doctor, all of your
7    experience with regard to the design or the
8    operation of pneumatic nailers?
9    A. Yes, specific to pneumatic nailers, yes.
10   Except, of course, that my education and teaching
11   involves design of pneumatic control systems, which
12   this is all about. With that, yes.
13   Q. Dr. Paul, did you attempt to reconstruct
14   this accident?
15   A. To some degree, yes.
16   Q. Is it necessary to understand how the
17   accident happened before you can evaluate the design
18   sufficiency of this tool, at least in determining
19   whether there was a problem with the tool that led
20   to the accident?
21   A. Not really. It depends what aspect of the
22   tool. You know, for example, if the trigger had
23   been taped down, I didn't really have to know the
24   details of the accident scenario to talk about that.

Page 27

1    In this case --
2    Q. Can I cut you off here?
3    A. Yes.
4    Q. Is there any evidence from any source
5    whatsoever that the trigger in this case had been
6    tied down or taped down?
7    A. No.
8    Q. Indeed, Mr. Beijar has said it was not tied
9    down; is that correct?
10   A. Well, I think he didn't think it was tied
11   down, but he didn't know. He didn't work with this
12   tool. He was a laborer.
13   Q. You would agree with me that that would be
14   a misuse of the tool, to tie down the trigger?
15   A. I would call it a foreseeable misuse, yes.
16   Q. I cut you off. I didn't mean to cut you
17   off.
18   A. Well, you know, depending on where I was in
19   looking at this scenario and this evaluation, the
20   scenario obviously enters the question of how did it
21   happen. My initial, I guess, descriptions and the
22   things I read was that it tripped, that it fired a
23   nail without the trigger being depressed.
24   Q. That was Mr. Beijar's claim?

Page 28

1    A. That was Mr. Beijar's description, that he
2    didn't hit the trigger. And I think that was part
3    of the description in the newspaper. And also in
4    Mr. Lang's letter, he said he talked to the
5    plaintiff, and he contradicted some of the
6    statements in the OSHA report, which was the only
7    other thing I had at that time.
8    Q. In other words, Mr. Beijar contradicted the
9    statements in the OSHA report.
10   A. Yes, in terms of having pulled down the
11   tool by the hose. My understanding is that in the
12   OSHA report, the home builders, and I forget their
13   name, they were cited for allowing tools to be
14   raised and lowered by the hose. That was one of the
15   citations they had. So even though OSHA didn't say
16   as far as I can recall, that it was pulled down by
17   the hose, they cited them for this practice.
18   Q. Are you aware of any witnesses to this
19   accident who claim that Mr. Beijar pulled the tool
20   down by the hose?
21   A. Sure. Well, my initial look into the
22   situation was if this particular tool either had a
23   problem with the double-trigger safety or not. And
24   I tested that. It did not seem to.

Page 29

1    Q. In other words, it can't fire without the
2    trigger being depressed.
3    A. That was my conclusion.
4       So then in either scenario, whether he
5    pulled it or didn't pull it, it couldn't fire
6    without the trigger being depressed. So at that
7    stage, I have to say -- you know, he was the closest
8    to the gun when it hit him. So he has a description
9    of how it happened.
10      There is another description by, you
11   know, two other people, three other people, although
12   only one of them was deposed, that indicate that he
13   pulled it with his left hand and caught it with his
14   right hand. So then I did have to get into some
15   reconstruction, A, to see, you know, whether either
16   scenario would allow the trigger to be depressed
17   accidentally while he is either catching or being
18   hit by the gun. So I essentially looked at the two
19   scenarios.
20   Q. Okay. When you say two scenarios, are you
21   talking about one scenario being the three
22   eyewitnesses and the other being that of Mr. Beijar?
23   A. The tool hitting him where it hit him,
24   according to the x-rays -- the x-rays are really the

WITNESS>
Volume VOLUME> - DATETEXT>

Page 30

1   only, you know, physical evidence that's here.  So
2   beyond that, I have to look at physical principles
3   and how the scenario could have developed.
4       Q.  But when you said two scenarios --
5       A.  Yes.
6       Q.  -- the two scenarios you are talking about
7   are, one is Mr. Beijar's scenario, and the other
8   scenario is the scenario given by the three
9   eyewitnesses.  Is that what you meant by the two
10  scenarios?
11      A.  Well, as a starting point, yes.
12      Q.  Okay.
13      A.  The starting point being that one is that
14  he doesn't consciously pull on anything.  Somebody
15  yells watch out, or he turns around and he sees this
16  thing coming towards him.
17      Q.  That's Mr. Beijar's scenario?
18      A.  That's Mr. Beijar's scenario.
19      Q.  The three other eyewitnesses have a
20  different view?
21      A.  Well, they all seem to have exactly the
22  same view, that he pulls the hose with his left
23  hand.
24      Q.  To get the tool --

Page 31

1       A.  -- off of the scaffolding.  Well, the only
2   person who was questioned on this was Mr. Pinard.
3   His indication is that he saw from 20 feet away the
4   actual trigger on the gun, and even though the
5   plaintiff was facing away from him.  And I have
6   problems with that in several respects.  Because 20
7   feet is further than that wall.  If you put that gun
8   20 feet from me, there's no way you are going to see
9   the trigger when the thing is falling during a
10  half-second period before it is hit by his body.  So
11  I think there's a lot of intended or unintended
12  reconstruction that's part of that description by
13  Mr. Pinard.
14          Mr. Santos never gets examined on the
15  details.  And the third gentleman, I only saw a
16  handwritten statement.  And all these three
17  statements are very similar and questionable in the
18  same, similar circumstance.
19          But, as it turns out, my opinion on the
20  defect is not really dependent on the exact accident
21  scenario.
22      Q.  Let me stop you there for a minute.
23      A.  Yes.
24      Q.  I want to get to your opinion on how the

Page 32

1   accident happened.
2       A.  Yes.
3       Q.  Then we'll talk about your opinions on the
4   design of the tool.
5       A.  Okay.
6       Q.  Before I do that, am I essentially correct
7   that all three of the eyewitnesses, Mr. Pinard,
8   Mr. Santos in his typed statement, signed, and
9   Mr. Cordeiro in his handwritten statement, signed --
10      A.  Cordeiro.
11      Q.  -- say that Mr. Beijar pulled the tool down
12  with his left hand and caught it in his right hand
13  as it was coming towards him and depressed the
14  trigger causing the tool to activate?  That's
15  essentially what they all say; isn't that true?
16      A.  Yes.
17      Q.  So now we have the two scenarios from the
18  eyewitnesses in front of you, Mr. Beijar's on the
19  one hand and the eyewitness scenarios on the other?
20      A.  Yes.
21      Q.  Okay.
22      A.  The general scenarios, yes.
23      Q.  Are there any other eyewitness scenarios,
24  other than those two, as to -- as far as you know --

Page 33

1   as to how this accident happened?
2       A.  No, not that I know of.
3       Q.  Did you come to an opinion as to how the
4   accident happened as part of trying to reconstruct
5   this accident?
6       A.  I have come to an opinion as to my opinion
7   how the accident most likely happened.
8       Q.  I'm going to ask you to give that opinion.
9   I know that you mentioned that you wanted a break
10  after an hour.  I think this is probably a good
11  time.
12      A.  I can keep going.
13      Q.  Okay.  Great.  Can you illustrate for me,
14  can you show me by using the tool -- and I brought a
15  hose here for you to use -- how you think this
16  accident happened.
17      A.  Well, I think this accident happened
18  differently from either what Mr. Beijar says or what
19  the two eyewitnesses say.  The reasons for that are
20  essentially the laws of physics and where the nail
21  entered his chest.
22      Q.  Can you show me how you think the accident
23  happened?
24      A.  Okay, sure.  Essentially the tool --

WITNESS>
Volume VOLUME> - DATETEXT>

Page 34

1     Q.  You have the tool in front of you that is
2   marked as Beijar Exhibit Number 2?
3     A.  Yes.
4     Q.  You understand that is the tool that was
5   being used at the time of his accident?
6     A.  That's my understanding.
7     Q.  Okay.  And you understand that it was
8   essentially a new tool at that time, in February of
9   2001?
10         MS. DAVIS:  Objection.
11     A.  Yes.
12     Q.  And that the company continued to use it
13   for the next two and a half years, which is why the
14   paint is all chipped off?
15     A.  Yes.  It looks more worn than a month's
16   use.
17     Q.  Okay.  But otherwise the tool is in the
18   same configuration that it was on the day of
19   Mr. Beijar's accident?
20     A.  Yes.
21     Q.  Okay.  Can you show me how you think this
22   accident happened?
23     A.  Well --
24     Q.  Do you want to use the hose?

Page 35

1     A.  Well, it is going to be awfully awkward.
2     Q.  I can help you hold it, if you like, or
3   Ms. Davis, if you like.
4     A.  Also, we don't have a staging.
5     Q.  All right.
6     A.  I will tell you how I think it came at him
7   and why.  Actually, I think that would happen
8   regardless of whether he pulled on the hose or not.
9   The nail entered his sternum here.
10     Q.  In the configuration you're showing right
11   now?
12     A.  Essentially.
13     Q.  In other words, from his right -- with an
14   aspect from his right to his left?
15     A.  Yes.
16     Q.  Upside down?
17     A.  Yes.
18     Q.  The tool is upside down?
19     A.  Yes.  Because the hose is looped over the
20   staging bracket.
21     Q.  Okay.
22     A.  And as the tool falls off the staging
23   bracket, it actually swings on the hose towards him
24   like this (indicating).  He's trying to ward it off

Page 36

1   with his right hand by grabbing the hose.  Because
2   of the momentum of the tool -- and the tool may hav
3   actually been in this position as he grabs the
4   hose -- the tool keeps going.  He tries to
5   essentially ward it off with his hand, with his arm
6   and elbow.  He contacts the trigger, and the tool
7   continues into his chest, depresses and fires.
8   That's how I think it happened.
9     Q.  Okay.  Can you tell me, is there anywhere
10   from any of the sources that anybody says, including
11   Mr. Beijar, that he hit the trigger with his elbow?
12     A.  No.
13     Q.  In fact, they all deny that, don't they?
14         MS. DAVIS:  Objection.
15     Q.  Mr. Beijar denies that he hit it at all?
16     A.  Yes.
17     Q.  And the witnesses --
18     A.  I didn't know who you met by "they all."
19     Q.  And the eyewitnesses, Mr. Pinard,
20   Mr. Cordeiro and Mr. Santos say that he pulled the
21   trigger with his thumb, his hand, right?
22     A.  I don't think they all say that.  At least
23   Mr. Pinard says that he, he was catching -- the way
24   I understand Mr. Pinard's and the other

Page 37

1   eyewitnesses' description is that he pulls the gun,
2   pulls it by the hose -- incidentally, this staging
3   is about ceiling height here.  He can't quite reach
4   the gun.  So according to the two -- to the one
5   eyewitness who was actually examined on it under
6   oath, he pulls it down with his left hand and pulls
7   it toward him and catches it like a football, he
8   says.  He says that he sees him catch it like that
9   (indicating), as it is coming down, and he hits the
10   trigger with his thumb and then pulls the thing in.
11   He had to actually pull it down like that
12   (indicating) and that's when it fired.  I don't
13   think that's consistent with physical principles.
14     Q.  Is there any witness who testifies whether
15   the trigger was depressed before or after the tip of
16   the tool hit him on the chest?
17     A.  Well, I think actually both Mr. Pinard and
18   Mr. Edwards, who -- I think it was Wayne Edwards -
19   who says based on what he had heard -- he was
20   reconstructing it, and he says that probably the
21   trigger was depressed before -- it had to be
22   depressed before it hit his chest.
23     Q.  Could you show me where in Mr. Pinard's
24   deposition he says that?

WITNESS>
Volume VOLUME> - DATETEXT>

Page 38

1    A. First let me look at Mr. Edwards:
2    Q. We can agree that Mr. Edwards was not
3 present at the scene; is that true?
4    A. Right.
5       In his statement he says: As the gun
6 fell down, John grabbed the gun and apparently hit
7 the trigger with his right hand. The nose of the
8 gun hit his chest, depressed, and shot the nail into
9 the center of his chest.
10    Q. Right.
11    A. So that sequentially is essentially, he
12 hits the trigger and the gun continues in.
13       I think also in his deposition he says,
14 again this is paraphrased: Reached with left
15 hand -- this is about Page 10-plus. Reached with
16 left hand, pulled hose, caught gun with right hand
17 on handle pointing towards him. Pulled into chest
18 while thumb on trigger. So that, again, says to me
19 that the trigger is already pulled and he pulls the
20 gun into his chest. So I also tried to do that with
21 the gun. He catches it (indicating), and pulls it
22 into his chest.
23       (Discussion off the record.)
24    A. And then pulls it into his chest. It is

Page 39

1 essentially, pull trigger and then pulling into his
2 chest.
3       Now, I also don't --
4    Q. Before. I'm looking at your copy of
5 Mr. Pinard's deposition. You actually kindly enough
6 folded down the page on Page 38 to 41.
7    A. Okay.
8    Q. Don't you remember me asking Mr. Pinard the
9 question:
10      "QUESTION: Could you tell whether or
11 not his thumb hit the trigger before it hit his
12 chest?" On Page 41, his answer was:
13      "ANSWER: No, I couldn't."
14    A. Right, because his back was towards him.
15    Q. "QUESTION: He could have grabbed it on
16 the outside of the tool. His thumb hit the trigger.
17      "ANSWER: Yes."
18      And then I asked him whether he could
19 tell whether he depressed the trigger before or
20 after the tip of the tool hit his chest, and
21 Mr. Pinard said he couldn't; isn't that right?
22    A. I think yes. But if you go back to Page 10
23 where he initially describes it, he said he caught
24 gun with right hand on handle pointing towards him

Page 40

1 while thumb was on -- while thumb on trigger. He's
2 actually asked: Did you see all this from 20 feet?
3 And he says yeah. Eventually at 41 he says: Well,
4 the plaintiff's back was towards me, but I saw all
5 that before.
6      So if you physically are towards the
7 person in back and you catch this gun, if he saw him
8 catch the gun with his right hand on the handle and
9 depress the trigger, obviously the tip was not yet
10 on his chest.
11    Q. Could you hook up the hose here? I'm still
12 trying to figure out how this could have happened
13 from your description.
14    A. Let me do it on the floor.
15    Q. Do you need some help?
16    A. No.
17    Q. Now, you said, I think, that the hose was
18 looped around a bracket?
19    A. Yes.
20    Q. On what do you base that?
21    A. Only on physical principles. There's no
22 other way that that could swing toward him.
23    Q. Unless he pulls it down and brought it into
24 his chest, right?

Page 41

1    A. It still could not swing towards him.
2    Q. Right. But if he pulled it down with his
3 left hand and pulled it in with his right, that
4 would be another way the tool could get to his
5 chest; is that true?
6    A. Except, it is against physical principles.
7 If he pulled on the hose, then the gun would come
8 off the scaffolding not in the position that hit his
9 chest.
10    Q. Unless he pulled it into him.
11    A. Even if he pulled it into him. Because if
12 it is lying in any orientation on the plank and you
13 pull on the hose, the hose is going to be what's
14 towards you, not the tip of the gun. So if you pull
15 it down, there's no other way the gun can come off
16 the plank except hose first, because you are pulling
17 on the hose. So if it comes at you this way, if he
18 catches it this way, then he would have to turn it
19 around and bring it in like this. I just don't
20 think that can happen. Eyewitness or not, I mean,
21 he's 20 feet away facing the guy's back.
22 Physically, it cannot happen that way.
23    Q. Let me ask you a question, Doctor. Do you
24 think that it is a reasonable thing to do to pull

WITNESS>
Volume VOLUME> - DATETEXT>

Page 42

1  the tool by the hose?
2      A. No, I don't think so.
3      Q. You think Mr. Beijar was unreasonable, in
4  your view, by pulling the tool by the hose?
5          MS. DAVIS: Objection.
6      A. Sure, but he certainly wasn't expecting to
7  get shot.
8      Q. Do you think that's a misuse of the tool,
9  to pull it by the hose?
10     A. I would call it a misuse, except that I
11 know that it is done all the time. And in fact, the
12 hose is used on most construction sites to lower the
13 tool and to take it up, actually. Because the
14 alternative is that you have to walk the tool up a
15 ladder with the hose behind it.
16     Q. Is there any evidence that there was a
17 ladder available for Mr. Beijar if he wanted to use
18 it?
19     A. I didn't see one in the photos, but the
20 photos were taken a day later. I think there was
21 some testimony that there was a ladder. I'm sure
22 there was a ladder leaning against something.
23     Q. Do you think that would have been an easier
24 and better way for Mr. Beijar to get the tool if he

Page 44

1  leaned the plank against what he thought was the
2  house -- I think he actually leaned it against the
3  house and the plank or just the plank -- and as per
4  the eyewitnesses, the gun was teetottering on the
5  edge of the plank. And that's according to
6  Mr. Pinard, why he told him to put the tool back and
7  said that he couldn't reach it. But that's not the
8  plaintiff's recollection.
9          The plaintiff's recollection is that he
10 turns around and the tool is coming towards him.
11 Now, I think that may very well have happened if his
12 foot got entangled with the hose. But it wouldn't
13 have pulled the tool down.
14     Q. What hose?
15     A. This hose, the air hose. If you look in
16 the pictures the next day, they have a tool lying up
17 there. It is to the right of the bracket. Now, I
18 don't know if they were trying to put the tool, you
19 know, in some position there like it was at the time
20 of the accident. But it is certainly consistent
21 with all the exhibits that they mark at their
22 deposition, that the tool was at the end of the
23 plank. So it was probably beyond the bracket.
24          And you see, you know, the hose coming

Page 43

1  needed to get it down?
2      A. I think in retrospect it would be, but it
3  certainly wasn't a very foreseeable event.
4      Q. Have you now told me all of the ways and
5  described the way you think this accident happened?
6      A. Well, I think I've described to you what in
7  my opinion was the most probable way that the
8  accident happened by showing you eventually how the
9  tool hits him.
10     Q. Let me stop you there and ask you a
11 question about that.
12     A. Okay.
13     Q. So that I understand, it is your view that
14 Mr. Beijar took his right hand, pulled the tool off
15 of the scaffold over his head. The hose was looped
16 around a bracket. And as he was pulling it down, it
17 swung towards him and hit his right elbow as his
18 right elbow bent at about a 90-degree angle. Is
19 that basically what happened?
20         MS. DAVIS: Objection.
21     A. No.
22     Q. How is that wrong? How am I wrong?
23     A. I don't think he had -- in my opinion, I
24 believe him, that the gun came off either when he

Page 45

1  down and Mr. Pinard said the hose was in front of
2  the plank. So if that tool falls off the plank, it
3  is going to go down like this, gravity will just
4  pull it straight down. But because of the hose up
5  there, it starts swinging towards him.
6          Now, where it hits his chest -- or where
7  he was pulling it as a football, the gun has already
8  fallen about 4 feet, it had fallen at least 4 feet.
9  So it had quite some energy. Now, even if he
10 reached up, according to Mr. Pinard, and caught the
11 gun up there, which was still about 1 1/2 feet after
12 it dropped from the plank, and then brought it down
13 and pulled it in, he already had his finger on the
14 trigger.
15          So either scenario, I don't think that
16 Mr. Pinard's scenario could have happened based on
17 physical evidence and physical principles. He could
18 have pulled it down, but then that's not how the gun
19 swung into his chest. He could have tried pulling
20 on it and the thing fell off and swung into him. He
21 could have just touched the, a hose while he was
22 going by. The thing was partially off the plank.
23 Or the plank could have started its drop.
24          Now, for any object to drop about 4 feet

WITNESS>
Volume VOLUME> - DATETEXT>

Page 46

1  -- okay? -- that chart is in there too, it takes
2  close to a second. So the time sequence was
3  certainly there, that the plaintiff turns around,
4  sees the thing coming towards him. Although he sees
5  it wrong as well. It couldn't have come at him this
6  way, the way the witnesses -- or one witness says.
7      Q. The way Mr. --
8      A. Mr. Picard (sic). It couldn't have come
9  this way if he pulled on the hose.
10     Q. I'm getting lost here. Let me try again.
11     A. Yeah.
12     Q. My first question was, in your
13  reconstruction, do you have a view whether or not
14  Mr. Beijar pulled on the hose?
15     A. I don't think he purposely pulled on the
16  hose near the plank. He may have stepped on the
17  hose on the ground and disturbed the hose.
18     Q. Is there any evidence from Mr. Beijar,
19  Mr. Pinard, from any of the witnesses, Mr. Cordeiro,
20  Mr. Santos, that Mr. Beijar stepped on the hose,
21  anywhere?
22     A. No.
23     Q. Is there any evidence that he pulled on the
24  hose?

Page 47

1      A. Well, there are statements that he pulled
2  on the hose.
3      Q. Three eyewitnesses have said that?
4      A. Yes. Three eyewitnesses say almost the
5  identical thing.
6      Q. And Mr. Beijar denies that he pulled on the
7  hose, right?
8      A. Yes.
9      Q. He denies that he touched the tool at all
10  before it went off, does he not?
11     A. That was his perception, yes. That's what
12  he says.
13     Q. So I'm going back now to the hose. Do you
14  have any factual basis at all, from any of the
15  witnesses, anything, to support your view that
16  Mr. Beijar did not pull on the hose, other than his
17  own statement?
18     A. And physical principles, the laws of
19  physics and Newton.
20     Q. If he pulled on the hose -- by the way, do
21  you know where his left hand was at the time of the
22  accident?
23     A. According to his perception, it was at his
24  left side.

Page 48

1      Q. Do you agree with that?
2      A. Yes, it is certainly consistent with my
3  scenario. That scenario is also consistent with his
4  hand being up.
5      Q. In your view of this accident, can you show
6  me where Mr. Beijar's right hand was just before
7  this accident?
8      A. When you say just before the accident,
9  before he contacts the tool or --
10     Q. Yes.
11     A. Well, I think it was generally at his right
12  side.
13     Q. Did he touch any part of the hose before
14  the accident happened, in your view?
15     A. In my view, yes.
16     Q. Which part of the hose did he touch?
17     A. Right above the tool.
18     Q. How much above the tool?
19     A. In looking at the dimensional data, his arm
20  to the elbow is about two inches shorter than mine.
21  So somewhere here.
22     Q. So you think that his hand was about 6
23  inches above the coupling?
24     A. Could have been 6 inches, could have been a

Page 49

1  little more. The thing swings in.
2      Q. 6 inches to 8 inches above the coupling?
3      A. I would actually start at the coupling to
4  maybe 8 inches above, yes.
5      Q. And it's your view --
6      A. And that depends on whether it was coming
7  straight on or at an angle and what kind of an
8  angle. Because I can even see that it is coming at
9  him almost perpendicular to his body. And then whe
10  he hits it, that turns it around and puts it into
11  the chest.
12     Q. Could you demonstrate that for me? I'm not
13  quite sure that I understand it.
14     A. Sure. It can be swinging like this towards
15  him, again from the thing. So instead of with the
16  point directly at him, it is at quite an angle like
17  this. So as he tries to stop the whole thing, he
18  reaches up, he tries to grab the hose --
19     Q. With his right hand?
20     A. With his right hand.
21         The thing is swinging towards him. It
22  continues into his arm because there's nothing else
23  that stops it. The only thing that stops it, tries
24  to stop it is the elbow.

WITNESS>
Volume VOLUME> - DATETEXT>

Page 50

1    Q.  Now, at this point in your reconstruction
2  you said his elbow was bent about 90 degrees, right?
3    A.  Well, he starts it straight out.  But when
4  it hits the trigger, it is about 90 degrees.  Or it
5  could be less.  It could be like this (indicating).
6  Because it winds up hitting him at an angle like
7  this.  So, he tries to stop it but the momentum is
8  carrying it into his chest, right here.
9    Q.  In your view, as he has his right hand at
10  the coupling or just above the coupling?
11    A.  At the coupling or just above the coupling.
12    Q.  When he originally has his hand out, his
13  arm is straight and then he brings it in to bend his
14  elbow to 90 degrees?
15    A.  He has to start bending his elbow, yes.
16    Q.  Because if he leaves his elbow out
17  straight, the tool never reaches his body, right?
18    A.  No.  That's not true.  Depending on where
19  he grabs it.  If he grabs it up here, keeps it
20  straight, it keeps going.
21    Q.  If it happened the way you just
22  illustrated, the tool will not drive a nail, will
23  it?
24    A.  No.  That's why I say that's not how it

Page 51

1  happened.
2    Q.  So he had to have, in your view, grabbed
3  the tool by the air hose, bent his arm so that it
4  came towards him, his elbow touches the trigger and
5  remains on the trigger at the time the contact trip
6  hits his sternum.  Is that basically it, in your
7  view?
8    A.  Yes.
9    Q.  The only way the accident could have
10  happened is that he actually had his finger on the
11  trigger at the time the tool discharged, right?
12    A.  I don't understand your question.
13    Q.  The only other way this accident could have
14  happened -- or another way this accident could have
15  happened is if he had his finger or his thumb on the
16  trigger as the tool was moving towards him.
17    A.  Yes, I agree with that, sure.
18    Q.  And the tool, the contact trip or the trip
19  hit his chest?
20    A.  Yes.  But still, the tool would have to be
21  in my opinion --
22    Q.  Upside-down?
23    A.  Upside-down.  Because if it says this way,
24  the way they are describing it, you would have to

Page 52

1  wind up down here like this.  It just -- in my
2  opinion, it is not possible.
3    Q.  Have you now told me everything that you
4  wish to say about how you think this accident
5  happened, the reconstruction of it?
6    A.  Well, everything I think responsive to your
7  question.  You know, I must say, you know, that I
8  arrive at this scenario by looking at all kinds of
9  possibilities.  And this scenario -- okay? -- could
10  also have happened by pulling it with his left hand.
11  When the thing falls, it becomes a pendulum.  Then
12  he's trying to stop it with his right hand.  So I
13  realize, you know, that there are -- the eyewitness
14  scenario says that he actively pulls it with his
15  left hand.  After that, their description I don't
16  believe, because it couldn't happen that way
17  physically due to the laws of nature.  But I cannot
18  exclude that he actually does start pulling it,
19  tries to pull it with his left hand.
20        But in terms of the design of the tool,
21  that's not relevant to me.  Because whether he does
22  it consciously or accidentally, you know, he wasn't
23  the user of the tool.  He wasn't the one who was
24  supposed to disconnect it.  And even if I were to

Page 53

1  accept the scenario that Mr. Pinard describes, the
2  same defects and the same remedies would have
3  prevented this accident.
4    Q.  Have you now told me all the facts in your
5  reconstruction?
6    A.  I think so.
7    Q.  I may have a couple more questions about
8  the tool but I don't think we need the hose anymore.
9  Can you disconnect the hose.
10    A.  (Witness complies.)
11    Q.  You don't have to put it on the ground.
12    A.  The problem is you have to use two hands to
13  pull it off.
14    Q.  Is this a good time for a break?
15    A.  Sure.
16        THE VIDEOGRAPHER:  The time is 11:5?
17  We are off the record.
18        (A recess was taken.)
19        THE VIDEOGRAPHER:  The time is 12:0?
20  p.m.  This is the beginning of Cassette Number 2 in
21  the deposition of Dr. Igor Paul.  We are on the
22  record.
23    Q.  Dr. Paul, I want to talk now about your
24  evaluation of the design of this tool that you have

WITNESS>
Volume VOLUME> - DATETEXT>

Page 78

1    Q.  In fact, you can do it in less than a
2  second?
3    A.  You could.
4    Q.  How long does it take to disconnect it?
5    A.  Probably the same.  But why do it?  In the
6  field, they don't do it.  Why do it?
7    Q.  Other than what you've talked about so far,
8  do you have any other criticisms of this tool as it
9  relates to this accident?
10   A.  No.  I think it is a nice tool.
11       MR. DUGGAN:  Can I have a minute?
12       THE VIDEOGRAPHER:  The time is 12:53.
13  We are off the record.
14       MR. DUGGAN:  I have no further
15  questions.
16       MS. DAVIS:  I have no questions.
17       (All exhibits are in the custody of
18  Christopher Duggan.)
19
20
21
22
23
24

Page 80

1              I N D E X
2
3            EXAMINATIONS
4  IGOR PAUL
5     BY MR. DUGGAN                    4
6        EXHIBITS MARKED
7  1, notice of deposition        3
8  2, active file            3
9  3, photos and manual, et cetera     3
10  4, file, design ergonomics      3
11  5, OSHA documents           3
12  6, Xeroxes of photos        3
13  7, article, Cape Cod Times      3
14  8, medicals          3
15  9, deposition transcripts       3
16  10, x-rays           3
17  2 A and B, invoices         13
18  3 A and B, drawings         64
19  11, Igor Paul hand-drawn design    76
20
21  Exhibits retained by Christopher A. Duggan, Esq.
22
23
24

Page 79

1       CERTIFICATE OF COURT REPORTER
2       I, David A. Arsenault, Registered
3  Professional Reporter, do certify that the
4  deposition of IGOR PAUL, in the matter of Beijar v
5  Stanley, on September 6, 2005, was stenographically
6  recorded by me; that the witness provided
7  satisfactory evidence of identification, as
8  prescribed by Executive Order 455 (03-13) issued by
9  the Governor of the Commonwealth of Massachusetts,
10  before being sworn by me, a Notary Public in and for
11  the Commonwealth of Massachusetts; that the
12  transcript produced by me is a true and accurate
13  record of the proceedings to the best of my ability;
14  that I am neither counsel for, related to, nor
15  employed by any of the parties to the above action;
16  and further that I am not a relative or employee of
17  any attorney or counsel employed by the parties
18  thereto, nor financially or otherwise interested in
19  the outcome of the action.
20
21
22  _____  9/15/05
23  David A. Arsenault, RPR
24

Page 81

WITNESS:  IGOR PAUL
CASE:   Beijar v Stanley
              SIGNATURE PAGE/ERRATA SHEET
PAGE   LINE   CHANGE OR CORRECTION AND REASON

I have read the transcript of my deposition taken September 6,
2005.  Except for any corrections or changes noted above I
hereby subscribe to the transcript as an accurate record of the
statements made by me.
Signed under the pains and penalties of perjury.

_____ DATE _____

Deponent, IGOR PAUL

On this _____ day of _____, 200__, before me, the
undersigned notary public, personally appeared IGOR PAUL, who
presented satisfactory evidence of identification, to wit,
_____, and signed this document in my
presence.

Notary Public in and for_____
My commission expires_____

# EXHIBIT 7

**Igor L. Paul, Sc.D., P.E.**
Engineering Consultant
P.O.Box 178, 844 Lakeshore Drive
Elkins, NH 03233-0178

Home Office:                                                    Home (Private):
Phone (603) 526-6631            igpaul@mit.edu              Phone (603) 526-6802
Fax    (603) 452-8686           igpaul@adelphia.net         Cell   (603) 748-1292

July 30 , 2005

Mr. Scott W. Lang                                   Re: Beijar  v.
Lang, Xifaras & Bullard                                 Stanley Fastening Systems
115 Orchard Street
New Bedford, MA 02740

Via Fax: (508) 993-8696 and US Mail

Dear Mr. Lang:

Based upon my review of the materials you forwarded with respect to this case, including the depositions of the plaintiff and Mr. Ponko (with exhibits) , the production documents received from the defendant , my inspection and testing of the Model N79WW Bostitch nailer which was involved in Mr. Beijar's accident and an identical model nailer rented for comparison and test purposes , based upon my knowledge , inspection and testing of other manufacturers' pneumatic nailers , and based upon my education , background and experience , the following summarizes my professional opinions on the inadequate, defective and inherently dangerous design of the Bostitch Model N79WW pneumatic nailer and its involvement in Mr. Beijar's accident and injuries.

Mr. Beijar was seriously injured on February 1, 2001 on a jobsite in Oyster Harbor, MA as he was walking near or under a work platform and a Bostitch Model N79WW pneumatic nailer fell from the platform or an adjacent wall , hit him in the chest , and drove a nail into his heart. Although the pneumatic nailer was not being used at the time, it was apparently still connected to the pressurized air hose . The Bostitch nailer does not have a convenient "ON/OFF" switch or lever to shut off pneumatic power to the tool when it is not being used and must be physically disconnected from the air hose to disconnect it from the compressed air source. This is inconvenient and not usually done on construction sites during breaks.

Mr. Beijar testified that as he was walking  between a wall and a pile of snow , he heard somebody shout "look out". As he turned to his right, he saw the nailer in front of him and coming towards him with the nail driving end generally pointing down and the cap assembly and hose connection pointing up. His recollection was that he shot out his right arm to try to push the nailer away, making contact with the hose some 1-1/2 to 2 feet above the hose coupling. The nailer

hit him in the chest and discharged a nail into his heart. Mr. Beijar testified that he did not hit the trigger with his hand because he only had time to use his right hand and that was in contact with the hose and was never near the trigger. He did not remember the exact orientation of the nailer when it made contact with his hand and arm, and when it hit his chest, or anything else about the nailer after it hit his chest and fell to the ground.

As described in the Bostitch Operating Manual, modern Bostitch nailers (as most other manufacturers' pneumatic nailers) including the N79WW model nailer, come with two types of actuating mechanisms for "sequential trip operation" and "contact trip operation". Both mechanisms use a "contact tip", which has to be compressed against a surface with a force of about 14 pounds, and a finger "trigger", which has to be pulled with a relatively small finger force, to fire a nail. Both the compression of the "contact tip" and the pulling of the "trigger" have to occur concurrently (just for an instant) for the nail to be fired. This tool actuation by two distinct and separate actions, is a safety requirement mandated by the extreme dangers posed by an unintended or accidental firing of a nail.

With a "sequential trip" dual action actuating mechanism the two distinct actions have to be performed "in sequence" to fire a nail and have to be BOTH "released" before another nail can be fired by again performing both distinct actions "in sequence". The "contact tip" has to be compressed FIRST against a surface (with a force of about 14 pounds) and that allows pulling of the "trigger" to fire the nail. After firing a nail, the "trigger" has to be released before the two sequential actions can be repeated to fire another nail. This is the safer of the two types of "trip" mechanisms as stated in the Bostitch nailer operating manuals.

The Bostitch nailer which fell on Mr. Beijar had a "contact trip" type of two step actuating mechanism (admittedly the less safe option). To fire a nail, both the "contact tip" has to be depressed and the trigger has to be pulled, but these actions can be done in either sequence and the "trigger" does not have to be released between firings. The "contact trip" actuating mechanism on the Bostitch nailer allows the two step actuating sequence to occur in either order, i.e. one can push the compression tip against the work surface (or any other surface) and then pull the trigger to fire the nail, or, one can first hold down the trigger and then hit the "contact tip" against a surface to fire the nail. This feature allows the nailer to be used in a so-called "bump-fire" mode, i.e. one can just hold down the trigger continuously (or "tie" or tape it in the pulled position) and then the nailer will fire a nail whenever the contact tip is compressed against a surface. The "contact trip" actuation mechanism allows "bump-firing" of the tool, which saves some time on a construction site because a series of nails can be driven without removing ones finger from the trigger, but it completely defeats the safety purposes of a two-step actuating sequence.

Neither of the of the two actuating mechanisms offered by Bostitch provide any kind of trigger guard or trigger lock to prevent accidental actuation of the trigger by bumping against it and

2

neither has a power shut-off switch or lever to shut off the pneumatic power at the nailer. The "contact trip" mechanism on the accident nailer allows "tying down" the trigger, in which case only compression of the "contact tip" will fire a nail. The alternate "sequential trip" mechanism does not allow "tying down" the trigger, insuring that two distinct sequential actions have to be performed by the operator to fire each nail.

My inspection and testing of the Bostitch nailer allegedly involved in Mr. Beijar's accident and an identical model exemplar nailer for comparison , showed that although the accident nailer was well used , the "contact trip" firing mechanism operated as designed and intended over the full range of air supply pressure and the "trigger" had to be physically depressed to allow the nailer to fire a nail. A nail could be fired by holding down the trigger and impacting the "contact tip", or a nail could be fired if the trigger was even instantaneously touched or hit while the "contact tip" was Drop tests producing dynamic impacts to the "contact tip" significantly exceeding those that could have been produced when it hit Mr. Beijar's chest , showed that the nailer would not fire a nail unless the trigger was depressed when the impact occurred. This was also confirmed by an analysis of the dynamic forces produced on the pneumatic head valve (which releases the nailing piston) when the tool is impacted on the nailing tip. Accidental release from impact to the tool could only occur when impact occurs on the cap end of the nailer (i.e. if it is dropped on the cap end or the cap end of the nailer is used as a hammer).

## Professional Opinions

Based upon my review of the materials and deposition testimony available to me to date, my inspection and testing of the subject nailer , and my evaluation of the nailer design , I state the following professional opinions to a reasonable degree of engineering and scientific certainty:

1- The accidental firing of the nail into Mr. Beijar's heart was caused by the unguarded "trigger" of the nailer hitting Mr. Beijar's right arm (probably near the elbow ) as he was trying to deflect the falling nailer with his right hand , depressing the "trigger" and keeping it depressed as the "contact tip" compressed against his chest. When his right hand contacted the hose above the hose coupling to the nailer (with the contact tip generally pointing down as per his testimony) , the nailer started pivoting around the hand-held hose section with the "contact tip" pointing towards the left side of his chest. However, to actually hit his left chest in the vicinity of the heart , portions of the nail magazine and the nailer handle grip above the magazine in the vicinity of the exposed "trigger" had to contact and interact with his raised right arm in the vicinity of his elbow. It was this continuing contact force which compressed the "trigger" and kept it compressed , but was unable to prevent the "nailer's" continued motion towards the impact with his chest. As the "contact

3

trip" was depressed against his chest, the nailer essentially "bump-fired" the nail into his heart. The absence of a trigger guard allowed the accidental contact and actuation of the trigger as Mr. Beljar was trying to ward off the falling nailer, and the "contact trip" mode of the nailer firing mechanism allowed the accidental firing of the nail into his heart.

2.   In my professional opinion the design of the Bostitch Model N79WW pneumatic nailer with the "contact trip" actuating mechanism was improper, inadequate, defective and inherently and unreasonably dangerous as follows:

  a)  In failing to provide a trigger guard or dual action "trigger" actuating mechanism on the nailer to prevent unintended and accidental contact with and actuation of the trigger while handling the nailer (during nailing operations, while connecting or disconnecting the nailer from the pneumatic supply hose, while moving the nailer between nailing locations, while trying to gain control of it after a fall etc.). Trigger guards and dual-action triggers (like those found on hand-held saws, grinders and other powered hand-tools) have been known and used for decades to prevent accidental trigger actuation and such a trigger safety should have been provided on this Bostitch nailer. Either a trigger guard or a dual-action trigger would have prevented this accident and injuries.

  b)  In failing to, alternatively, provide a self-actuating shut-off mechanism on the nailer to automatically lock out the power or the firing mechanism on the nailer after a period of none-use (while still connected to the pneumatic power source). Such a safety would engage either the "trigger" or one of the two pneumatic firing valves making them inoperable until they were manually released prior to use. Dual-action triggers are one type of such a safety device which actually locks out the "trigger" after each use, requiring a manual release before a nail could be fired. The pneumatic pressure of a connected nailer could also be used to provide a "delayed" automatic engagement of a trigger or pneumatic valve safety lock requiring manual release before use of the nailer. Such a safety device would have prevented Mr. Beljar's accident and injuries.

  c)  In failing to, alternatively, provide a convenient manual shut-off switch, button, or lever on the nailer (with appropriate instructions on the nailer and in the operating manual) to allow the nailer to be easily "shut off" between uses and/or while handling it, and/or moving it between locations etc, without having to disconnect it from the pneumatic hose. A manual trigger

4

lock-out pin (which can be pushed in to lock out the trigger and pulled out to release it) or a manual valve locking pin or lever (which disconnects or locks out the pneumatic valve) are examples of simple, practical and economical ways of providing such a "shut off" function.

d) In failing to provide a "sequential trip" and/or "anti-tie down" feature on the "contact trip" actuated nailer which would not allow the trigger to be permanently "tied down" in an engaged position and would require the trigger to be released after each "bump-fired" series of driven nails, and re-engaged before firing the next nail (in any firing mode "contact trip" or "bump-fired"). Because the "contact trip" actuating mechanism allows easy "tying down" of the trigger to facilitate "bump-firing" of the nailer, completely by-passing and defeating the safety function of a dual action firing mechanism, "contact trip" equipped nailers should include an "anti-tie down" and/or "sequential trip" feature to insure that two distinct and separate sequential manual actions are required each time a nail is fired, either as a single nail, or as the first nail in a series of "bump-fired nails". A "sequential trip" and/or "anti-tie down" safety feature on the accident nailer would have prevented Mr. Beijar's accident and injuries.

In my professional opinion, Mr. Beijar was an innocent and completely helpless victim of the improper, inadequate, defective and inherently and unreasonably dangerous design of the Bostitch "contact trip" nailer. Feasible, practical, and economical state-of-the-art safety design of the nailer would have prevented this accident and injuries.

Sincerely yours,

Igor Paul

P.S.: Under separate cover I am sending you copies of the digital photographs and video taken of the Bostitch nailers during inspection and testing. The subject nailer can be picked up at my home office in NH.

5