# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10233-RCL

JONATHAN BEIJAR,

Plaintiff

v.

STANLEY FASTENING SYSTEMS, L.P.
Defendant

## AMENDED COMPLAINT

### INTRODUCTION

The Plaintiff, Jonathan Beijar's claims against the Defendant, Stanley Fastening Systems, L.P., are brought pursuant to Massachusetts General Laws, Chapter 152, Section 15 for a personal injury sustained on February 1, 2001. The Plaintiff claims that this injury, caused by a roofing nail spontaneously fired by a nail gun, through his sternum, piercing his right ventricle and lodging into his heart, was the direct and proximate result of the negligent conduct of the Defendant, Stanley Fastening Systems, L.P., the Defendant, Stanley Fastening Systems, L.P.'s breach of warranties, the defective condition of the Defendant, Stanley Fastening Systems, L.P.'s product, and the Defendant, Stanley Fastening Systems, L.P.'s unfair and deceptive acts and practices in the conduct of trade or commerce.

### PARTIES

1.    The Plaintiff, Jonathan Beijar, resides at 17 Willis Street, New Bedford, Bristol County, Massachusetts.

2.    The Defendant, Stanley Fastening Systems, L.P. is a limited partnership

2

organized in Connecticut and authorized to do business in Massachusetts, with a business address at Route 2, Briggs Drive, East Greenwich, Rhode Island and a principal place of business in New Britain Connecticut. The Defendant, Stanley Fastening Systems, L.P., was at all material times doing business within the Commonwealth of Massachusetts. The Defendant, Stanley Fastening Systems, L.P., at all material times, has distributed and continues to distribute, products in the Commonwealth of Massachusetts.

3. This Complaint is being brought pursuant to Massachusetts General Laws, Chapter 152, Section 15.

## JURISIDICTION

## JURISDICTION

4. Personal jurisdiction exists over the Defendant pursuant to 28 U.S.C., § 1332.

5. The Plaintiff is and was at all times relevant hereto, domiciled in and a citizen of the Commonwealth of Massachusetts.

6. The Defendant is and was at all times relevant hereto, a limited partnership organized in Connecticut and with a principal place of business in New Britain, Connecticut.

7. This action is of a civil nature involving, exclusive of interest, a sum in excess of $75,000. Every issue of law and fact herein is wholly between citizens of different states.

8. Venue in the United States District Court, District of Massachusetts is proper pursuant to 28 U.S.C., § 1391. The events giving rise to this action occurred in the District of Massachusetts.

3

## FACTS

9.   On or about February 1, 2001, the Plaintiff, Jonathan Beijar, was working as an

employee for Care Free Homes, Inc., as a laborer, and performing his duties in

Barnstable, Massachusetts.

10.   On or about February 1, 2001, the Plaintiff, while in the exercise of due care,

while working, was severely injured, when a nail gun (hereinafter referred to as

"the nail gun") fell from an overhead staging plank as the Plaintiff was walking on

the ground in the area below the staging.  As the Plaintiff attempted to avoid

being struck by the nail gun, the barrel of the nail gun struck the Plaintiff's chest

and spontaneously discharged, firing a three and a half inch roofing nail through

his sternum, piercing his right ventricle, and lodging into his heart.

11.   The Plaintiff was rushed to Cape Cod Hospital, and from there was airlifted to

Boston Medical Center.

12.   He underwent emergency open heart surgery at Boston Medical Center.

13.   The Plaintiff was disabled from February 1, 2001 until he returned to work in the

fall of 2003.

14.   The Plaintiff received Workers' Compensation benefits under Massachusetts

General Laws, Chapter 152, as a result of the February 1, 2001 accident.

15.   The nail gun bore a label stating, "Bostitch, Stanley Fastening Systems, Briggs

Drive, East Greenwich; Collation Type:  Wire Weld; Fastener Length: 2"-3-1/2"."

16.   The Defendant, Stanley Fastening Systems, L.P., Stanley Fastening Systems,

L.P., designed, developed, inspected, assembled, tested, manufactured,

marketed, distributed, sold and provided instructions and warnings for the nail

4

gun.

17.    The Defendant, Stanley Fastening Systems, L.P., was and is a merchant with respect to the nail gun, having for a long period of time been in the business of designing, developing, inspecting, assembling, testing, manufacturing, marketing, distributing, selling and providing instructions and warnings for the product which injured the Plaintiff.

18.    The Defendant, Stanley Fastening Systems, L.P., was negligent and/or careless with respect to the Plaintiff in that the nail gun or its component parts were negligently and carelessly developed, designed, inspected, assembled, marketed, sold, distributed, tested, serviced, maintained, repaired and provided with instructions and warnings.

19.    The Defendant, Stanley Fastening Systems, L.P., its servants, agents, or employees under persons for whom it is and/or was legally responsible, impliedly warranted that the nail gun and its component parts were safe, of merchantable quality, and fit for any ordinary or reasonable purpose contemplated for their use.

20.    The Defendant, Stanley Fastening Systems, L.P., had reason to know the particular purpose for which the goods were required and that the Plaintiff was relying on the Defendant, Stanley Fastening Systems, L.P.'s skill and judgment to furnish such goods.

21.    The Defendant, Stanley Fastening Systems, L.P., knew or should have known that the nail gun and its component parts were not safe and of merchantable quality, were defective, and were not fit for their particular purpose, which defect could not have been reasonably discovered by the Plaintiff.

5

22.    The Defendant, Stanley Fastening Systems, L.P., knew or should have known that the nail gun or its component parts were of a dangerous nature and in a dangerous condition.

23.    The Defendant, Stanley Fastening Systems, L.P., marketed, sold or distributed the nail gun in a manner that it foresaw or should have foreseen would likely bring the nail gun into contact with a person such as the Plaintiff.

24.    The Defendant, Stanley Fastening Systems, L.P., had a duty to ensure that the nail gun would not discharge without being deliberately engaged to discharge.

25.    The particular purpose for the nail gun was known to the Defendant, Stanley Fastening Systems, L.P.

26.    As a direct and proximate result of the negligence, carelessness, and breaches of warranty of the Defendant, Stanley Fastening Systems, L.P., on or about February 1, 2001, the Plaintiff, Jonathan Beijar, sustained serious personal injuries.

27.    As a direct and proximate result of the injuries that he sustained in the February 1, 2001 industrial accident, the Plaintiff (a) was caused to incur and will continue to incur substantial medical expenses; (b) was caused to be disabled and will continue to be disabled in the future; (c) was caused and will continue to be caused great pain of body and mind; (d) was caused to be disfigured and will continue to be disfigured in the future; (e) was caused and will continue to be caused to be unable to work and to suffer a loss of earning capacity and lost wages; (f) was caused to incur significant out of pocket expenses; and (g) was caused and will continue to be caused curtailment of normal activities and loss of

6

his enjoyment of life.

28.    Due notice has been given to the Defendant, Stanley Fastening Systems, L.P., of

any and all breaches of warranty.

29.    At all times relevant hereto, the Defendant, Stanley Fastening Systems, L.P.,

was engaged in trade or commerce in Massachusetts, within the meaning of

Massachusetts General Laws, Chapter 93A.

30.    On January 21, 2004, the Plaintiff, by his attorney, sent a written demand for

relief to the Defendant, Stanley Fastening Systems, L.P., pursuant to

Massachusetts General Laws Chapter 93A.  (A copy of the Plaintiff's demand

letter is attached as Exhibit 1 hereto and incorporated herein by reference).

31.    The Defendant, Stanley Fastening Systems, L.P., has failed to make a

reasonable offer of relief to the Plaintiff.

32.    The Defendant, Stanley Fastening Systems, L.P., in breaching its warranties to

the Plaintiff that the product and its component parts were merchantable, safe

and fit for a particular purpose, committed unfair and deceptive acts and

practices, in violation of Massachusetts General Laws Chapter 93A.

33.    The actions of the Defendant, Stanley Fastening Systems, L.P., described herein

were performed willfully and knowingly.

34.    As a direct and proximate result of the above-described unfair and deceptive acts

and practices of the Defendant, Stanley Fastening Systems, L.P., the Plaintiff

has been significantly damaged and is further entitled to multiple damages and

attorneys' fees.

35.    At no time has the Defendant, Stanley Fastening Systems, L.P., offered any

7

reasonable settlement or conformed with the requirements established under Massachusetts General Laws Chapter 93A.

36.  The refusal to grant relief by the Defendant, Stanley Fastening Systems, L.P., has been made in bad faith, with knowledge or reason to know that the Defendant, Stanley Fastening Systems, L.P., had acted in violation of Massachusetts General Laws Chapter 93A.

37.  As a direct and proximate result of the above-described unfair and deceptive acts and practices, the Plaintiff was forced to obtain the services of an attorney and is entitled to be compensated for attorneys' fees under Massachusetts General Laws Chapter 93A.

## CAUSES OF ACTION

### First Cause of Action - Negligence

38.  The Plaintiff, Jonathan Beijar, repeats and realleges the allegations contained in paragraphs 1 through 37 of the Complaint, incorporating them herein by reference.

39.  This is an action by the Plaintiff, Jonathan Beijar, against the Defendant, Stanley Fastening Systems, L.P., for negligence for damages suffered by Jonathan Beijar, including but not limited to, conscious pain and suffering and great pain of body and mind, lost wages, loss of earning capacity, medical expenses, and loss of enjoyment of life.

### Second Cause of Action – Breach of Implied Warranty of Merchantability

40.  The Plaintiff, Jonathan Beijar, repeats and realleges the allegations contained in paragraphs 1 through 39 of the Complaint, incorporating them herein by

8

reference.

41.    This is an action by the Plaintiff, Jonathan Beijar, against the Defendant, Stanley

Fastening Systems, L.P., for breach of an implied warranty of merchantability.

Third Cause of Action -- Breach of Implied Warranty of Fitness for a Particular Purpose

42.    The Plaintiff, Jonathan Beijar, repeats and realleges the allegations contained in

paragraphs 1 through 41 of the Complaint, incorporating them herein by

reference.

43.    This is an action by the Plaintiff, Jonathan Beijar, against the Defendant, Stanley

Fastening Systems, L.P., for breach of an implied warranty of fitness for a

particular purpose resulting in the injury of the Plaintiff, Jonathan Beijar.

Fourth Cause of Action

44.    The Plaintiff, Jonathan Beijar, repeats and realleges the allegations contained in

paragraphs 1 through 43 of the Complaint, incorporating them herein by

reference.

45.    This is an action by the Plaintiff, Jonathan Beijar, against the Defendant, Stanley

Fastening Systems, L.P., for damages arising out of unfair and deceptive acts or

practices of the Defendant, Stanley Fastening Systems, L.P., pursuant to

Massachusetts General Laws Chapter 93A.

Fifth Cause of Action

46.    The Plaintiff, Jonathan Beijar, repeats and realleges the allegations contained in

paragraphs 1 through 45 of the Complaint, incorporating them herein by

reference.

47.    This is an action by the Plaintiff, Jonathan Beijar, against the Defendant, Stanley

9

Fastening Systems, L.P., for treble damages arising out of a knowing and willful violation by the Defendant, Stanley Fastening Systems, L.P., of Massachusetts General Laws Chapter 93A.

<u>Sixth Cause of Action</u>

48.    The Plaintiff, Jonathan Beijar, repeats and realleges the allegations contained in paragraphs 1 through 47 of the Complaint, incorporating them herein by reference.

49.    This is an action by the Plaintiff, Jonathan Beijar, against the Defendant, Stanley Fastening Systems, L.P., for treble damages arising out of the failure to tender a reasonable offer of settlement pursuant to Massachusetts General Laws Chapter 93A.

## **DEMAND FOR RELIEF**

A.    The Plaintiff, Jonathan Beijar, demands judgment against the Defendant, Stanley Fastening Systems, L.P., in an amount which will fairly and adequately compensate him for his damages, plus interest, costs, and such other relief as the Court may deem appropriate, as to Counts One, Two and Three.

B.    The Plaintiff, Jonathan Beijar, demands judgment in his favor and against the Defendant, Stanley Fastening Systems, L.P., for substantial damages, plus double or treble damages, interest, costs, reasonable attorneys' fees, and for such other and further relief as the Court may deem proper, as to Counts Four, Five and Six.

## **JURY CLAIM**

THE PLAINTIFF CLAIMS A TRIAL BY JURY.

10

JONATHAN BEIJAR
By his attorney,

Scott W. Lang, Esquire  BBO #285720
Lang, Xifaras & Bullard
115 Orchard Street
New Bedford, MA  02740
(508) 992-1270

Dated: April ___29___, 2004

# Exhibit 1

LAW OFFICES

### LANG, XIFARAS & BULLARD

115 ORCHARD STREET
NEW BEDFORD, MASSACHUSETTS 02740

TELEPHONE (508) 992-1270
FAX (508) 993-8696
WWW.LXB-NEWBEDFORD.COM
EMAIL: MAIL@LXB-NEWBEDFORD.COM

SCOTT W. LANG * °
MARGARET D. XIFARAS * #
PETER C. BULLARD *

SUSAN FORGUE WEINER *
JENNIFER L. DAVIS *

OF COUNSEL
WILLIAM M. STRAUS *▪
GEORGE C. PERKINS *
JOSEPH B. MCINTYRE *

ADMITTED TO PRACTICE
* MASSACHUSETTS
° DISTRICT OF COLUMBIA
▪ VIRGINIA
# FLORIDA

OF COUNSEL
HON. JOHN M. XIFARAS *
RETIRED JUSTICE OF THE SUPERIOR COURT

## BY CERTIFIED AND REGULAR MAIL
## RETURN RECEIPT REQUESTED

January 21, 2004

General Partner
Stanley Fastening Systems, L.P.
Route 2, Briggs Drive
East Greenwich, RI  02818

Dear Sir or Madam:

Re:   <u>Breach of Warranty on Bostitch Framing Nail Gun</u>
      Claimant:     Jonathan Beijar
      Injury Date:  February 1, 2001
      Product:      Bostitch Framing Nail Gun

I am writing to you on behalf of my client, Jonathan Beijar, regarding Stanley
Fastening Systems, L.P.'s unfair and deceptive conduct in breaching warranties
associated with the design, manufacture and sale of its Bostitch framing nail gun.
Please be advised that this is a written demand for relief pursuant to Mass. Gen.
L. c. 93A.

On February 1, 2001, Mr. Beijar was severely injured when a Bostitch framing
nail gun[1] fell from an overhead plank at a construction site and struck his chest,

---

[1] The framing nail gun bore a label stating "Bostitch, Stanley Fastener Systems, Briggs Drive,
East Greenwich; Collation Type: Wire Weld; Fastener Length: 2"-3-1/2". The label also

as he was walking in the area below the plank. Upon making contact with Mr. Beijar's chest, the nail gun spontaneously discharged, firing a three and a half inch roofing nail through his sternum, piercing his right ventricle, and lodging into his heart.

At the time of his injuries, Mr. Beijar was working as a laborer on a home construction site at Oyster Harbors, Osterville, Massachusetts. The nail gun was owned by his employer, Care Free Homes, Inc., of 239 Huttleston Avenue, Fairhaven, Massachusetts.

Mr. Beijar's injuries resulted from defects in the manufacture and design of the nail gun, as well as (a) in the manner in which it was sold, (b) its development, inspection, assembly, testing, marketing, and distribution, and (c) in the provision of instructions and warnings for it. Specifically, the nail gun was inadequately guarded for safety, did not contain sufficient warnings regarding the dangers surrounding its use, was designed in a manner that permitted a nail to release without an intentional release of the trigger, and was designed, manufactured, marketed, distributed, developed, inspected, assembled, and sold in a manner that placed its users at undue risk of injury.

Stanley Fastening Systems, L.P. has violated Massachusetts General Laws Chapter 93A in the following respects, among others:

1.  by manufacturing, designing, developing, inspecting, assembling, testing, marketing, distributing, providing instructions and/or warnings for, and/or selling, a product that was not merchantable, safe, or fit for a particular purpose, which was known to it; and

2.  by breaching both express and implied warranties for the nail gun.

Upon information and belief, Stanley Fastening Systems, L.P.'s acts and omissions were performed willfully and knowingly. As such, please be advised that my client has a prospective cause of action under Massachusetts General Laws Chapter 93A, Section 9.

As a direct and proximate result of the above-described unfair and deceptive acts and practices, Mr. Beijar (a) has sustained serious injuries to his heart and chest; (b) has undergone extensive medical treatment and, to date, has incurred medical bills exceeding $7,700; (c) was caused to be disabled and will continue to be disabled in the future; (d) was caused and will continue to be caused great pain of body and mind; (e) was caused to be disfigured and will continue to be disfigured in the future; (f) was caused to be unable to work for two and a half years; (g) was caused to suffer a loss of earning capacity and lost wages; (h) was caused to incur significant out of pocket expenses; and (i) was caused and

---

contained information regarding the fastener shank. The fastener shank information is somewhat illegible, but appears to state 'Fastener Shank DIA: .113" - .131".'

will continue to be caused curtailment of normal activities and loss of his enjoyment of life.

In light of the above-described circumstances, demand is hereby made upon Stanley Fastening Systems, L.P. to pay my client $250,000 to compensate him for his injuries and losses.

Under Massachusetts General Laws, Chapter 93A, you have thirty (30) days from your receipt of this letter to respond with a reasonable offer of settlement.  If you fail to do so, the statute provides that you will be liable for multiple damages and reasonable attorney fees incurred by Mr. Beijar for the prosecution of this action.

Sincerely,

Scott W. Lang
SWL/jld

■ Complete items 1, 2, and 3. Also complete
item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
or on the front if space permits.

A. Signature
X ☐ Agent ☐ Addressee

B. Received by ( Printed Name)   C. Date of Delivery
Scott K Fujal   1/22/04

1. Article Addressed to:

General Partner
Stanley Fastening Systems,
L.P.
Route 2, Briggs Drive
East Greenwich, RI 02818

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail  ☐ Express Mail
☐ Registered  ☐ Return Receipt for Merchandise
☐ Insured Mail  ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)  ☐ Yes

2. Article Number
(Transfer from service label)   7003 1010 0004 6259 6011

PS Form 3811, August 2001   Domestic Return Receipt   102595-02-M-1540

---

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Scott W. Lang, Esquire
Lang, Xifaras & Bullard
115 Orchard Street
New Bedford, MA 02740

5255

16

---

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE
EAST GREENWICH, RI 02818

| | | | |
|---|---|---|---|
| Postage | $ | 0.37 | UNIT ID: 0102 |
| Certified Fee | | 2.30 | |
| Return Receipt Fee (Endorsement Required) | | 1.75 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | | Clerk: KKCF4T |
| Total Postage & Fees | $ | 4.42 | 01/21/04 |

Sent To  General Partner
Street, Apt. No.  Stanley Fastening Systems, L.P.
or PO Box No.  Route 2, Briggs Drive
City, State, ZIP+4  East Greenwich, RI 02818

7003 1010 0004 6259 6011

# EXHIBIT 9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-10233-RCL

JONATHAN BEIJAR
    Plaintiff

v.

STANLEY FASTENING SYSTEMS, L.P.
    Defendant

**PLAINTIFF, JONATHAN BEIJAR'S ANSWERS TO DEFENDANT'S
INTERROGATORIES**

1.    Please state your full name, present address, date of birth and social
security number.

A.    Name:                  Jonathan Beijar
        Address:               61 Laura Keene Ave.
                                     Acushnet, Massachusetts
        Date of Birth:        12/8/1977
        Social Security Number:  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

2.    Please set forth in full detail the facts of the incident giving rise to this
lawsuit, including but not limited to:

        a.  where the incident occurred;
        b.  how the incident occurred; and
        c.  when the incident occurred.

A.    a.    Lot 14-5 Pirates Cove Road, Osterville, Massachusetts
        b.    A Stanley Bostitch pneumatic nailer fell from an overhead staging
            plank at my worksite as I was walking on the ground in the area
            below the staging.  I attempted to avoid being struck by the nailer,
            but the barrel of the nailer struck my chest and spontaneously
            discharged, firing a three and a half inch roofing nail through my
            sternum, piercing my right ventricle, and lodging into my heart.
        c.    February 1, 2001, at approximately 12:20 P.M.

3.    Please identify by full name and address every person who has
information about the incident, including but not limited to eyewitnesses,
and briefly state for each the nature of their information.

all treatments, the nature of all treatments, and your understanding of the purpose of all treatments.

A.    I am not presently being treated for the injuries that I sustained as a result of the February 1, 2001 incident.

21.    For the period of February 1, 1996 through to the present, set forth whether you have suffered from any disease, injury, illness, or other condition and, if so, provide the name or a description of the disease, injury, illness or other condition; the date when each such disease, injury, illness or other condition began and ended; the name and address of each physician or other health care provider from whom you received treatment for each such disease, injury, illness, or other condition together with the dates of treatment rendered; the name and address of each hospital or other institution to which you were admitted or from which you received treatment together with the dates of admission.

A.    To the best of my recollection, I did not suffer any significant injuries or illnesses during the stated time period.

22.    Please identify each person whom you expect to call as an expert witness at trial, state the subject matter on which each expert is expected to testify, state the substance of the facts and opinions to which each expert will testify, and summarize the grounds for each opinion.

A.    Information regarding expert witnesses, if not privileged, will be furnished seasonally.

23.    Please state the basis for the contention in Paragraph 24 of your Complaint that "due notice" of "any and all breaches or warranty" was provided to Stanley, including in your answer:

    a. The nature of the "due notice;"
    b. By and to whom the "due notice" was provided; and
    c. The date(s) on which "due notice" was provided.

A.    On January 21, 2004, my attorney wrote to Stanley Fastening Systems, L.P.'s General Partner detailing the February 1, 2001 incident, describing the nailer, and identifying my resulting injuries.

24.    Please identify each occasion on which you used the product, or any similar product, including in your answer the purpose for which you used it and the length of time you used it.

A.    I used pneumatic nailers on a few home remodeling projects. I do not recall the length of time that I used the nailers.

12

To the best of my recollection, I used a pneumatic nailer at the Care Free Homes, Inc. worksite at Lot 14-5 Pirates Cove Road, Osterville, Massachusetts on a couple of occasions. I do not recall the exact number of occasions on which I used a nailer at the Pirates Cove Road worksite, nor do I recall which nailer(s) I used or for how long I used the nailer(s). I did not use a nailer on February 1, 2001.

25.    Were you using any safety equipment at the time the incident occurred? If so, please identify each type of safety equipment you were using and its/their present location.

A.    No.

Signed under the penalties of perjury this _15TH_ day of October, 2004.

_____
Jonathan Beijar

As to Objections:

JONATHAN BEIJAR
By his attorney,

_____
Scott W. Lang, Esquire  BBO #285720
Lang, Xifaras & Bullard
115 Orchard Street
New Bedford, MA 02740
(508) 992-1270

Dated: October _18_, 2004

13

## CERTIFICATE OF SERVICE

      I, Scott W. Lang, Esquire, hereby certify that I have served the within **PLAINTIFF, JONATHAN BEIJAR'S ANSWERS TO DEFENDANT'S INTERROGATORIES** on the defendant by mailing a copy to its attorney of record:  Christopher Duggan, Esquire, at Smith & Duggan, LLP, 2 Center Plaza, Boston, MA  02108, by first class mail, this _18th_ day of October, 2004.

Scott W. Lang, Esquire

# EXHIBIT 10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JONATHAN BEIJAR, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 04-10233-RCL |
| | ) | |
| v. | ) | |
| | ) | |
| STANLEY FASTENING SYSTEMS, L.P., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

STANLEY FASTENING SYSTEMS, L.P.'s
ANSWERS TO PLAINTIFF'S INTERROGATORIES

1.    Please state the full name, residential address, employer, business address, and
occupation of each person involved in answering these interrogatories on behalf of the
defendant, identifying each interrogatory that each such person assisted in answering, and
identifying all persons consulted in responding to these interrogatories, including the
information that each person provided.

**ANSWER:**

    Stanley Fastening Systems, L.P. ("Stanley") objects to this interrogatory as overly
broad, unduly burdensome, and outside the scope of discovery.  Stanley states that it has
complied with its obligations under Fed. R. Civ. P.  33(a).

    Without waiving this objection, Stanley answers:

    Matthew B. Ponko, an agent of Stanley, is a Senior Project Engineer at Stanley
Fastening Systems, L.P., Briggs Drive, East Greenwich, RI 02818.  Mr. Ponko has
furnished information that forms the basis of these answers to interrogatories.

2.    Please identify all persons, including but not limited to the defendant and employees of
the defendant, who (a) designed, (b) developed, (c) inspected, (d) assembled, (e) tested,
(f) manufactured, (g) furnished component parts for, (h) marketed, (i) distributed, (j) sold,
(k) promoted, or (l) provided instructions and warnings for, the product.

10.    Please describe the nailer by identifying its model number, model name, serial number, and date of manufacture.

**ANSWER:**

The nailer produced by plaintiff's employer, Care Free Homes, Inc., which was identified by plaintiff as the tool involved in this accident, is a Model N79WW-1, s/n 0357 047, manufactured on December 22, 2000.

11.    Please state whether the defendant or anyone on its behalf conducted any tests on the product either before or after February 1, 2001 relating to any of the following:

    a.    the operation of the trigger, contact trip, and air hose mechanisms;
    b.    the processes and mechanisms by which nails could be discharged from the product;
    c.    any dangers associated with leaving the product unattended; and
    d.    whether a nail could discharge from the product without the purposeful engagement of the trigger.

**ANSWER:**

Stanley objects to this interrogatory as irrelevant, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent that it seeks all information regarding every test ever performed on the N79WW. The N79WW and its component parts have undergone extensive testing on a wide range of issues. Stanley further objects to this interrogatory as not reasonably limited in time or scope to the extent that it is not limited to specific alleged defects in the N79WW.

Without waiving this objection, Stanley answers:

(a-d). Before sale, the N79WW was subjected to a great deal of testing. Note, however, that Stanley does not sell air hoses, so it has no responsive information on that point.

In the development process, each component part is subjected to many tests relating to durability, functionality and performance, among other things. After assembly, each tool is tested before it is sold.

The tool was also tested after the accident, after Mr. Beijar brought this lawsuit almost three years after the accident. Despite the fact that Care Free Homes continued to use the product with satisfaction for years after the accident, it still functioned correctly when Stanley tested it in 2004. A copy of this report has been produced to the Plaintiff's lawyer.

7

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of the foregoing document to be served upon counsel of record as listed below:

> Scott W. Lang, Esq.
> Lang, Xifaras & Bullard
> 115 Orchard Street
> New Bedford, MA 02740

by facsimile and first class mail, postage prepaid, on September 16, 2004.

Christopher A. Duggan

14

# EXHIBIT 11

1

1            UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3    NO. 04-10233-RL

4

5    ------------------------------------------------

6    JONATHAN BEIJAR,                              )

7                        Plaintiff,               )

8                                                  )

9          vs.                                     )

10                                                 )

11   STANLEY FASTENING SYSTEMS, L.P.,              )

12                        Defendant.               )

13   ------------------------------------------------

14

15          DEPOSITION OF MATTHEW PONKO, taken in

16   behalf of the Plaintiff, pursuant to the

17   applicable provisions of the Massachusetts Rules

18   of Civil Procedure, before Sandra A. Viera,

19   Court Reporter and Notary Public in and for

20   the Commonwealth of Massachusetts, at the

21   Law Offices of Lang, Bullard & Xifaras,

22   115 Orchard Street, New Bedford, Massachusetts,

23   on Friday, October 29, 2004, commencing at

24   10:00 a.m.

33

1                    (Witness indicating)

2          Q.   Okay.  And that's the exhaust?

3          A.   Yes.

4          Q.   And then "No. 2" is the front of

5     the tool and that's the yellow part of the tool?

6          A.   Yes.

7          Q.   And the back end of the tool, you

8     indicated is the part of the tool that ends

9     with a nozzle-type of shape to it at the --

10         A.   Bottom.

11         Q.   -- bottom; all right.  That would be

12    "No. 3."

13                    Now what's the function of No. 1,

14    which is the exhaust?

15         A.   This -- uhm, this is a compressed

16    pneumatic nailer and it gets its power from

17    compressed air being basically released into

18    the cylinder, which then drives the piston.

19    When the piston returns, it has to exhaust

20    that air in the cylinder; and that is the

21    purpose, the sole purpose of the exhaust

22    is to get the air pressure above the piston

23    out of the tool so that the piston can

24    come back and return and reset for the next

40

1                (Counsel indicating)

2        A.   Yes.

3        Q.   Okay.  All right, now tell me about,

4    please, sequential firing of the tool.

5        A.   Sequential firing or sequential trigger

6    is another way that the tool can be configured;

7    and depending upon how you want to use the tool,

8    you may choose that operation.  The --

9    the difference, the main difference between

10   the contact trip operation versus sequential

11   trip operation is that you have to do that

12   in a sequence.

13           If you recall contact, I described

14   two methods, which it didn't matter either way,

15   but both had to be actuated to cycle the tool.

16   In sequential operation, you have to follow

17   a certain sequence of operations in order

18   for the tool to actuate; and that sequence

19   is compress the trip, have the trip fully

20   bottom out and then you pull the trigger.

21           If you reverse that procedure,

22   the tool will not fire.

23       Q.   So if I -- if I hold the trigger

24   down and I press the trip until it bottoms out,

43

1          MR. LANG: Let me try it again.

2    Examination by Mr. Lang:

3          Q.  My understanding is that this particular

4    machine will either work in a contact trip mode

5    or a sequential trip mode; is that correct?

6          A.  Yes.

7          Q.  Okay; is there any other way that it

8    will operate; that it will fire?

9          A.  For this nailer, no.

10          Q.  Can you, please, explain to me what

11    the contact trip mode is -- how it's activated.

12          A.  The contact trip is activated in either

13    one of two ways.  The first way would be you

14    would put the trip on the work piece,

15    depress the tool, which compresses the contact

16    trip.  When the contact trip bottoms out,

17    you can then pull the trigger and it will

18    discharge a fastener.

19              In the other mode in which it will

20    cycle is if you pull the trigger and then

21    touch the trip to the work surface, and that

22    is called "bump firing" where you can have

23    the trigger pulled and tap the nose or the trip

24    on the work surface and it will discharge a

50

1    recommend modifying the tools at all.  In fact,

2    we warn against modifying.  I -- I'm not aware

3    of any modification that --

4         Q.  Are you aware of any advertising for

5    modifying or any type of item that's out

6    there that would modify the trip so that it

7    would fire without being fully bottomed out?

8         A.  No, I'm not aware of any.

9         Q.  All right.  The -- now, if we can,

10   sequential trip, can you explain to me how

11   the sequential trip mode works on this particular

12   tool?

13        A.  In sequential mode, the -- it --

14   as the name implies, it requires a sequence

15   and the trip, in this application,

16   you would have to compress the trip against

17   the work surface, the trip would bottom out

18   and then you could pull the trigger and it will

19   cycle.  If you wanted to drive another fastener,

20   you would have to lift the tool up,

21   reset the trip and recompress it, bottom it

22   out and then pull the trigger again.

23        Q.  Is there a difference between

24   the sequential trip mode and the bump mode?

54

1    surface and you've kept the trigger pulled --

2         Q.  Right.

3         A.  -- you may discharge a fastener if

4    you -- that you may not want where it goes.

5         Q.  Okay.  Now in order -- is there --

6    how do you -- how do you switch the tool?

7                   You said it has two modes of

8    operation; the contact mode and the sequential

9    mode.  How do you switch it from either one?

10        A.  With this tool, you would be required

11   to switch the trigger out.

12        Q.  And tell me exactly what that means.

13        A.  Uhm, when the tool is sold, we give

14   you -- depending upon how the tool was sold,

15   in this instance, this was a contact trip tool,

16   and a sequential trigger kit, conversion kit,

17   would have been given away with the tool.

18                 And if they wanted to configure

19   the tool to a sequential mode, all they needed

20   to do is basically drive out two pins and

21   swap the trigger; and then I think there's

22   a spring there, install the spring,

23   the trigger and insert the pin; and it's ready

24   to go again.  It typically takes five minutes

55

1    to do.

2        Q.   Okay.  Do we know -- and there's an

3    instruction booklet on how to do that?

4        A.   With the conversion kit, there is --

5    it comes with a full explanation of the both

6    types of firing modes and configurations

7    as well as warnings and the, uhm, instructions

8    on how to do it.

9        Q.   Have -- can this tool be fired like

10   a gun; in other words, without having any contact

11   with a surface?

12            MR. DUGGAN:   Objection.

13       A.   If you -- explain to me what you mean.

14   I don't know what that means.

15       Q.   Can this tool -- let me ask it another

16   way.

17            Can this tool be fired without any

18   contact, without the trip having any contact

19   with a surface?

20       A.   No, the trip has to be depressed.

21   So it has to be against something to depress

22   it.  Typically, that's the work piece that you

23   would depress it against.

24       Q.   Can it be modified so it requires

64

1        A.  It's -- it's designed -- the end cap

2    is designed.  It has a threaded --

3    it's a threaded fitting that gets threaded

4    into the end cap.  It is a pipe thread cap.

5        Q.  And does that mean then that it

6    actually is, in essence, screwed into the air

7    hose?

8                MR. DUGGAN:  Objection.

9    Examination by Mr. Lang:

10        Q.  The coupling from the air hose is

11    screwed in or does it clip in?

12        A.  No, let me go back.  I defined it as

13    the -- you were referring to the fitting into

14    the tool --

15        Q.  I understand.

16        A.  -- that is screwed in.

17        Q.  That's screwed in, okay.

18                How does the tool attach to the air

19    hose?

20        A.  The tool's attached to the air hose

21    by a, uhm, coupling and that would be a

22    female coupling that would be attached to the

23    hose.

24        Q.  Does it clip in?

65

1      A.   It's -- typically, it's a slip fit

2    that's -- you would pull a collar down

3    and it would enable the tool to be --

4    the fitting to be attached and then you

5    would release the collar and it locks itself

6    on to the tool.

7      Q.   Okay.  And this is designed to attach

8    to the tool without the use of any other tools

9    themselves; in other words, it could be done

10   manually, by hand.

11           It is designed so that the female

12   coupling is attached to the male coupling

13   simply by inserting it and then allowing

14   the spring mechanism or allowing some sort of

15   collar to come up around it or twist around

16   it; is that how it works?

17     A.   It -- in this -- yes, the normal

18   type of hoses that are available are --

19   uhm, they have a slip fitting that's --

20   that slides axial along the hose and it --

21   I'm going to say from what I would think,

22   probably a quarter of an inch back --

23   and then it's spring loaded.  You apply it to

24   the tool, it springs back under power,

66

1    under spring power; and it locks itself on.

2              There aren't any tools required.

3         Q.   Okay.  All right, now if the --

4    a fully loaded nail gun weighs 9.037 pounds,

5    can the fully loaded nail gun be suspended

6    from the air hose attached by the coupling?

7              In other words, will it hold it or

8    will it disengage because of the weight?

9              MR. DUGGAN: Objection.

10        A.   Well, first of all, you wouldn't want

11   to do that.  Let me just state that by saying

12   that first.

13        Q.   Why wouldn't you want to do that?

14        A.   Because you never know what could

15   happen.  It's something you would -- would not

16   want to do.  That would imply that the tool

17   is not in use.

18              We recommend and warn, when the tool

19   is not in use, it be unplugged from the power

20   source; because the tool is under pressure at

21   that point.

22        Q.   And what do you mean by "it's under

23   pressure"?

24        A.   Well if there is -- let's just --

68

```
 1   want to leave -- you don't want to leave any

 2   power tool unattended.

 3        Q.  Because someone who doesn't understand

 4   the operation could come upon it; is that what

 5   you're saying?

 6        A.  For a variety of reasons.  That's one

 7   instance.  Again, it's not safe handling of

 8   any kind of power tool to be left alone.

 9        Q.  If the -- if the nail gun is --

10   comes dangling from a scaffolding, as it

11   allegedly did in this case, is the coupling

12   designed so that the nail gun will break

13   away from the -- in other words, will that

14   weight trigger a break away from the coupling

15   of the nail gun and the coupling of

16   the air hose?

17            Is there anything in the design

18   that allows it to break away?

19            MR. DUGGAN:  Objection to the form.

20        A.  No.

21        Q.  So the only way it will break away is

22   if you manually detach it?

23        A.  Yes, that's the way you would discouple

24   the tool -- would be a normal procedure for
```

116

1    contact trigger?

2        A.  Yes.

3        Q.  Okay.  And then, depending on the

4    customer, you could buy the conversion kit for

5    the N79?

6        A.  If you ordered the tool as a contact,

7    it came with the sequential free.

8        Q.  Okay.

9        A.  If you specifically ordered it as a

10   sequential trigger, the contact trip kit was not

11   included with it.

12       Q.  You could buy it?

13       A.  No, we would just send them to you if

14   you requested it.

15       Q.  Okay.  And the N88, you decided that

16   it had to be a sequential --

17       A.  Right.

18       Q.  -- trigger.  It could not be a contact

19   tool?

20       A.  Correct; entirely different application,

21   that's why.  A very -- that tool was designed

22   for a very specific application.

23       Q.  Okay.

24       A.  Not -- you would not use the N79 to

**LAPLANTE & ASSOCIATES, INC.**
**(508) 999-7499**

133

1      A.   Okay, I misinterpreted your description

2   of a deadman's advise -- deadman's device.

3      Q.   Okay; and the answer is that you haven't

4   considered one.  That's not something that you

5   would --

6      A.   To enable someone to use the tool

7   without their hand on the trigger?

8      Q.   To enable someone to only be able to

9   use the tool if their hand is on the handle of

10  the tool.

11          In other words, a deadman's device,

12  in this type of tool, would mean that unless

13  your hand was on the handle of the tool,

14  it cannot be operated because the on/off switch,

15  in essence, would be built into the handle.

16     A.   It's effectively what we have.  It's a

17  trigger.

18     Q.   Okay.  And I'm just saying, aside from

19  the trigger.

20     A.   No, the trigger is that device.

21     Q.   The trigger can be overridden very,

22  very easily, though.  If they tie back the

23  trigger, it's overridden?

24     A.   It would be a blatant misuse of the

138

1    the sequence in order to fire a nail out of

2    the tool.

3              Is the scenario that's posed in

4    this particular narrative by the OSHA inspector

5    speaking to the foreman a plausible scenario?

6              MR. DUGGAN:  Objection.

7         A.   It's plausible in the sense that it

8    explains how both mechanisms were actuated

9    to me.  And if -- you know, in that respect,

10   I would -- I could believe that that could --

11   that could cause the tool to actuate because

12   that -- you have cycled it or you have caused

13   the both trips, the trip and the trigger,

14   to be actuated.

15        Q.   Right.  Is the scenario that the nail

16   gun swinging into his chest would be enough

17   force to depress the trip to the point where

18   it bottoms out, is that -- is that something

19   that's plausible?

20             MR. DUGGAN:  Objection.

21        A.   I don't really know how far -- I'm sorry

22   --

23             MR. DUGGAN:  Objection.

24        A.   -- I don't know how far the tool fell

LAPLANTE & ASSOCIATES, INC.
(508) 999-7499

143

1        Q.   The trigger in this case is completely

2   exposed.   The trigger on this N79 is completely

3   exposed then?

4             MR. DUGGAN:   Objection.

5        Q.   There's no cap, cowling, around it.

6   There's no trigger guard around the trigger.

7             MR. DUGGAN:   Objection.

8        A.   That -- that's correct.   There is no

9   trigger guard.   And the way the tool is designed,

10   it's designed to be used with someone with

11   the intentions of using very thick gloves

12   because these tools are designed to be used

13   in the winter and all year-round; so we design

14   the tool to give the optimal ability for

15   the end user to get at the trigger, considering

16   numerous scenarios.

17        Q.   When you design it, do you consider

18   the scenario that someone in -- allegedly

19   catching the tool or trying to catch the tool

20   has complete access to the trigger?

21        A.   No, that would be -- I mean, No. 1,

22   it's, you know, again, blatant misuse of the

23   tool.   It implies that the tool is either

24   being thrown or being dropped at someone.

156

1                C E R T I F I C A T E

2    COMMONWEALTH OF MASSACHUSETTS

3    BRISTOL, ss.

4

5

6            I, Sandra A. Viera, a Notary Public in

7    and for the Commonwealth of Massachusetts, do

8    hereby certify:

9

10           That the witness whose deposition is

11   hereinbefore set forth, was duly sworn by me and

12   that such deposition is a true record of the

13   testimony given by the said witness.

14

15           IN WITNESS WHEREOF, I have hereunto set

16   my hand and notarial seal.

17

18

19

                 Sandra A. Viera

20               Court Reporter/Notary Public

21

     My Commission expires April 14, 2006.

22

23

24

# EXHIBIT 12



August 20, 2005

Christopher A. Duggan, Esq.
Smith & Duggan LLP
Lincoln North
55 Old Bedford Road
Lincoln, MA 01773

> Re:    *Beijar v. Stanley Fastening Systems, L.P.*
>        C.A. No. 04-10233-RCL

Dear Mr. Duggan:

This is my report regarding the accident involving Jonathan Beijar and the Stanley-Bostitch pneumatic nailer, model N79WW, serial number 0356 047, that Mr. Beijar or his lawyer claim was involved in the accident. I have tried to follow the outline you suggested.

At the outset, you will note that some of the language in this report is similar to Mr. Olmstead's report, which I have had the benefit of reading. Because I only received Igor Paul's report on August 15, and because my report was due by August 24, (and I had a previous vacation scheduled for the week of August 23), my time to prepare this letter was limited. Consequently, where my opinions overlap into areas about which Mr. Olmstead has written, I have taken the liberty of borrowing from his report, to the extent I agree with what he says. What should be clear is this: this accident occurred because Mr. Beijar pulled or activated the trigger on the tool while the tip of the tool was pressed against his chest. There is no other way for this accident to happen, as Mr. Olmstead has stated.

This is borne out by the eyewitness testimony and statements. Therefore I did not feel the need, and did not have the time, to use different language to describe the same point. In reconstructing the accident, and in outlining both the operation and benefits of the N79WW, Mr. Olmstead's report reflects my own opinion.

<u>Statements of Opinions to be Expressed</u>

I have, essentially, come to these conclusions, all to within a reasonable degree of scientific certainty:

# BOSTITCH

1.  The tool Mr. Beijar claims was involved in his accident was a perfectly good tool.
    It was reasonably fit for its intended and foreseeable uses, and its design did not
    cause Mr. Beijar's accident.

2.  The accident was caused when Mr. Beijar depressed the trigger as he pushed the
    contact trip against his chest, causing the tip to depress. These two actions,
    depression of the contact trip and activation of the trigger, are essential to cause
    the tool to cycle -- it did not, and could not, cycle unless both of these things
    happened. Mr. Beijar's claim that he did not touch the tool, or depress the trigger,
    is incorrect.

3.  The accident occurred because of failure to follow several of Bostitch's safety
    instructions and warnings, including the requirement that the tool not be left
    unattended while connected to the compressor, and that people not pull the tool by
    the air hose. The instructions and labels are appropriate, plainly written, and easy
    to follow by those in the construction field.

4.  Stanley's design and test protocols are appropriate and reasonable for the
    development and distribution of pneumatic nailers such as the N79WW.

5.  Both the Contact Trip and Sequential Trip Triggers are Reasonably Safe and
    Appropriate devices for use with framing nailers.

If asked, I intend to offer these opinions at trial. I also expect that I will testify in a
manner consistent with my earlier deposition testimony. Finally, I will, if asked, explain how the
proposed alternative designs suggested by Igor Paul, about which I learned when I received his
July 30, 2005 report on August 15, are either impractical, unnecessary, and some might actually
make the tool more dangerous.

Bases for Opinions

1.  Design Sufficiency of the Tool

To a reasonable degree of scientific certainty, it is my opinion that the tool was
reasonably fit for its intended and foreseeable uses. The tool met or exceeded all industry
standards, including ISANTA standards, and Stanley-Bostitch's own internal safety and product
tests. It was a new product at the time of the accident, having been sold in December of 2000, as
is proven by the serial number.

**BOSTITCH** STANLEY

Not only did the tool meet or exceed industry standards, its design is so effective that users find it a safe and efficient tool for general construction purposes. For example, Care Free Homes found it so useful that they put it back in use after the accident and continued to use it satisfactorily until it was replaced with another Bostitch framing nailer after Mr. Beijar filed this lawsuit. Mr. Pinard testified that these Bostitch nailers were the best pneumatic nailers he had ever used.

I tested this tool and found that it operated exactly as intended. Despite the fact that it had been in use almost continually for more than two years, it still met Bostitch's test requirements. The tool will not cycle unless both the trip is depressed and the trigger is pulled. Igor Paul agrees with this finding in his July 30, 2005 report.

Tools such as this can be used with either a contact trip or sequential trip activation trigger. The people at Care Free Homes had chosen the contact trip trigger, which is by far the more popular of the two triggers for commercial and construction applications. Both triggers are reasonably safe when handled in accordance with good practices and the operating instructions and warnings on the tool.

The additional or alternative designs suggested by Igor Paul in his letter of July 30, 2005, in my opinion, are either impractical or, actually, would make the tool more dangerous. Any design that requires or encourages the users to keep their fingers on or in close proximity to the trigger on these pneumatic tools creates unnecessary hazards. Further, the tool can easily be removed from the power source as stated in the manual when not in use. Nothing further is needed or desirable.

This tool was sold with a sequential trip conversion kit and easy-to-follow instructions such that, had the users wished to do so, they could have converted the trigger from a contact trip to a sequential trip tool within a matter of minutes. However, there is no evidence that a sequential trip trigger would have made any difference in Mr. Beijar's accident. The accident, as described by the eyewitnesses, could have occurred with either the contact trip or the sequential trip trigger. For that reason, it is important to follow all of the safety instructions that accompany the tool, including the instructions (1) to disconnect the tool from the compressor when not in use; and (2) not to pull the tool by the air hose as was described by the eyewitnesses. Indeed, Mr. Beijar admitted, in his deposition that he knew it was improper and unsafe to pull the tool by the air hose and that in doing so might well cause him injury.

# BOSTITCH®  STANLEY

## 2.    The accident

I have read Mr. Olmstead's report and agree with his description of the accident scenario and with his reconstruction of the accident. If asked, and if the facts at trial are consistent with the depositions taken to date, I expect to offer an opinion that the accident was caused essentially in the manner described by Mr. Pinard in his deposition.

Mr. Beijar was injured on February 1, 2001, at a home construction site in Osterville, Massachusetts. The rendition given by the eyewitnesses, Ryan Cordeiro, Wayne Pinard and David Santos, essentially agree on the scenario. The Bostitch N79WW nailer was resting on an overhead scaffold, still connected to the compressor, with part of the tool hanging over the side of the planking. One of the witnesses states that Mr. Beijar bumped into the loose planking causing the tool to move closer to the edge of the scaffold.

According to the foreman, Mr. Beijar had been instructed to move the tool back onto the center of the planking (Pinard dep. p. 10), but Beijar apparently elected not to do this. Instead, the eyewitnesses state that Mr. Beijar pulled the tool off the planking by grabbing the air hose and pulling down (Pinard dep. p. 11, Santos Statement), something Mr. Beijar admitted he knew was unsafe to do. (Beijar dep. pp. 27-28.) As the tool fell off the plank, Mr. Beijar "caught it like a football" (Pinard dep. p. 11) and pulled it towards his chest, causing the tip of the tool to contact his chest. (Pinard dep. p. 11.) Either before the tip hit Mr. Beijar or just after, Mr. Beijar depressed the trigger with his thumb (Pinard dep. pp. 39-41) causing the tool to cycle. He had a clear view of the accident and the tool and was sure Mr. Beijar's thumb hit the trigger.

## 3.    Cause of the Accident

Mr. Beijar's accident was caused by a combination of his own negligence in pulling on the air hose to take the tool off of the scaffold (according to the eyewitnesses), when he knew this was a dangerous thing to do (according to his own deposition testimony, Beijar dep. pp. 27-28) and several violations of the safety instructions both on the tool and in the manual that accompanied the tool that contributed to the accident. Specifically, the tool was left unattended, on a scaffold, while still connected to the air compressor, a flat violation of the safety manual. Finally, I have tried to address some of the claims made by Igor Paul in a letter dated July 3, 2005, which I saw for the first time on August 15, 2005.

Please, also, note the comments in paragraph 5 below about the sequential trip / contact trip triggers on the Care Free Homes tools.



   4.  Stanley-Bostitch's Design and Testing Protocols Are Appropriate

   Bostitch pneumatic nailers are designed to meet or exceed ANSI/ ISANTA safety requirements in all respects while insuring the production of an efficient, practical tool for use by contractors and others. The test protocols we have produced to the plaintiff's lawyer demonstrate that the N79WW met these goals. When we tested the tool identified as the one involved in Mr. Beijar's accident, it still met these standards, despite almost three years of heavy use by Care Free Homes.

   5.  The Contact Trip Trigger is a Reasonably Safe Device for use in a Framing Nailer

   There is nothing inappropriate about selling a tool with a contact trip that is accompanied by a sequential trip conversion kit. Indeed, this is consistent with the relevant ANSI / ISANTA provisions, and accomplishes the goal of supplying tools to end users that are reasonably safe, efficient and practical for use in the construction field. Furthermore, there is no indication that a sequential trip rather than a contact trip trigger would have prevented Mr. Beijar's accident. Mr. Beijar claimed he did not depress the trigger but the tool cycled anyway, which our testing has proven inaccurate – both the contact trip and the trigger had to be depressed for the tool to drive a nail. They eyewitness, Mr. Pinard, testified that Mr. Beijar pulled the trigger with his right thumb, but he could not tell if that occurred before or after the nose of the tool hit Mr. Beijar's tip. If the nose hit first, and then Mr. Beijar pulled the trigger while the trip was depressed, the tool would cycle with either type of trigger.

   One of the witnesses from Care Free Homes noted that he changed a Sequential Trip Trigger to a contact trip trigger in about two minutes, proving not only the ease with which this change can be made but also the fact that contractors using framing nailers do not prefer sequential trip riggers and proving, also, that, given if the tool involved in Mr. Beijar's accident had been sold with a sequential trip, it would have been converted to a contact trip trigger.


Data/Information Considered in Formation of Opinions

I have considered the following data and information in forming my opinions:

Investigation materials

   OSHA Records; Photographs of the accident scene; Photographs of the Tool, statements of witnesses and other records from Care Free Homes; report of Robert Olmstead; Letter of Igor Paul



Records from Stanley-Bostitch

    Stanley-Bostitch testing protocols; Bostitch Operation and Maintenance Manual for the N79WW tool; Copies of warnings on the N79WW as shipped; "Stanbo" documents as to safety, and other materials produced to Mr. Beijar's lawyer by Stanley-Bostitch in this matter; patent.

Pleadings

    Amended Complaint of Jonathan Beijar and Stanley's Answer; Beijar's Answers To Interrogatories; Stanley's Answers to Interrogatories;

Depositions

    Beijar, Wayne Edwards, Jr. and Wayne Pinard.  I looked at the exhibits to these depositions, also.  I also reviewed my own deposition transcript, and, if further depositions are taken, I expect to review these, as well.

Other

    I reviewed the applicable ANSI/ISANTA 1993 standards; I also have examined and helped test the tool Beijar claims he was using at the time of the accident, and have reviewed the data resulting from those tests.  I have reviewed the sequential trip conversion kit and instructions and intend to rely on these, also, if asked at trial.  I may demonstrate for the jury the ease with which the triggers can be changed.

List of Exhibits That Summarize or Support Opinions

    I believe that all of the materials listed in the preceding section support my views both as to how the accident happened and that the tool is a good, safe and effective tool when used in a reasonable and foreseeable manner.  The sole except to this is the report of the plaintiff's expert, Igor Paul, who seems to ignore or reject the eyewitness testimony, even the testimony of Mr. Beijar, and offers a version of the accident that has no support in the testimony.



Qualifications (Including Listing of Publications Authored in Preceding Ten Years)

1.      Qualifications

My curriculum vitae are attached as Exhibit A to this disclosure.

2.      Publications
        None

Compensation for Study and/or Testimony

        None

List of Trial/Deposition Testimony in Preceding Four Years

James Tyson
Jonathan Beijar

Please let me know if I may be of further assistance.

Very Truly Yours,


Matthew Ponko
Sr. Project Engineer

Attachment

# Stanley Resume

**Date Prepared**     1 / 20 / 05

**Name**           Ponko, Matthew, B                **Leadership Band**   PB
                   (Last, First, MI)

**Position/Title**  Sr. Project Engineer             **Location**         East Greenwich

**Business Group**  Fastening Systems                **Function/Region**  Engineering

**Date of Hire**    1 / 27 / 97                      **Phone**            401-884-2500 X35560

## Education

| School and Location | Major | Dates From | To | Degree |
|---|---|---|---|---|
| Providence College | Business | 04 | - | MBA |
| Roger Williams College | Engineering | 85 | 90 | BSMET |
| New England Institute of Technology | Engineering | 80 | 82 | ASMET |

**Other Training and Education** *(Describe other professional training including date and source)*
- 1- **Value Stream Mapping** - January 04 - Stanley Fastening Systems
- 2- **Building Successful Leaders** - March 04 -Stanley Learning Center
- 3- **Peer Review Training** - April 04 - Stanley Fastening Systems
- 4- **Providence College** - Financial Accounting Sept-Dec 04
  - Managerial Accounting Jan-May 05
  - Managerial Finance Jan –May 05

**Professional Experiences Summary** *(Briefly identify competencies, e.g., functional, product, technical, customer, international, etc.)*
- Extensive background in design and development of Consumer products.
- Developing business acumen and capabilities through graduate school studies.
  - Experience developing products in Europe, the Far East and Australia
  - Design Experience
    - Corded and cordless Home and Office Products developed in ASIA
    - Design of Prototype Spring Engine for sliding bulk head project.
  - Project Management experience
    - CST collated screw tools
    - CRN cordless roofing tool
    - Advanced Products team
      - Lead development of Palm nailer prototype and hand-off to pneumatic group.
  - Fastening Systems 30B6 (Corporate rep for Product Liability)
    - Forensic analysis of tools
    - Court depositions.
    - Point person for trial attorneys and experts
    - Coordination of documentation for discovery process and trails

# Stanley Resume

**Name**         Ponko, Matthew, B
                                        (Last, First, MI)

**Other Qualifications** *(Professional licenses, honors, awards, special recognition, community leadership, etc.)*
- ICC Building Committee Member:
  - Creating and managing budget, current 2004 budget is 1.5 Million
  - Involved in hiring of contractors to manage parish funded improvements or maintenance projects of church property.

**Languages** *(Describe any additional proficiencies)*

## Geographic Considerations
Are you interested in assignments outside your present country location? ☐ Yes   ☒ No
If yes, indicate desired locations.

**Work Experience** *(List most recent employer first, include military service, if any)*

| Dates From | Dates To | Band/ Grade | Company Name, Function & Location | Position/Title |
|---|---|---|---|---|
| 03 | Present | PB | Stanley Fastening Systems East Greenwich, RI Advanced Products Team | Sr. Project Engineer |
| 98 | 03 | PB | Stanley Fastening Systems East Greenwich, RI New Product Development | Project Engineer |
| 97 | 98 | PB | Stanley Fastening Systems East Greenwich, RI New Product Development | Design Engineer |
| 94 | 97 | N/A | Key-Tech Warwick, RI Program Management | Systems Design Engineer |
| 92 | 94 | N/A | International Equipment Co. Needham Heights New Product Development | Project Engineer |
| 91 | 92 | N/A | Harvard University Cambridge, Ma. Instrument Design | Design Engineer Contract Position |
| 82 | 85 | N/A | Thermo Jarrell Ash Franklin Ma. Instrument Design | Mechanical Designer |