UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-10233-RCL

JONATHAN BEIJAR
    Plaintiff

v.

STANLEY FASTENING SYSTEMS, L.P.
    Defendant

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT
OF STANLEY FASTENING SYSTEMS, LP's
MOTION FOR SUMMARY JUDGMENT**

Stanley Fastening Systems, L.P. ("Stanley") submits in support of its motion for summary judgment its statement of material facts as to which there is no genuine issue to be tried for purposes of this motion.

Record citations to the pleadings, depositions, answers to interrogatories, and other evidence relied upon in this statement will identify the materials and exhibits attached to the Transmittal Affidavit of Christopher A. Duggan ("Duggan Aff.") that accompanies Stanley's motion by Transmittal Affidavit exhibit references and interrogatory or deposition citations where applicable.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

**Introduction**

1.    According to eyewitness testimony, plaintiff Jonathan Beijar pulled the air hose of a pneumatic nailer that was resting on an overhead scaffold, causing the nailer to fall towards his chest. Beijar grabbed the nailer by the handle, pulled it towards his chest, and depressed the trigger as the tip of the nailer hit his chest, causing the tool to drive a nail into himself. (Ex. 1, Deposition of Wayne Pinard ("Pinard Dep."), at 11; Ex. 2,

Statement of David Santos ("Santos Stmt."), dated February 1, 2001; Ex. 3, Statement of Ryan Cordeiro ("Cordeiro Stmt."), undated.)

2. In so doing, Beijar violated the express instructions of the manufacturer not to pull the nailer by the hose (ex. 4, Operation and Maintenance Manual for N79WW/N80SB Pneumatic Stick Nailers ("N79WW Operation Manual"), Stanley bates nos. 016 Stan 000003-000004). Beijar admitted that pulling the nailer by its air hose was a misuse of the tool. (Ex. 5, Deposition of Jonathan Beijar ("Beijar Dep."), at 27-28.)

3. Beijar, however, offered a completely different version of events. He testified that the nailer fell off of the scaffold for no apparent reason, and that he caught it by the air hose as it moved towards him. Beijar swore that he never touched the handle or the trigger after he grabbed the air hose about 18 inches above the handle and held his elbow straight out away from him, but the tool cycled and drove a nail anyway. (*Id*. at 37, 61.)

4. Beijar has retained an expert, Igor Paul, who, in deposition, admitted that Beijar's story is impossible. (Ex. 6, Deposition of Igor Paul ("Paul Dep."), at 33.) Paul tested the product and found that it could not drive a nail unless both a safety on the tip of the tool was depressed and the trigger was pulled – precisely as designed by Stanley. (*Id*. at 15-18; Ex. 7, Expert Report of Igor Paul, dated July 30, 2005, at 3.)

5. Paul further admits that Beijar's version is impossible, and that the accident could not have occurred unless Beijar both pulled the trigger and depressed the safety on the tip of the tool against his chest. (Ex. 6, Paul Dep. at 15-18, 33.)

6. Paul fashioned his own version of the accident that is unsupported by any of the facts or witnesses. Essentially, Paul admits that the accident could not have happened as

described by Beijar, but he rejects, also, the version of the other eyewitnesses because their version does not support a finding for the plaintiff. (*Id*. at 33, 46-47.)

**The Accident**

7. Beijar alleged that on or about February 1, 2001, he sustained a personal injury while working for Care Free Homes, Inc. ("Care Free"), as a laborer at a home construction site at Lot 14-5 Pirates Cove Road, Osterville, Massachusetts. (Ex. 8, Amended Complaint at ¶¶ 9-10; Ex. 9, Plaintiff Jonathan Beijar's Answers to Defendant's Interrogatories No. 2a.)

8. More specifically, Beijar alleges that he was "severely injured, when a nail gun … fell from an overhead staging plank as the Plaintiff was walking on the ground in the area below the staging. As the Plaintiff attempted to avoid being struck by the nail gun, the barrel of the nail gun struck the Plaintiff's chest and spontaneously discharged, firing a three and a half inch roofing nail through his sternum, piercing his right ventricle, and lodging into his heart." (Ex. 8 at ¶ 10; Ex. 9, Answer No. 2b.)

9. The pneumatic nailer that Beijar alleges caused his injury on February 1, 2001 incident, incorrectly referred to by Beijar (and others) as a "nail gun," is a model N79WW-1, serial no. 0357 047, manufactured by Stanley on December 22, 2000 (the "nailer"). (Ex. 10, Stanley's Answers to Interrogatories, Ans. No. 10.) Beijar admitted at his deposition that he could not confirm the nailer referred to in this matter is the one that caused his injury. (Ex. 5, Beijar Dep., at 38-39.)

10. According to the job's foreman, Wayne Pinard, Beijar had been instructed to move the nailer, which was on the edge of a plank located about ten feet above the

ground on a scaffold, further toward the center of the plank to ensure it would not fall as the workers were leaning rafters against the plank. (Ex. 1, Pinard Dep., at 10.)

11. Instead, with his left hand Beijar pulled the nailer off the planking by grabbing the air hose connected to the nailer and pulling it down. (*Id.* at 11; Ex. 2, Santos Stmt.; Ex. 3, Cordeiro Stmt.) Beijar admitted at his deposition that he knew it was unsafe to pull a nailer down by its air hose. (Ex. 5, Beijar Dep. at 27-28.)

12. As the nailer fell off the plank, Beijar "caught it like a football" and pulled it towards his chest, causing the tip of the nailer to contact his chest. (Ex. 1, Pinard Dep. at 11.)

13. Either before the tip of the nailer hit Beijar or just after, Beijar depressed the trigger of the nailer with his thumb, causing the nailer to cycle and discharge a nail into his chest. (*Id.* at 39-41.) Pinard had a clear view of the accident and the tool and is certain that Beijar's right thumb hit the trigger. (*Id.*)

**The Model N79WW-1 Pneumatic Nailer**

14. This nailer, manufactured by Stanley, has a contact trip activating device. It requires both that the trigger be pulled and that a spring-loaded trip at the tip of the tool to be depressed before the tool will cycle and drive a nail. Contact trip tools will cycle and drive a nail each time the tip is pressed against a hard surface, as long as the user's finger remains on the trigger. Thus, it is a useful tool for "bump firing" when doing jobs like decking, sheathing and pallet construction. Stanley offers another type of trigger, known as the "sequential trip" trigger, which is available on all models of nailers. Unlike the contact trip, the user must remove his finger from the trigger of a sequential trip device, then press the tip of the tool against one work piece, then pull the trigger before the tool

will cycle - and it will cycle only once. (Ex. 4, N79WW Operation Manual at pp. 4 and 7, Stanley bates no. 016 Stan 000003-000004.)

15.     Prior to Beijar's accident, Stanley included sequential trip triggers with all contact trip tools, including this nailer, and gave easy instructions for converting contact trip to sequential trip tools. The process does not require special tools and can be done quickly, in about two minutes. (Ex. 11, Deposition of Matthew Ponko ("Ponko Dep."), at 54-55, 116; Ex. 12, Expert Report of Matthew Ponko ("Ponko Rpt."), at 3; Ex. 13, Expert Report of Robert Olmstead ("Olmstead Rpt.") at 4.)

16.     Pinard testified that when this nailer was purchased new, it came with a sequential trip conversion kit, but he chose not to make the conversation, as the contract trip application is more efficient for the type of work Care Free does than the sequential trip. (Ex. 1, Pinard Dep. at 20.) He testified that he had once converted a sequential trip nailer to a contract trip nailer in about two minutes. (*Id*. at 19.)

17.     The decision as to which trigger to use rests with the user**.** The instructions and warnings in the N79WW Operation Manual also discuss the differences and advantages between contact trip and sequential trip triggers, and reminded the user that the N79WW could be operated with either trigger depending upon the uses and goals of the user. (Ex. 4, N79WW Operation Manual at 4 and 7, bates no. 016 Stan 000003-000004.)

18.     Under the heading **AIR SUPPLY AND CONNECTIONS**, the N79WW Operation Manual states:

> !WARNING : Always disconnect air supply: … 4.) When tool is not in use; 5.) When moving to a different work area, as accidental actuation may occur, possibly causing injury.

(*Id*. at 3, bates no. 016 Stan 000002.) On page 7, the N79WW Operation Manual states:

**BEFORE HANDLING OR OPERATING THIS TOOL:**

I.   READ AND UNDERSTAND THE WARNINGS CONTAINED IN THIS MANUAL.

On page 8, additional warnings and instructions appear, including the following:

**IN ADDITION TO THE OTHER WARNINGS CONTAINED IN THIS MANUAL OBSERVE THE FOLLOWING FOR SAFE OPERATION**

- **Use the BOSTITCH pneumatic nailer only for the purpose for which it was designed . . .**
- **Always carry the tool by the handle. Never carry the tool by the air hose . . .**
- **Always be aware that misuse or improper handling of this tool can cause injury to yourself and others . . .**
- **Never leave a tool unattended with the air hose attached . . .**

**Beijar Knew How To Use Nailers Prior To The Incident And Was Familiar With Relevant Safety Issues**

19.   Beijar testified that he had used pneumatic nailers prior to working for Care Free, and had read an Operator's Manual for a Bostitch nailer, though he does not know for which model, several months before the accident. (Ex. 5, Beijar Dep. at 6-7, 9-10, 30, 45, 75.)

20.   When he read the Bostitch operating manual for a pneumatic nailer several months before the accident, and testified that he understood what he had read. (*Id*. at 75.) He knew that if a nailer was hooked to an air compressor, it could discharge a nail. (*Id*. at 24.)

21.   Beijar was comfortable using nailers prior to working for Care Free. (*Id*. at 9-10.) He knew was important to follow instructions, and that a nailer could be dangerous if safety instructions were not followed. (Id. at 9-10.)  He knew prior to the accident that if

6

the trigger was compressed and the tip of the nailer contacted something hard, a nail would cycle. (*Id*. at 25.)

22.     Beijar knew that one safety warning was that the air hose should never be used to pull or drag the nailer. (*Id*. at 27-28.) He knew there was a danger that if the air hose was pulled, it could result in the discharge of a nail from the nailer, causing an injury. (*Id*.) He knew that pulling on a nailer's air hose was a misuse prior to joining Care Free. He understood that the safe practice was to disconnect the nailer from the air hose when not in use. (*Id*. at 76.) He knew prior to the accident that the air should be disconnected from the nailer prior to moving the nailer to a different work location, or when it was not in use, and that a nailer still connected to the air hose should not be left unattended. (*Id*. at 78-81.) He testified that it was "common knowledge" that it was wrong to pick up tools via cords as he could either hurt himself or damage the tool, and he knew that prior to beginning work at Care Free. (*Id*. at 93-94.)

23.     While he disputed the findings in the OSHA report prepared immediately after the accident, Beijar agreed that if the accident had happened as described in that report (that a person had tugged on the air hose, pulling the nailer down and catching it), that would be a plain misuse of the nailer. (*Id*. at 109; Ex. 14, Citation and Notification of Penalty ("OSHA Report") issued June 22, 2001 at 2.)

**Beijar Cannot Prove Any Evidence Of A Defect**

24.     Beijar agreed that there is nothing wrong with a contact trip nailer that activates after the tip is depressed and the trigger is then depressed. (Ex. 5, Beijar Dep. at 89.)

7

25.     Paul agreed that the nailer complies with all applicable ANSI industry standards, and he could not identify a single standard, regulation, law with which the nailer did not comply. (Ex. 6, Paul Dep., at 11-12.) When Paul tested this nailer in 2005, he found:

> My inspection and testing of the Bostitch nailer … showed that although the accident nailer was well used, the "contact trip" firing mechanism operated as designed and intended over the full range of air supply pressure and the "trigger" had to be physically depressed to allow the nailer to fire a nail. A nail could be fired by holding down the trigger and impacting the "contact tip," or a nail could be fired if the trigger was even instantaneously touched or hit while the "contact tip" was [sic] Drop tests producing dynamic impacts to the "contact tip" significantly exceeding those that could have been produced when it hit Mr. Beijar's chest, showed that the nailer would not fire a nil unless the trigger was depressed when the impact occurred. This was also confirmed by an analysis of the dynamic forces produced on the pneumatic head valve (which releases the nailing piston) when the tool is impacted on the nailing tip. Accidental release from impact to the tool could only occur when impact occurs on the cap end of the nailer (i.e. if it is dropped on the cap end or the cap end of the nailer is used as a hammer).

(Ex. 7, Paul Rpt., at 3; see also Ex. 6, Paul Dep., at 15-18, concluding that the nailer operated as designed.)

**The Nailer Worked Properly On The Date Of The Accident, And Afterwards**

26.     Pinard, the foreman of the Care Free crew, testified that he used the nailer the morning of the accident. (Ex. 1, Pinard Dep. at 13.) He testified that the nailer, which was brand new, worked as it was supposed to. (*Id*. at 14.) He testified that Bostitch nailers are "beautiful guns … great nailers, work the best." (*Id*. at 16.)

27.     Following the accident, the nailer was pulled from use for six to eight months. It was not serviced or examined during that period. Care Free then resumed using it, and used it until notified of the lawsuit in the spring of 2004. From the time it was put back

into service in mid- to late-2001, to 2004, Care Free personnel used the nailer virtually every day, and they never had a problem with it. (*Id*. at 17.)

### Beijar's Expert, Igor Paul, Consciously Disregards And Discards Beijar's Own Account Of The Accident

28. Beijar did not use the nailer prior to the accident, as he was working at the construction site as a laborer. (*Id*. at 44.)

29. Beijar testified that the accident occurred as he was walking by the plank on some staging on which the nailer had been placed. (Ex. 5, Beijar Dep. at 36.) The staging was high enough, perhaps ten feet off the ground, that he could not touch it from the ground. (*Id*. at 63.) He testified he heard someone yell "look out!" (*Id*. at 36.) He first looked to his left, then his right, and he suddenly found the nailer swinging down at him from the plank. (*Id*. at 36, 60-61.) According to a drawing of the plank and scene prepared by Beijar, the nailer was not located at the edge of the plank, but more toward the middle of the plank. (Ex. 15, Beijar Dep. Ex. No. 3.)

30. Beijar testified that in an effort to ward off the nailer, he touched the hose with his right hand, about 18"-24" above the nailer itself. (Ex. 5, Beijar Dep. at 37.) His left hand remained at his side. *Id*. When he first saw the nailer, the trigger was level with his eyes. (*Id*. at 40.) It was within 12" of him, with the tip pointing down. He claims that he never touched the nailer prior to impact, only the air hose. (*Id*. at 41-42, 73.)

31. Paul completely and deliberately disregards Beijar's account of the accident. (Ex. 7, Paul Rpt. at 3; Ex. 6, Paul Dep. at 33.) Paul claims that as the nailer descended, it contacted Beijar's right arm. More specifically, he claims that the trigger hit Beijar's right arm "probably near the elbow." (Ex. 7, Paul Rpt. at 3; Ex. 6, Paul Dep. at 35-36.) This directly contradicts Beijar's deposition testimony: Beijar clearly stated that his arm

was "up and out to the right" as the nailer was descending. (Ex. 5, Beijar Dep. at 61.) Paul further claims that Beijar's right arm kept the trigger depressed as the "contact tip" compressed against his chest. (Ex. 7, Paul Rpt. at 3; Ex. 6, Paul Dep. at 36.) This factual assertion is impossible, as it directly contradicts Beijar's emphatic testimony, offered twice, that he never contacted the nailer prior to its impact against his chest (ex. 5, Beijar Dep. at 41-42, 73), as well as his testimony that his right arm was "up and out to the right." (*Id*. at 61.)

32.    Paul bases his findings, which contradict all accounts of the incident, on "the laws of physics and where the nail entered [Beijar's] chest." (Ex. 6, Paul Dep. at 33.) Paul stated, without any basis from an eyewitness, that when Beijar repeatedly denied touching the nailer before it hit his chest, that it was only Beijar's "perception" that he did not touch it with his right arm as the nailer descended.

33.    In effect, Paul testified that the accident scenario involved the nailer falling towards Beijar, Beijar grabbed the nailer by the air hose, bent his arm so that as the nailer came toward him, his elbow not only touched the trigger but remained on the trigger until the contact tip hit Beijar's sternum. (*Id*. at 51.)

**Igor Paul Ignores The Inconvenient And Damaging Testimony Of The Three Care Free Eyewitnesses**

34.    The Care Free foreman, Pinard, witnessed the accident. He had instructed Beijar to move the nailer from the plank, as it was leaning over the edge and was being jostled as several workers laid long wooden rafters up against the plank for use on the home. (Ex. 1, Pinard Dep. at 34-35.) Pinard testified that Beijar attempted to reach up to push the nailer back further onto the plank, but was not tall enough. (*Id*. at 36-37.) Pinard reported that the nailer was on the middle of the plank, with the air hose running

10

underneath the middle of the plank. (Ex. 16, Pinard Dep. Ex. Nos. 3-5.) Pinard stated that Beijar could have pushed the nailer further in by using a rafter, or by using an available six-foot stepladder to climb up. (Ex. 1, Pinard Dep. at 36-37.)

35. Instead, Pinard observed Beijar pull on the nailer with his left hand, causing the nailer to fall off of the plank sideways. (*Id*. at 38.) The nailer fell a distance of four or five feet, and Beijar caught it like a football. (*Id*. at 39.) Pinard observed Beijar to grab the nailer by the handle with his thumb on the trigger. (*Id*. at 40.) Pinard could not determine whether Beijar's thumb hit the trigger before or after the contact tip hit Beijar's chest. (*Id*. at 41.) Although Pinard was facing Beijar's back, he was able to see the nailer and trigger clearly. (*Id*. at 47.)

36. The two other Care Free workers on the job site that day corroborated Pinard's deposition testimony in their written statements. David Santos stated that Care Free workers, including Beijar, were leaning rafters against the staging plank. When Beijar leaned a rafter against the plank,

> he started to knock the gun off and Wayne [Pinard] the foreman asked him to move the gun back on the plank so it didn't fall. He then pulled on the hose and when he did, the gun fell landing into his hand while pulling the gun towards his chest while depressing the trigger and the gun fired a 3½ inch spike into his chest.

(Ex. 2, Santos Stmt.)

37. The fourth Care Free worker present that day, Ryan Cordeiro, prepared a handwritten statement that stated:

> We were standing up rafters and laying them up against the wall. Wayne asking [sic] him [Beijar] to move the the [sic] gun off of the plank. John [sic] then pulled the air hose from the gun. When he did that the gun fell off the plank

> he then caught the gun by the handle as he did that the gun went off as it hit his chest.

(Ex. 3, Cordeiro Stmt.)

38.    Paul rejects the sworn deposition testimony and the statements of the three witnesses present at the time of the accident. There is no basis in this testimony for a finding that Beijar hit the nailer with his right arm or elbow to depress the trigger, as Paul claims. (Ex. 7, Paul Rpt. at 3; see ex. 6, Paul Dep. at 36, acknowledging that there is no eyewitness source for the conclusion that Beijar's elbow hit the trigger.)

39.    Paul testified that "this accident happened differently from either what Mr. Beijar says or what the two [sic] eyewitnesses say. The reasons for that are essentially the laws of physics and where the nail entered [Beijar's] chest." (Ex. 6, Paul Dep. at 33.)

40.    Paul claims that the nailer must have gotten caught on a bracket supporting a plank (ex. 6, Paul Dep. at 40, 44-45, and ex. 17, sketches of nailer superimposed over photographs of scaffold, part of Paul Dep. Ex. No. 3), but this position is flatly contradicted by Pinard's testimony and sketches (ex. 16) and Beijar's own sketch (ex. 15).

41.    Paul suggested in his deposition testimony that Beijar may have inadvertently stepped on the air hose while walking by it, causing the nailer to fall. (Ex. 6, Paul Dep. at 46.) Paul was forced to admit, however, that there is no basis in any eyewitness testimony that this scenario occurred. (*Id*. at 46.)

> **Igor Paul's Account Of The Accident Is Based Upon Conjecture And Is Unreliable**

42.    Paul admits that the hypotheses he offers are inconsistent with the deposition testimony of Beijar, Beijar's post-accident statements, Pinard's deposition testimony, and

the witness statements of the two other Care Free eyewitnesses. He acknowledges that none of the scenarios he offers – that Beijar's elbow contacted the trigger all the way to his chest, or that the Beijar stepped on an air hose – are supported by any testimony whatsoever. (*Id*. at 33, 46.)

### Beijar Cannot Identify A Manufacturing Defect

43. Pinard put the nailer back into service six to eight months after the accident and never had any problem with it until the parties to this litigation took the nailer in 2004. (Ex. 1, Pinard Dep. at 17.)

44. Paul himself admits that there is nothing wrong with the nailer, that it works properly and as designed, and that it conforms to all applicable industry standards. (Ex. 7, Paul Rpt. at 3; Ex. 6, Paul Dep. at 15-18.)

45. Matthew Ponko, Senior Project Engineer at Stanley, performed a series of tests on the nailer on April 22, 2004. (See Ex. 18, Stanley Fastening Systems Engineering Laboratory Test Procedure, Instructions, and Work Request Form, Test Lab No. 08815-00, Bates nos. 016 Stan 0000109 – 0000126.) Stanley's testing concluded that despite physical external wear,

> There were no unintentional actuations or incidents produced. The tool functioned as was intended by design.

(*Id.* at page 3, bates no. 016 Stan 0000111.) Mr. Ponko confirmed this finding in his Expert Disclosure. (Ex. 12, Ponko Rpt. at 3.) He further confirmed that the nailer conformed to all applicable industry standards and regulations. (*Id.* at 3.)

46. Robert Olmstead, Stanley's former Chief Engineer and current consultant, also concluded that the nailer worked properly and as designed, and conformed to all applicable industry standards and regulations. (Ex. 13, Olmstead Rpt. at 3.)

**Beijar's Late Notice Of The Alleged Defect Has Prejudiced Stanley**

47.     Beijar did not notify Stanley of the accident at the time it happened.  He did not provide notice until his attorney wrote Stanley a letter on January 21, 2004, almost three years after the incident.  (Ex. 9, Beijar's Answer to Int. No. 23.)

48.     Yet, it is clear that within days of the accident, Beijar was contemplating legal action against Stanley.  In an article published in the Cape Cod Times on February 7, 2001 – just six days after the accident – Beijar recounted the accident.  The article then went on to state:

> Beijar is considering legal action against the nail gun manufacturer, because the gun is supposed to discharge only when pressure is applied to the trigger and the nose of the gun.  But the gun discharged upon hitting his chest, with no pressure applied to the trigger, he [Beijar] said.

(Ex. 19, "Man shot in heart with nail gun leaves hospital after surgery," by Cynthia McCormick and Noelle Barton, Cape Cod Times, pages A-1, A-9, February 7, 2001.)

Respectfully submitted,

Stanley Fastening Systems, L.P.
By its Attorneys,


*/s/ Christopher A. Duggan*
Christopher A. Duggan, Esquire
BBO No. 544150
David G. Braithwaite, Esquire
BBO No. 634013
Smith & Duggan LLP
Lincoln North
55 Old Bedford Road
Lincoln, MA  01773
(617) 228-4400

Dated:  October 21, 2005

14

CERTIFICATE OF SERVICE

    The undersigned certifies service of the foregoing on October 21, 2005 in accordance with Federal Rule of Civil Procedure 5(b)(2) and United States District Court for the District of Massachusetts Electronic Case Filing Administrative Procedure § E(2) as to all parties, having appeared in this action through counsel admitted to practice before this Court, identified by the Clerk as receiving Notice of Electronic Filing.

*Counsel for Defendant Stanley Fastening Systems, L.P.*

          */s/ David G. Braithwaite*
          David G. Braithwaite
          BBO #634013