UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JONATHAN BEIJAR,
    Plaintiff

v.                                                                                             Civil Action No.04-10233-RCL

STANLEY FASTENING SYSTEMS, L.P.,
    Defendant

**PLAINTIFF JONATHAN BEIJAR'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, Jonathan Beijar ("Beijar") opposes the Motion for Summary Judgment filed by the Defendant, Stanley Fastening Systems, L.P. ("Stanley") for the reasons set forth below.

**I.    SUMMARY OF ARGUMENT**

A. <u>Stanley is not entitled to summary judgment because there are genuine issues of material fact.</u>

Stanley has not met its burden of showing there are no genuine issues of material fact. In this summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his favor.

Here, there are genuine issues of material fact regarding (1) how the incident occurred and (2) the defective design of the nailer. Beijar has offered his own testimony and the competent, relevant and reliable testimony of an expert, Dr. Igor Paul, regarding these issues.

B. <u>Stanley is not entitled to judgment as a matter of law.</u>

Stanley has also failed to establish that the evidence, viewed in the light most favorable to Mr. Beijar, entitles Stanley to judgment as a matter of law. Mr. Beijar has

offered evidence in support of his claims, including competent, relevant and reliable expert testimony.

Dr. Igor Paul based his conclusions on the facts in evidence, the laws of physics, and his reconstruction of the accident. He appropriately rejected testimony of "witnesses" who had obstructed views of the accident where that testimony contradicted the physical evidence and his reconstruction. In addition, Dr. Paul's conclusions are consistent with Mr. Beijar's testimony when considering the speed with which the incident occurred and that Mr. Beijar went into shock immediately afterward. Because his opinions have a foundation in the facts and are not mere speculation, Dr. Paul's testimony should be admitted as evidence.

Finally, Mr. Beijar did not unreasonably delay providing Stanley with notice of his claim. Mr. Beijar was not the owner of the nailer in question, did not know the name of the nailer's manufacturer following the accident, and could not access the nailer in order to investigate. He was therefore unable to make the decision to litigate this matter more promptly.

## II.    STATEMENT OF FACTS

### A.  THE INCIDENT

At approximately 12:00 p.m. on February 1, 2001, Jonathan Beijar was seriously injured when he was struck by a falling pneumatic nailer, which discharged a three and a half inch nail through his sternum and into his heart, piercing his left ventricle. (Ex. 4, Plaintiff Jonathan Beijar's Answers to Defendant's Interrogatories, at No. 2.) This incident occurred while Mr. Beijar was working as a laborer at a home construction site at Lot 14-5 Pirates Cove Road, Osterville, Massachusetts, for Care Free Homes, Inc. ("Care Free"). (*Id.*; Ex. 5, Affidavit of Jonathan Beijar ("Beijar Aff.") ¶ 1.)

Mr. Beijar had been walking back and forth, carrying boards from the place where the boards had been cut in order to lean them against the house. (Ex. 5, Beijar Aff. ¶ 3.) As he did so, he walked below a staging plank that was approximately ten feet overhead. (Ex. 5, Beijar Aff. ¶ 4; Ex. 2, Deposition of Jonathan Beijar ("Beijar Dep.") at 63.) After he put up a board and began walking back, Mr. Beijar heard someone say, "Look out." (Ex. 5, Beijar Aff. ¶ 5.) When he turned to the right, he observed the nailer falling toward him. (Ex. 5, Beijar Aff. ¶ 7.) Mr. Beijar attempted to deflect the nailer by raising his right arm and hand. (Ex. 5, Beijar Aff. ¶ 8; Ex. 2, Beijar Dep. at 41.) His right hand contacted the air hose connected to the nailer; despite his attempt, the nailer continued toward him and discharged. (Ex. 5, Beijar Aff. ¶¶ 9, 12; Ex. 2, Beijar Dep. at 62.) Mr. Beijar recalled feeling the nailer strike his chest but could not recall feeling the nailer strike his raised arm. (Ex. 5, Beijar Aff. ¶¶10, 13.) The incident occurred in a matter of seconds and he went into shock immediately following the incident. (Ex. 5, Beijar Aff. ¶14; Ex. 2, Beijar Dep. at 42.) In fact, he was not even certain that the nailer had gone off or that he had been struck with the nail until he noticed the hole in his sweatshirt, at which point his shock turned to fear. (Ex. 5, Beijar Aff. ¶15; Ex. 2, Beijar Dep. at 62, 70-71.)

Mr. Beijar did not pull the airhose to the nailer prior to the incident. (Ex. 2, Beijar Dep. at 27-28, 80, 88.) He had not been using the nailer prior to the time of the incident. (Ex. 2, Beijar Dep. at 44; Ex. 5, Beijar Aff. ¶16.) He is unaware of what caused the nailgun to fall from the staging. (Ex. 5, Beijar Aff. ¶16.)

### B. OTHER WITNESSES

Wayne Pinard, the Care Free foreman, was present at the job site and observed that the nailer was close to falling off the side of the staging plank prior to the incident. (Ex. 1,

Deposition of Wayne Pinard ("Pinard Dep.") at 10.)  Mr. Pinard claims that Mr. Beijar pulled the airhose to the nailer, causing the nailer to fall on him.  (*Id.* at 11.)  Mr. Pinard also states that Mr. Beijar caught the nailer, pressing it against his chest.  (*Id.*)  However, Mr. Pinard was twenty to thirty feet away from Mr. Beijar when the incident occurred.  In addition, Mr. Beijar had his back turned to Mr. Pinard at the time of the incident.  (*Id.* at 26, 41, 46-47.)  Mr. Pinard testified that Mr. Beijar's body was between him and the nailer.  (*Id.* at 50.)

Mr. Pinard's testimony places another employee, Dave Santos, near him at the time of the accident.  (*Id..* at 11.)  According to an unsworn, undated statement, another employee, Ryan Cordeiro was present at the time of the incident.  (*See* Defendant's Ex. 3.)  The statement contains no indication of where Mr. Cordeiro may have been standing during the incident.

### C.  THE DESIGN OF THE PNEUMATIC NAILER

The pneumatic nailer that injured Mr. Beijar was set up with a "contact trip" firing mechanism.  (Ex. 6, Report of Dr. Igor Paul ("Paul Rep.") at 2.)  This meant that as long as the trigger and the tip of the nailer were concurrently depressed, the nailer would fire.  (*Id.*)  The nailer was sold in the contact trip configuration, although it would have included a kit for converting the nailer into a "sequential trip" configuration.  (Ex. 7, Deposition of Matthew Ponko ("Ponko Dep.") at 54.)  The sequential trip configuration would have required that the nailer tip be depressed prior to the trigger before the nailer would fire.  (Ex. 6, Paul Rep. at 2.)

The nailer tip, also referred to as the trip, does not have to be depressed at a 90 degree angle in order to allow firing of a nail.  The nailer was designed so that even pressing on the edge of the trip would depress it, thus allowing nails to be driven at various angles.  (Ex. 7, Ponko Dep. at 148-149.)

5

The nailer did not have a trigger guard incorporated into the design. (Ex. 6, Paul Rep. at 2.) As a result, the trigger could be depressed if the nailer swung toward a person attempting to deflect the nailer with his hand. (Ex. 7, Ponko Dep. at 142.) The design of the nailer did not consider the scenario of a person catching the nailer after it had been dropped or thrown. (Ex. 7, Ponko Dep. at 143.)

The nailer utilized compressed air to drive nails and had an airhose connected to one end with a coupling. This coupling was not designed to break away if the nailer were to fall. (Ex. 7, Ponko Dep. at 68.)

### D. DR. PAUL'S ANALYSIS

Dr. Igor Paul, the expert retained by Mr. Beijar, has a Doctor of Science Degree in Mechanical Engineering from the Massachusetts Institute of Technology. (Ex. 3, Paul Dep. Ex. 2B.) He has worked as a consultant since 1963. (Ex. 3, Paul Dep. at 6.) He has experience designing pneumatic impact tools and a sequential trigger mechanism. (*Id.* at 9-10.) In addition, Dr. Paul has personally used pneumatic nailers while working on his homes. (*Id.* at 20.)

Dr. Paul's initial step was to conduct testing to determine whether the nailer could have discharged without the trigger being depressed. He concluded it could not. (*Id.* at 29.)

Dr. Paul then engaged in accident reconstruction, due to the conflicting witness accounts of how the incident occurred, in order to determine whether these scenarios would allow for accidental trigger depression. (*Id.* at 29.) Beside the witness accounts, he considered principles of physics and the location where the nail entered Mr. Beijar's chest. (*Id.* at 33.)

During his investigation, he found several reasons to discount Mr. Pinard's (and the other two alleged witnesses') version of the events. First, if Mr. Beijar had pulled on the airhose, the nailer would have fallen airhose end first. (*Id.* at 41.) However, Mr. Beijar had been struck with the discharging end, or tip, of the nailer. Second, Dr. Paul considered Mr. Pinard's position twenty to thirty feet distant from Mr. Beijar, and the fact that Mr. Beijar's back had been turned to him. (*Id.* at 37, 44-46.) Nevertheless, Dr. Paul accepted as plausible Mr. Pinard's assertion that the nailer had been "teetottering" on the edge of the overhead plank. (*Id.* at 44.)

Dr. Paul utilized photos taken of the accident scene and the witnesses' deposition drawings when he concluded that the placement of nailer and airhose near a supporting bracket prior to the nailer's fall would account for the angle at which the nailer struck Mr. Beijar's chest. (*Id.* at 44-45; Ex. 2, Beijar Dep. Exs. 5-8.) Mr. Beijar had testified at his deposition that the photographs fairly and accurately depicted the condition of the scene of the accident at the time he was hurt. (Ex. 2, Beijar Dep. at 66.) Dr. Paul also determined that the nailer's drop of approximately four feet would have taken about one second. (Paul Dep. at 45-46.)

Finally, Dr. Paul evaluated the design of the nailer, which he determined to be defective. He noted that a nailer design incorporating either a dual action trigger, an automatic shutoff, or a trigger guard would have prevented the accident. (*Id.* at 54, 74.)

### E. CONSISTENCY OF DR. PAUL'S CONCLUSIONS WITH MR. BEIJAR'S TESTIMONY

In his report, Dr. Paul concludes that some part of Mr. Beijar's arm, possibly his elbow, hit the trigger of the nailer. (Ex. 6, Paul Rep. at 3.) Mr. Beijar testified that, at the time of the accident, his right arm was "up and out to the right." (Ex. 2, Beijar Dep. at 37,

61.) Mr. Beijar is uncertain of the angle of his elbow at the time of the accident. (Ex. 5, Beijar Aff. ¶11.) Mr. Beijar did know, however, that the nailer was at face level and that he raised his arm to deflect the hose a foot and a half to two feet above where the nailer was. Dr. Paul determined that this positioning would have allowed Mr. Beijar's arm or elbow to touch the trigger of the nailer as it swung from its cord. (Ex. 6, Paul Rep. at 3.)

Despite Mr. Beijar's insistence that he did not touch the nailer with his hand, a careful reading of Mr. Beijar's testimony reveals Mr. Beijar's acknowledgment of the speed with which the incident occurred and his uncertainty regarding the position of the nailer as it fell towards him. He agreed that the incident happened very quickly, in a matter of seconds. (Ex. 2, Beijar Dep. at 72.) When the nailer hit him, he was even uncertain that it had fired, because he had not heard a sound. (*Id*. at 61-62.) Mr. Beijar testified that he could not recall whether the hose was behind the trigger when he put up his hand to deflect the nailer. (*Id*. at 38.) He was uncertain of the angle of the nailer tip when it came down and was only guessing that the nailer had been about twelve inches away from him. (*Id*. at 40-41, 61.) Furthermore, Mr. Beijar's explained that he knew he did not touch the trigger "because I know my left hand was down to my side and my right hand had gone up and touched the hose." (*Id*. at 37.) This explanation makes no mention of the position of his right arm. When asked whether he could have brushed the tool, as opposed to touching it, his answer becomes more speculative: "I don't see how I could have…" (*Id*. at 41-42.)

Viewed in this light, Dr. Paul's conclusions are consistent with Mr. Beijar's testimony regarding the incident.

**F. TIMELY NOTICE TO STANLEY**

On January 21, 2004, Mr. Beijar, through his attorney, provided a written notice to Stanley that detailed the incident, described the nailer, and identified Mr. Beijar's injuries. (Ex. 4, Beijar Int. No. 23.)

Regardless of his early contemplation of litigation, Mr. Beijar was unable to proceed with a lawsuit soon after the accident. This is because Mr. Beijar was unaware of and could not investigate the nailer's brand or the identity of the nailer's manufacturer; the nailer was the property of Care Free, and Care Free had retained possession of the nailer. (Ex. 5, Beijar Aff. ¶ 18.)

### III.    ARGUMENT

#### A.  STANDARD

Summary judgment is only appropriate when the moving party has affirmatively established that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Smith v. Robertshaw Controls Co., 410 F.3d 29, at 34 (2005). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. Smith at 31.

#### B.  STANLEY IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACT.

There are at least two major material issues of fact in dispute in this matter. The first is how the incident occurred. The second are the ways in which the nailer was defectively designed. These facts are material to the determinations of whether Stanley failed to use reasonable care in the design of the nailer and whether Stanley's failure caused Mr. Beijar's injury.

**1.  The facts surrounding how the incident occurred are in dispute.**

According to Mr. Beijar's testimony, the nailer fell from the overhead staging as he walked by. Mr. Pinard's testimony is that Beijar pulled the nailer by the hose, grabbed the nailer, pulled it toward his chest and depressed the trigger.

Mr. Pinard, however, was twenty to thirty feet away from where the incident occurred. Mr. Beijar had his back to Mr. Pinard. Mr. Pinard also testified that Mr. Beijar's body was in between him and the nailer.

According to Mr. Pinard, Care Free employee David Santos was working with Mr. Pinard when the incident occurred. (Ex. 1, Pinard Depo. at 11.) He therefore would have faced the same obstructions as Mr. Pinard; that is, he would have been standing twenty to thirty feet away, with Mr. Beijar's back toward him. There is no indication in the record of Mr. Cordeiro's position at the time of the accident.

Furthermore, the statements of Care Free Employees David Santos and Ryan Cordeiro are not in an appropriate format for the court's consideration. The statements are not affidavits and do not contain sworn testimony. See Fed.R.Civ.P. 56(e). Mr. Cordeiro's statement is also undated.

Finally, Dr. Paul reconstructed the accident and offered his opinion as to how the incident could have occurred, taking physical principles and the physical evidence, including the location of the nail in Mr. Beijar's chest, into consideration. In going through this exercise, he determined that the accident could not have occurred as the above witnesses reported.

**2. The defective design of the nailer is in dispute.**

Dr. Paul has described three features – a dual action trigger, automatic shutoff and a trigger guard – that would have prevented the discharge of the nail into Mr. Beijar's chest. In

response, Stanley has offered the self-serving reports of an employee and former employee. Stanley's employee, Matthew Ponko, admitted that he had not seen the OSHA incident report prior to conducting testing, nor were the tests he did conduct designed to replicate the accident conditions. (Ex. 7, Ponko Dep. at 122-123.) Ponko did, however, affirm that, where the nailer was swinging toward an individual with a hand raised to deflect the nailer, the trigger could have been depressed. He also testified that the nailer had not been designed for the scenario of the nailer being dropped or thrown at an individual.

Beijar's agreement that there is nothing wrong with a contact trip nailer that activates after the tip is depressed and then the trigger is depressed is irrelevant, in that it is uninformed. He is not an expert. Care Free's continued use of the nailer without incident is also irrelevant. This incident occurred when the nailer fell from overhead and hit a worker. If the incident was not repeated, then no such injuries would result.

The above facts demonstrate that there are genuine issues of material fact surrounding the cause of Mr. Beijar's injury and whether Stanley took reasonable care in designing its nailer.

    **C.**    **STANLEY IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE IT HAS NOT ESTABLISHED THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

    **1. As the non-moving party opposing a motion for summary judgment, Mr. Beijar is entitled to have the facts construed in the light most favorable to him.**

A reading of the facts in the light most favorable to Mr. Beijar would produce a fact pattern as follows. Mr. Beijar did not pull the cord to move the nailer. The nailer spontaneously fell on him. Although, in the one second in which the events occurred, Mr. Beijar does not recall touching the nailer's trigger, some part of his body, likely his elbow,

touched the trigger of the nailer as Mr. Beijar was attempting to avoid contact with the nailer. This led to the discharge of a three and a half inch nail into his sternum, piercing his ventricle and heart. If Stanley had incorporated a dual action trigger, an automatic shutoff, or a trigger guard into its nailer design, Mr. Beijar would not have sustained his serious injury. Stanley failed to design its nailer to account for the scenario of the nailer falling or being thrown toward an individual. In addition, Mr. Beijar notified Stanley of his intention to litigate the matter within a reasonable time of learning the identity of the nailer's manufacturer.

The above facts support Mr. Beijar's claims of negligence, breach of warranty, and unfair trade practices. Stanley had a duty to design the nailer so that it would operate safely in the environment of a construction site. Stanley breached that duty by not incorporating safety features into the nailer that would have prevented it from firing when falling toward an individual. The failure to incorporate such safety features rendered the nailer defective, unreasonably dangerous and unfit for its ordinary use in construction. This defect led to the nailer's discharge of a nail into Mr. Beijar's chest, resulting in serious injuries to Mr. Beijar.

Mr. Beijar's knowledge of using nailers is irrelevant to these claims, as he was not using the nailer at the time it fell on him. Care Free's use of the nailer without incident after the accident is also irrelevant. This incident occurred when the nailer fell from overhead, hitting a passing worker. If these circumstances were not repeated, no similar injuries would have resulted.

**2. Dr. Paul's testimony is admissible because his opinions are competent, relevant and reliable.**

In determining the admissibility of an expert's testimony, a judge must determine whether a qualified expert's testimony both rests on a reliable factual foundation and is relevant to the task at hand. <u>Babcock v. General Motors Corp.</u>, 299 F.3d 60, at 67 (1st Cir.

2002), *citing* <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993); *see also* Fed.R.Evid. 702.  A judge must also determine whether the testimony would assist the trier of fact in understanding the facts at issue.  *Id.*

      Here, Dr. Paul's testimony is relevant because it would aid the jury in determining how the incident could have occurred and whether the nailer design was defective, two material issues in dispute.  Stanley argues, however, that Dr. Paul's testimony fails in having a reliable factual foundation, is based on conjecture and assumption, and should be excluded.  The main thrust of Stanley's argument appears to rely upon Dr. Paul's rejection of portions of witness testimony.  At least two of these witnesses, referred to as "eyewitnesses" by Stanley, had obstructed views of the incident; the third witness' position is unknown.  Stanley further argues that Dr. Paul's conclusions contradict Mr. Beijar's testimony regarding the incident.  This is incorrect when one accounts for Mr. Beijar's uncertainty regarding the incident and the speed with which the incident occurred.

   a. <u>Dr. Paul's testimony rests on a reliable factual foundation because he based his conclusions on facts in evidence, his knowledge of physics, and his reconstruction of the accident.</u>

      Dr. Paul's testimony is based on the facts in evidence, the laws of physics, and his reconstruction of the accident.  He is the only person who could step back and watch how the nailer would fall and come into contact with Mr. Beijar, with a view to observing and recalling the details.  Dr. Paul recreated the incident in a lab setting, where he could observe and take note of how the incident must have occurred.

      Dr. Paul's testimony necessarily involves a recreation of events, because the only testimony that available is of (a) a person who had a mere second to react to what was

happening and who immediately went into shock; and (b) a person whose view of the events was obstructed by distance and Mr. Beijar's back.

Dr. Paul's reconstruction of the incident is based on the known facts, including the fact that the nailer came from overhead, the height from which the nailer came, the fact that the nailer discharged, the location where the nail entered the Plaintiff's heart, the angle of the nail, and the fact that the nailer was connected to a hose. He has not conjectured how the incident occurred; he has shown how it occurred. Like the expert in Babcock, he examined the product in question and utilized photos and other materials given to him in reconstructing the accident. *Id.* at 68. Dr. Paul's background and experience in engineering enabled him to also apply the laws of physics in order to form his opinion. *See* Giard v. Darby and C.R. England, Inc., 360 F.Supp.2d 229, at 236 (D. Mass. 2005).

The incident that occurred in this case is therefore dissimilar to the incident in Cipillone v. Yale Industrial Products, Inc., 202 F.3d 376 (1st Cir. 2002). In Cipillone, the expert conjured that the plaintiff was carrying something in his hand. Here, Dr. Paul knew that (1) the nailer came from overhead; (2) the approximate height from which its descent began; (3) the nailer discharged; (4) due to the distance and the obstruction of Mr. Beijar's back, Mr. Pinard could not have seen what he testified to seeing; and (5) Mr. Beijar had about one second to observe and react to what was happening to him and (6) immediately after the incident, Mr. Beijar was faced with the shock of realizing that a three and a half inch nail had entered his heart. From his recreation of the incident based on these facts, Dr. Paul was able to arrive at the remaining facts. He did not engage in "conjuring," as the expert in Cipillone had.

    b. <u>Dr. Paul appropriately rejected testimony of "witnesses" where that testimony contradicted the physical evidence, the laws of physics, and his reconstruction of the accident.</u>

Dr. Paul's rejection of the "witnesses'" version of events is entirely appropriate. Mr. Pinard, the only witness who was deposed, acknowledged that Mr. Beijar was twenty to thirty feet away and had his back to him when the incident occurred. The other statements, by Mr. Santos and Mr. Cordeiro, do not address the witnesses' positioning or how far away they were from Mr. Beijar, nor were they made under oath. Moreover, the other statements do not positively address how Mr. Beijar hit the trigger. In addition, the statements clearly assume facts that the witnesses did not view; the witnesses could not possibly have seen the nail fired into Mr. Beijar chest or the gun "going off," if it happened when the nailer was depressed against his chest. Finally, after reconstructing the accident, Dr. Paul found that the accident could not have occurred as the "eyewitnesses" testified.

Dr. Paul reasonably rejects the "eyewitness" testimony, because the "eyewitnesses" clearly did not witness the incident. Mr. Beijar's back was to the one witness who testified. The other two witnesses did not testify under oath and do not indicate how they actually saw Mr. Beijar touch the trigger or the nail being fired.

    c. <u>Dr. Paul's conclusions are consistent with Mr. Beijar's testimony when considering Mr. Beijar's uncertainty and the speed with which the incident occurred.</u>

In his report, Dr. Paul concludes that some part of Mr. Beijar's arm, possibly his elbow, hit the trigger of the nailer. Stanley alleges that Mr. Beijar's testimony on pages 37 and 61 of his deposition transcript indicates that his elbow was situated in a manner that would not allow for it to hit the trigger. However, Mr. Beijar never testified that his elbow was straight; rather, he testified that his right arm was "up and out to the right." Mr. Beijar is uncertain of the angle of his elbow at the time of the accident. Mr. Beijar did know that the

nailer was at face level and that he raised his arm to deflect the hose a foot and a half to two feet above where the nailer was. Dr. Paul determined that this positioning would have allowed Mr. Beijar's arm or elbow to touch the trigger of the nailer as it swung from its cord.

Stanley also points to Mr. Beijar's insistence that he did not touch the nailer as further evidence of that Dr. Paul's testimony was conjectural. A careful reading of Mr. Beijar's testimony, however, reveals Mr. Beijar's acknowledgment of the speed with which the incident occurred and his uncertainty regarding the position of the nailer as it fell towards him. He agreed that the incident happened very quickly, in a matter of seconds. Mr. Beijar testified that he could not recall whether the hose was behind the trigger when he put up his hand to deflect the nailer. He was uncertain of the angle of the nailer tip when it came down and estimated that the nailer had been about twelve inches away from him. In addition, Mr. Beijar's explanations that he knew he did not touch the trigger mainly refer to his right hand, not his right arm or elbow.

For these reasons, Dr. Paul's conclusions, which were based on physical evidence, the laws of physics, and his reconstruction of the accident, are not inconsistent with Mr. Beijar's testimony regarding the incident.

Dr. Paul's testimony differs from that of the expert in <u>Bogosian v. Mercedes-Benz of North America, Inc.</u>, 104 F.3d 472 (1st Cir. 1996). This case involves a dangerous tool descending upon the Plaintiff in a matter of one second. The fact pattern in <u>Bogosian</u> did not involve sudden events but, rather, a Plaintiff who consciously observed that her vehicle was in park before exiting the vehicle and having the vehicle roll over her foot. The Plaintiff in <u>Bogosian</u> was simply observing a static condition in a calm atmosphere, with no constraints on the time available to observe the condition. Mr. Beijar was confronted with a moving

condition in an extremely limited period of time, under circumstances that were highly stressful and that required an immediate, impulse-driven reaction from him. Another factor separating Bogosian from this matter is that the proffered expert in that case did not have an engineering degree; there was thus an issue of qualification not present in this matter.

**3. Even if Dr. Paul's testimony were not admissible, Mr. Beijar has presented enough evidence to support his claims.**

There is evidence in this matter, besides Dr. Paul's testimony, that would allow a reasonable jury to find in Mr. Beijar's favor on his claims. This evidence includes (1) the testimony of Mr. Beijar regarding how the accident occurred and his description of the accident scene, (2) the testimony of Mr. Ponko regarding the design of the nailer and the absence of a trigger guard, (3) the photographs of the accident scene, (4) the nailer itself, and (5) X-rays and other medical evidence indicating the angle and location at which the nail penetrated Mr. Beijar's chest.

**4. Mr. Beijar did not unreasonably delay providing Stanley with notice of his claim.**

A defense of late notice under M.G.L. c. 106, §2-318 requires the presence of two elements: unreasonable delay and prejudice to the defendant. If either of these elements is missing, the plaintiff's claim survives. Smith v. Robertshaw Controls Co., 410 F.3d 29, at 36 (2005). Whether notice is reasonably prompt "depends on the reasonableness of the buyer's behavior in the circumstances." Smith at 35, citing Delano Growers' Coop. Winery v. Supreme Wine Co., 473 N.E.2d 1066 at 1072-73 (1985).

Unlike the facts in Sacramona and Castro, Mr. Beijar was neither the owner nor a user of the nailer that struck him; he was simply an innocent bystander. *See* Sacramona v. Bridgestone/Firestone, Inc., 106 F.3d 444 (1st Cir. 1997); Castro v. Stanley Works, 864 F.2d 961 (1st Cir. 1989.) Because Care Free controlled access to the nailer, Mr. Beijar was himself

unable to investigate the incident and therefore unable make a more prompt decision as to whether to proceed with a lawsuit. Mr. Beijar's statements to a newspaper reporter shortly after the accident that he was contemplating litigation has no bearing, as Mr. Beijar did not know the identity of the manufacturer of the nailer at that time. The timing of Mr. Beijar's notice to Stanley was therefore reasonable under these circumstances. Further, the facts of this case do not support Stanley's claim that they were prejudiced.

### IV.     CONCLUSION

Stanley is not entitled to summary judgment because there are genuine issues of material fact in this matter, involving how the incident occurred and the design of the nailer.

There is evidence in this matter that Stanley did not use reasonable care in the design of its nailer by disregarding the possibility of a nailer falling toward an individual. This defective design led to Mr. Beijar's serious injury. For these reasons, Stanley is not entitled to judgment as a matter of law, and Mr. Beijar should be allowed the opportunity to present his case to a jury.

**The Plaintiff requests a hearing before the Court to present an oral argument against the Defendant's Motion for Summary Judgment.**

> Respectfully submitted,
> JONATHAN BEIJAR,
> By his attorney,
>
>
> /s/ Scott W. Lang
> Scott W. Lang, Esq.  BBO#285720
> Lang, Xifaras & Bullard
> 115 Orchard Street
> New Bedford, MA 02740
> (508) 992-1270

Dated: November 14, 2005