UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JONATHAN BEIJAR,
     Plaintiff

v.                                Civil Action No.04-10233-RCL

STANLEY FASTENING SYSTEMS, L.P.,
     Defendant

## PLAINTIFF JONATHAN BEIJAR'S RESPONSE TO THE DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff Jonathan Beijar submits this response to the Defendant's statement of material facts. This response sets forth material facts that are in dispute in this matter. Furthermore, the Defendant has presented several of the facts in its statement in a misleading manner.

<u>RESPONSE TO STATEMENTS OF FACT</u>

1.    According to eyewitness testimony, plaintiff Jonathan Beijar pulled the air hose of a pneumatic nailer that was resting on an overhead scaffold, causing the nailer to fall towards his chest. Beijar grabbed the nailer by the handle, pulled it towards his chest, and depressed the trigger as the tip of the nailer hit his chest, causing the tool to drive a nail into himself. (Ex. 1, Deposition of Wayne Pinard ("Pinard Dep."), at 11; Ex. 2, Statement of David Santos ("Santos Stmt."), dated February 1, 2001; Ex. 3, Statement of Ryan Cordeiro ("Cordeiro Stmt."), undated.)

**PLAINTIFF'S RESPONSE: The Plaintiff states that the facts set forth in paragraph 1 are in dispute. First, there were no "eyewitnesses" to the incident. Wayne Pinard testified that he was twenty to thirty feet away from Mr. Beijar and that Mr. Beijar had his back to him when the incident occurred. (Ex. 1, Deposition of Wayne**

Pinard ("Pinard Dep.") at 26, 41, 46-47.)  The other two identified "eyewitnesses" have not provided reliable testimony in this matter; the Defendant has merely produced statements that the "witnesses" did not sign under oath.  Ryan Cordeiro's statement is undated.  In addition, neither of the other two witnesses indicate (a) what their position was relative to Mr. Beijar during the accident or (2) that they saw the Plaintiff touch the trigger on the nailer.  In fact, their affidavits clearly address events that they did not observe, such as the nail being discharged. Because the nail discharged when the nailer's tip was against the Plaintiff's chest, this eliminated any opportunity for someone to view the nail being released.

Second, the referenced facts directly contradict the testimony of the Plaintiff, who stated that he did not pull the air hose.  (Ex. 2, Deposition of Jonathan Beijar ("Beijar Dep.") at 27-28, 80, 88.)  The referenced facts also contradict the testimony of Dr. Igor Paul, who explained that the accident could not have occurred as the witnesses described.  (Ex. 3, Deposition of Igor Paul ("Paul Dep.") at 37, 44-46.)  As such, these facts are in dispute.

2.    In so doing, Beijar violated the express instructions of the manufacturer not to pull the nailer by the hose (ex. 4, Operation and Maintenance Manual for N79WW/N80SB Pneumatic Stick Nailers ("N79WW Operation Manual"), Stanley bates nos. 016 Stan 000003-000004).  Beijar admitted that pulling the nailer by its air hose was a misuse of the tool.  (Ex. 5, Deposition of Jonathan Beijar ("Beijar Dep."), at 27-28).

PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in paragraph 2 are in dispute.  The Plaintiff denies pulling the nailer by its air hose and thus, denies violating the instructions of the manufacturer.  (Ex. 2, Beijar Dep. at 27-28,

**80, 88.)  As to the Plaintiff's testimony that pulling the air hose is a misuse of the tool, this opinion both (a) has no relevance to the incident as the Plaintiff and his expert state it occurred and (b) is uninformed by any expertise and, thus, should be disregarded.**

3.    Beijar, however, offered a completely different version of events.  He testified that the nailer fell off of the scaffold for no apparent reason, and that he caught it by the air hose as it moved towards him.  Beijar swore that he never touched the handle or the trigger after he grabbed the air hose about 18 inches above the handle and held his elbow straight out away from him, but the tool cycled and drove a nail anyway.  (*Id.* at 37, 61).

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in paragraph 3 are in dispute.  The Plaintiff's version of how the incident occurred directly conflicts with the testimony of the three "witnesses" cited by the Defendant in paragraph 1, above.**

**In addition, the Defendant has set forth these facts in a misleading manner.  The Plaintiff did not testify regarding the position of his elbow in the cited portions of his deposition.  Rather, he testified that his right hand was up and his right arm was "up and out to the right."  (Ex. 2, Beijar Dep. at 37, 61.)**

4.    Beijar has retained an expert, Igor Paul, who, in deposition, admitted that Beijar's story is impossible.  (Ex. 6, Deposition of Igor Paul ("Paul Dep.") at 33.)  Paul tested the product and found that it could not drive a nail unless both a safety on the tip of the tool was depressed and the trigger was pulled – precisely as designed by Stanley.  (*Id.* at 15-18; Ex. 7, Expert Report of Igor Paul, dated July 20, 2005, at 3.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in paragraph 4 are in dispute.  Dr. Paul's version of how the incident occurred directly conflicts with the testimony of the three "witnesses" cited by the Defendant in paragraph 1, above.  (Ex. 3, Paul Dep. at 37, 44-46.)**

5.    Paul further admits that Beijar's version is impossible, and that the accident could not have occurred unless Beijar both pulled the trigger and depressed the safety on the tip of the tool against his chest.  (Ex. 6, Paul Dep. at 15-18, 33.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in this paragraph are in dispute.  Dr. Paul's version of how the incident occurred directly conflicts with the testimony of the three "witnesses" cited by the Defendant in paragraph 1, above.  (*Id.* at 37, 44-46.)**

6.    Paul fashioned his own version of the accident that is unsupported by any of the facts or witnesses.  Essentially, Paul admits that the accident could not have happened as described by Beijar, but he rejects, also, the version of the other eyewitnesses because their version does not support a finding for the plaintiff.  (*Id.* at 33, 46-47.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in paragraph 6 are in dispute.  Dr. Paul's version of the accident is supported by his physical reconstruction of the accident.  (*Id.* at 37, 44-46.)  He also considered photographs of the scene and physical evidence such X-rays.  (*Id.* at 29-30, 44.)  He rejected the Plaintiff's testimony that he did not touch the trigger, as he believes, based on the position of the nail in the Plaintiff's sternum and his understanding of physics. (*Id.* at 29-30, 44-46.)  Because the incident occurred so quickly and the Plaintiff entered into a state of shock immediately thereafter, Dr. Paul's testimony is not necessarily**

**inconsistent with the Plaintiff's testimony; instead, it "filled in the blanks" that were**

**missing from Mr. Beijar's recollection of the events.**

7.    Beijar alleged that on or about February 1, 2001, he sustained a personal injury while

working for Care Free Homes, Inc. ("Care Free"), as a laborer at a home construction

site at Lot 14-5 Pirates Cove Road, Osterville, Massachusetts.  (Ex. 8, Amended

Complaint at ¶¶ 9-10; Ex. 9, Plaintiff Jonathan Beijar's Answers to Defendant's

Interrogatories No. 2a.)

**PLAINTIFF'S RESPONSE:  The facts in paragraph 7 are not in dispute.**

8.    More specifically, Beijar alleges that he was "severely injured, when a nail gun … fell

from an overhead staging plank as the Plaintiff was walking on the ground in the area

below the staging.  As the Plaintiff attempted to avoid being struck by the nail gun, the

barrel of the nail gun struck the Plaintiff's chest and spontaneously discharged, firing a

three and a half inch roofing nail through his sternum, piercing his right ventricle, and

lodging into his heart."  (Ex. 8 at ¶ 10; Ex. 9, Answer No. 2b.)

**PLAINTIFF'S RESPONSE:  The facts in paragraph 8 are not in dispute.**

9.    The pneumatic nailer that Beijar alleges caused his injury on February 1, 2001

incident, incorrectly referred to by Beijar (and others) as a "nail gun," is a model

N79WW-1, serial no. 0357 047, manufactured by Stanley on December 22, 2000 (the

"nailer").  (Ex. 10, Stanley's Answers to Interrogatories, Ans. No. 10.)  Beijar

admitted at his deposition that he could not confirm the nailer referred to in this matter

is the one that caused his injury.  (Ex. 5, Beijar Dep., at 38-39.)

**PLAINTIFF'S RESPONSE:  The facts in paragraph 9 are not in dispute.**

10.    According to the job's foreman, Wayne Pinard, Beijar had been instructed to move the
nailer, which was on the edge of a plank located about ten feet above the ground on a
scaffold, further toward the center of the plank to ensure it would not fall as the
workers were leaning rafters against the plank.  (Ex. 1, Pinard Dep., at 10.)

**PLAINTIFF'S RESPONSE:  The facts set forth in this paragraph 10 are in
dispute.  The Plaintiff testified that he did not pull the air hose.  (Ex. 2, Beijar Dep. at
27-28, 80, 88.)**

11.    Instead, with his left hand Beijar pulled the nailer off the planking by grabbing the air
hose connected to the nailer and pulling it down.  (*Id.* at 11; Ex. 2, Santos Stmt.; Ex. 3,
Cordeiro Stmt.)  Beijar admitted at his deposition that he knew it was unsafe to pull a
nailer down by its air hose.  (Ex. 5, Beijar Dep. at 27-28.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 11 are in dispute.
Mr. Beijar has testified that he did not grab the nailer by its air hose.  (*Id*. at 27-28, 80,
88.)  As to the Plaintiff's testimony that pulling the air hose is a misuse of the tool, this
opinion both (a) has no relevance to the incident as the Plaintiff and his expert state it
occurred and (b) is uninformed by any expertise and, thus, should be disregarded.**

12.    As the nailer fell off the plank, Beijar "caught it like a football" and pulled it towards
his chest, causing the tip of the nailer to contact his chest.  (Ex. 1, Pinard Dep. at 11.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 12 are in dispute.
Mr. Beijar has testified that he did not touch the nailer with his hands.  (*Id*. at 37, 41-42,
61.)**

13.    Either before the tip of the nailer hit Beijar or just after, Beijar depressed the trigger of
the nailer with his thumb, causing the nailer to cycle and discharge a nail into his

chest. (*Id.* at 39-41.)  Pinard had a clear view of the accident and the tool and is certain that Beijar's right thumb hit the trigger.  (*Id.*)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 13 are in dispute. Mr. Pinard was standing twenty to thirty feet away from Mr. Beijar when the accident occurred, and has testified that Mr. Beijar had his back to him.  (Ex.1, Pinard Dep. at 26, 41, 46-47.)  Also, Mr. Beijar has testified that he did not touch the nailer with his hands.  (*Id.* at 37, 41-42, 61.)**

14.     This nailer, manufactured by Stanley, has a contact trip activating device.  It requires both that the trigger be pulled and that a spring-loaded trip at the tip of the tool to be depressed before the tool will cycle and drive a nail.  Contact trip tools will cycle and drive a nail each time the tip is pressed against a hard surface, as long as the user's finger remains on the trigger.  Thus, it is a useful tool for "bump firing" when doing jobs like decking, sheathing and pallet construction.  Stanley offers another type of trigger, known as the "sequential trip" trigger, which is available on all models of nailers.  Unlike the contact trip, the user must remove his finger from the trigger of a sequential trip device, then press the tip of the tool against one work piece, then pull the trigger before the tool will cycle – and it will cycle only once.  (Ex. 4, N79WW Operation Manual at pp. 4 and 7, Stanley bates no. 016 Stan 000003-000004.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 14 are not in dispute.**

15.     Prior to Beijar's accident, Stanley included sequential trip triggers with all contact trip tools including this nailer, and gave easy instructions for converting contact trip to sequential trip tools.  The process does not require special tools and can be done

quickly, in about two minutes.  (Ex. 11, Deposition of Matthew Ponko ("Ponko

Dep."), at 54-55, 116; Ex. 12, Expert Report of Matthew Ponko ("Ponko Rpt.") at 3;

Ex. 13, Expert Report of Robert Olmstead ("Olmstead Rpt.") at 4.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 15 are not in**

**dispute.**

16.    Pinard testified that when this nailer was purchased new, it came with a sequential trip

conversion kit, but he chose not to make the conversation, as the contract trip

application is more efficient for the type of work Care Free does than the sequential

trip.  (Ex. 1, Pinard Dep. at 20.)  He testified that he had once converted a sequential

trip nailer to a contract trip nailer in about two minutes.  (*Id.* at 19.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 16 are not in**

**dispute.**

17.    The decision as to which trigger to use rests with the user.  The instructions and

warnings in the N79WW Operation manual also discuss the differences and

advantages between contact trip and sequential trip triggers, and reminded the user

that the N79WW could be operated with either trigger depending upon the uses and

goals of the user.  (Ex. 4, N79WW Operation Manual at 4 and 7, bates nos. 016 Stan

000003-000004.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 17 are not in**

**dispute.**

18.    Under the heading **AIR SUPPLY AND CONNECTIONS,** the N79WW Operation

Manual states:

!WARNING:  Always disconnect air supply: … 4.) When tool
is not in use; 5.) When moving to a different work area, as
accidental actuation may occur, possibly causing injury.

(*Id.* at 3, bates no. 016 Stan 000002.)  On page 7, the N79WW Operation

Manual states:

### BEFORE HANDLING OR OPERATING THIS TOOL:

**1.     READ AND UNDERSTAND THE WARNINGS
CONTAINED IN THIS MANUAL.**

On page 8, additional warnings and instructions appear, including the following:

**IN ADDITION TO THE OTHER WARNINGS
CONTAINED IN THIS MANUAL OBSERVE THE
FOLLOWING FOR SAFE OPERATION**

- **Use the BOSTITCH pneumatic nailer only for the
purpose for which it was designed …**
- **Always carry the tool by the handle.  Never carry the
tool by the air hose …**
- **Always be aware that misuse or improper handling
of this tool can cause injury to yourself and others …**
- **Never leave the tool unattended with the air hose
attached …**

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 18 are not in
dispute.**

19.     Beijar testified that he had used pneumatic nailers prior to working for Care Free, and

had read an Operator's Manual for a Bostitch nailer, though he does not know for

which model, several months before the accident.  (Ex. 5, Beijar Dep. at 6-7, 9-10, 30,

45, 75.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 19 are not in
dispute.**

20.     When he read the Bostitch operating manual for a pneumatic nailer several months

before the accident, and testified that he understood what he had read.  (*Id.* at 75.)  He

knew that if a nailer was hooked to an air compressor, it could discharge a nail.  (*Id.* at

24.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 20 are not in**

**dispute.**

21.     Beijar was comfortable using nailers prior to working for Care Free.  (*Id.* at 9-10.)  He

knew was important to follow instructions, and that a nailer could be dangerous if

safety instructions were not followed.  (Id. at 9-10.)  He knew prior to the accident that

if the trigger was compressed and the tip of the nailer contacted something hard, a nail

would cycle.  (*Id.* at 25.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 21 are not in**

**dispute.**

22.     Beijar knew that one safety warning was that the air hose should never be used to pull

or drag the nailer.  (*Id.* at 27-28.)  He knew there was a danger that if the air hose was

pulled, it could result in the discharge of a nail from the nailer, causing an injury.  (*Id.*)

He knew that pulling on a nailer's air hose was a misuse prior to joining Care Free.

He understood that the safe practice was to disconnect the nailer from the air hose

when not in use.  (*Id.* at 76.)  He knew prior to the accident that the air should be

disconnected from the nailer prior to moving the nailer to a different work location, or

when it was not in use, and that a nailer still connected to the air hose should not be

left unattended.  (*Id.* at 78-81.)  He testified that it was "common knowledge" that it

was wrong to pick up tools via cords as he could either hurt himself or damage the tool, and he knew that prior to beginning work at Care Free.  (*Id.* at 93-94.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in paragraph 22 are in dispute.  The Plaintiff denies pulling the nailer by its air hose and thus, denies violating the instructions of the manufacturer.  (Ex. 2, Beijar Dep. at 27-28, 80, 88.)  As to the Plaintiff's testimony that pulling the air hose is a misuse of the tool, this opinion both (a) has no relevance to the incident as the Plaintiff and his expert state it occurred and (b) is uninformed by any expertise and, thus, should be disregarded.**

23.     While he disputed the findings in the OSHA report prepared immediately after the accident, Beijar agreed that if the accident had happened as described in that report (that a person had tugged on the air hose, pulling the nailer down and catching it), that would be a plain misuse of the nailer.  (*Id.* at 109; Ex. 14, Citation and Notification of Penalty ("OSHA Report") issued June 22, 2001 at 2.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in paragraph 23 are in dispute.  The Plaintiff denies pulling the nailer by its air hose and thus, denies violating the instructions of the manufacturer.  (Ex. 2, Beijar Dep. at 27-28, 80, 88.)  As to the Plaintiff's testimony that pulling the air hose is a misuse of the tool, this opinion both (a) has no relevance to the incident as the Plaintiff and his expert state it occurred and (b) is uninformed by any expertise and, thus, should be disregarded.**

24.     Beijar agreed that there is nothing wrong with a contact trip nailer that activates after the tip is depressed and the trigger is then depressed.  (Ex. 5, Beijar Dep. at 89.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in paragraph 24 are in dispute.  Plaintiff's opinion that there is nothing wrong with a**

**contact trip nailer that activates after the tip is depressed and the trigger is then depressed is uninformed by any expertise and, thus, should be disregarded.**

25.    Paul agreed that the nailer complies with all applicable ANSI industry standards, and he could not identify a single standard, regulation, law with which the nailer did not comply.  (Ex. 6, Paul Dep., at 11-12.)  When Paul tested this nailer in 2005, he found:

> My inspection and testing of the Bostitch nailer … showed that although the accident nailer was well used, the "contact trip" firing mechanism operated as designed and intended over the full range of air supply pressure and the "trigger" had to be physically depressed to allow the nailer to fire a nail.  A nail could be fired by holding down the trigger and impacting the "contact tip," or a nail could be fired if the trigger was even instantaneously touched or hit while the "contact tip" was [sic] Drop tests producing dynamic impacts to the "contact tip" significantly exceeding those that could have been produced when it hit Mr. Beijar's chest, showed that the nailer would not fire a nail unless the trigger was depressed when the impact occurred.  This was also confirmed by an analysis of the dynamic forces produced on the pneumatic head valve (which releases the nailing piston) when the tool is impacted on the nailing tip.  Accidental release from impact to the tool could only occur when impact occurs on the cap end of the nailer (i.e. if it is dropped on the cap end or the cap end of the nailer is used as a hammer).

(Ex. 7, Paul Rpt., at 3; see also Ex. 6, Paul Dep., at 15-18, concluding that the nailer operated as designed.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 26 are not in dispute.**

26.    Pinard, the foreman of the Care Free crew, testified that he used the nailer the morning of the accident.  (Ex. 1, Pinard Dep. at 13.)  He testified that the nailer, which was brand new, worked as it was supposed to.  (*Id.* at 14.)  He testified that Bostitch nailers are "beautiful guns … great nailers, work the best."  (*Id.* at 16.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 26 are not in dispute.**

27.    Following the accident, the nailer was pulled from use for six to eight months.  It was not serviced or examined during that period.  Care Free then resumed using it, and used it until notified of the lawsuit in the spring of 2004.  From the time it was put back into service in mid- to late-2001, to 2004, Care Free personnel used the nailer virtually every day, and they never had a problem with it.  (*Id.* at 17.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in paragraph 27 are stated in a misleading manner.  While Mr. Pinard testified that Care Free personnel never had a problem with the nailer, the Plaintiff states that he is not asserting that the nailer did not operate as designed or somehow failed to driver nails when the trigger and contact tip were depressed.  The Plaintiff is asserting that the safety features of the nailer were not designed properly, rendering the nailer unsafe if it falls from overhead and comes into contact with a worker.  The Plaintiff is not asserting that this foreseeable event occurred other than on February 1, 2001.**

28.    Beijar did not use the nailer prior to the accident, as he was working at the construction site as a laborer.  (*Id.* at 44.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 28 are not in dispute.**

29.    Beijar testified that the accident occurred as he was walking by the plank on some staging on which the nailer had been placed.  (Ex. 5, Beijar Dep. at 36.)  The staging was high enough, perhaps ten feet off the ground, that he could not touch it from the ground.  (*Id.* at 63.)  He testified he heard someone yell "look out!"  (*Id.* at 36.)  He

first looked to his left, then his right, and he suddenly found the nailer swinging down

at him from the plank.  (*Id.* at 36, 60-61.)  According to a drawing of the plank and

scene prepared by Beijar, the nailer was not located at the edge of the plank, but more

toward the middle of the plank.  (Ex. 15, Beijar Dep. Ex. No. 3.)

**PLAINTIFF'S RESPONSE: The Plaintiff states that the facts set forth in**

**paragraph 27 are stated in a misleading manner.  Mr. Beijar testified that he did not**

**know the exact position of the nailer while he prepared the drawing.  (Ex. 2, Beijar Dep.**

**at 52, 67.)**

30.    Beijar testified that in an effort to ward off the nailer, he touched the hose with his

right hand, about 18"-24" above the nailer itself.  (Ex. 5, Beijar Dep. at 37.)  His left

hand remained at his side.  *Id.*  When he first saw the nailer, the trigger was level with

his eyes.  (*Id.* at 40.)  It was within 12" of him, with the tip pointing down.  He claims

that he never touched the nailer prior to impact, only the air hose.  (*Id.* at 41-42, 73.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 30 are not in**

**dispute.**

31.    Paul completely and deliberately disregards Beijar's account of the accident.  (Ex. 7,

Paul Rpt. At 3; Ex. 6, Paul Dep. at 33.)  Paul claims that as the nailer descended, it

contacted Beijar's right arm.  More specifically, he claims that the trigger hit Beijar's

right arm "probably near the elbow."  (Ex. 7, Paul Rpt. At 3; Ex. 6, Paul Dep. at 35-

36.)  This directly contradicts Beijar's deposition testimony:  Beijar clearly stated that

his arm was "up and out to the right" as the nailer was descending.  (Ex. 5, Beijar Dep.

at 61.)  Paul further claims that Beijar's right arm kept the trigger depressed as the

"contact tip" compressed against his chest.  (Ex. 7, Paul Rpt. At 3; Ex. 6, Paul Dep. at

36.)  This factual assertion is impossible, as it directly contradicts Beijar's emphatic

testimony, offered twice, that he never contacted the nailer prior to its impact against

his chest (ex. 5, Beijar Dep. at 41-42, 73), as well as his testimony that his right arm

was "up and out to the right."  (*Id.* at 61).

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 31 are in dispute.**
**The Plaintiff's testimony that his arm was "up and out to the right" is in no way**
**inconsistent with Dr. Paul's testimony regarding how the incident occurred.  In fact, the**
**Plaintiff's testimony that his arm was "up and out to the right" places his arm in a**
**location where it could have inadvertently struck the trigger of the nailer as it swung.**

32.    Paul bases his findings, which contradict all accounts of the incident, on the "laws of

physics and where the nail entered [Beijar's] chest."  (Ex. 6, Paul Dep. at 33.)  Paul

stated, without any basis from an eyewitness, that when Beijar repeatedly denied

touching the nailer before it hit his chest, that it was only Beijar's "perception" that he

did not touch it with his right arm as the nailer descended.

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in**
**paragraph 32 are in dispute.  Dr. Paul's version of the accident is supported by his**
**physical reconstruction of the accident.  (*Id.* at 37, 44-46.)  He also considered**
**photographs of the scene and physical evidence such as X-rays.  (*Id.* at 29-30, 44.)  He**
**rejected the Plaintiff's testimony that he did not touch the trigger, as he believes, based**
**on the position of the nail in the Plaintiff's sternum and his understanding of physics.**
**(*Id.* at 29-30, 44-46.)  Because the incident occurred so quickly and the Plaintiff entered**
**into a state of shock immediately thereafter, Dr. Paul's testimony is not necessarily**

**inconsistent with the Plaintiff's testimony; instead, it "filled in the blanks" that were**

**missing from Mr. Beijar's recollection of the events.**

33.    In effect, Paul testified that the accident scenario involved the nailer falling towards

Beijar, Beijar grabbed the nailer by the air hose, bent his arm so that the nailer came

toward him, his elbow not only touched the trigger but remained on the trigger until

the contact tip hit Beijar's sternum.  (*Id.* at 51.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 33 are not in**

**dispute.**

34.    The Care Free foreman, Pinard, witnessed the accident.  He had instructed Beijar to

move the nailer from the plank, as it was leaning over the edge and was being jostled

as several workers laid long wooden rafters up against the plank for use on the home.

(Ex. 1, Pinard Dep. at 34-35.)  Pinard testified that Beijar attempted to reach up to

push the nailer back further onto the plank, but was not tall enough.  (*Id.* at 36-37.)

Pinard reported that the nailer was on the middle of the plank, with the air hose

running underneath the middle of the plank.  (Ex. 16, Pinard Dep. Ex. Nos. 3-5.)

Pinard stated that Beijar could have pushed the nailer further in by using a rafter, or by

using an available six-foot stepladder to climb up.  (Ex. 1, Pinard Dep. at 36-37.)

**PLAINTIFF'S RESPONSE:  The facts set forth in paragraph 34 are in dispute.**

**The referenced facts contradict the Plaintiff's testimony, who stated that he did not pull**

**the air hose.  (Ex. 2, Beijar Dep. at 27-28, 80, 88.)**

35.    Instead, Pinard observed Beijar pull on the nailer with his left hand, causing the nailer

to fall off of the plank sideways.  (*Id.* at 38.)  The nailer fell a distance of four or five

feet, and Beijar caught it like a football.  (*Id.* at 39.)  Pinard observed Beijar to grab

the nailer by the handle with his thumb on the trigger.  (*Id.* at 40.)  Pinard could not

determine whether Beijar's thumb hit the trigger before or after the contact tip hit

Beijar's chest.  (*Id.* at 41.)  Although Pinard was facing Beijar's back, he was able to

see the nailer and trigger clearly.  (*Id.* at 47.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in**

**paragraph 35 are in dispute.  Wayne Pinard testified that he was twenty to thirty feet**

**away from Mr. Beijar and that Mr. Beijar had his back to him when the incident**

**occurred.  (Ex. 1, Pinard Dep. at 26, 41, 46-47.)**

36.    The two other Care Free workers on the job site that day corroborated Pinard's

deposition testimony in their written statements.  David Santos stated that Care Free

workers, including Beijar, were leaning rafters against the staging plank.  When Beijar

leaned a rafter against the plank,

> he started to knock the gun off and Wayne [Pinard] the foreman
> asked him to move the gun back on the plank so it didn't fall.
> He then pulled on the hose and when he did, the gun fell
> landing into his hand while pulling the gun towards his chest
> while depressing the trigger and the gun fired a 3 ½ inch spike
> into his chest.

(Ex. 2, Santos Stmt.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in**

**paragraph 36 are in dispute.  First, the two identified "eyewitnesses" have not provided**

**reliable testimony in this matter; the Defendant has merely produced statements that**

**the "witnesses" did not sign under oath.  Ryan Cordeiro's statement is undated.  In**

**addition, neither of the other two witnesses indicate (a) what their position was relative**

**to Mr. Beijar during the accident or (2) that they saw the Plaintiff touch the trigger on**

**the nailer.  In fact, their affidavits clearly address events that they did not observe, such**

as the nail being discharged. Because the nail discharged when the nailer's tip was against the Plaintiff's chest, this eliminated any opportunity for someone to view the nail being released.

Second, the referenced facts directly contradict the testimony of the Plaintiff, who stated that he did not pull the air hose. (Ex. 2, Beijar Dep. at 27-28, 80, 88.) The referenced facts also contradict the testimony of Dr. Igor Paul, who explained that the accident could not have occurred as the witnesses described. (Ex. 3, Paul Dep. at 37, 44-46.) As such, these facts are in dispute.

37.    The fourth Care Free worker present that day, Ryan Cordeiro, prepared a handwritten statement that stated:

> We were standing up rafters and laying them up against the wall. Wayne asking [sic] him [Beijar] to move the the [sic] gun off of the plank. John [sic] then pulled the air hose from the gun. When he did that the gun fell off the plank he then caught the gun by the handle as he did that the gun went off as it hit his chest.

(Ex. 3, Cordeiro Stmt.)

PLAINTIFF'S RESPONSE: The Plaintiff states that the facts set forth in paragraph 36 are in dispute. First, the two identified "eyewitnesses" have not provided reliable testimony in this matter; the Defendant has merely produced statements that the "witnesses" did not sign under oath. Ryan Cordeiro's statement is undated. In addition, neither of the other two witnesses indicate (a) what their position was relative to Mr. Beijar during the accident or (2) that they saw the Plaintiff touch the trigger on the nailer. In fact, their affidavits clearly address events that they did not observe, such as the nail being discharged. Because the nail discharged when the nailer's tip was

against the Plaintiff's chest, this eliminated any opportunity for someone to view the nail being released.

Second, the referenced facts directly contradict the testimony of the Plaintiff, who stated that he did not pull the air hose. (Ex. 2, Beijar Dep. at 27-28, 80, 88.) The referenced facts also contradict the testimony of Dr. Igor Paul, who explained that the accident could not have occurred as the witnesses described. (Ex. 3, Paul Dep. at 37, 44-46.) As such, these facts are in dispute.

38.   Paul rejects the sworn deposition testimony and the statements of the three witnesses present at the time of the accident. There is no basis in this testimony for a finding that Beijar hit the nailer with his right arm or elbow to depress the trigger, as Paul claims. (Ex. 7, Paul Rpt. At 3; see ex. 6, Paul Dep. at 36, acknowledging that there is no eyewitness source for the conclusion that Beijar's elbow hit the trigger.)

PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in paragraph 38 are in dispute. Dr. Paul's version of the accident is supported by his physical reconstruction of the accident. (*Id*. at 37, 44-46.) He also considered photographs of the scene and physical evidence such as X-rays. (*Id.* at 29-30, 44.) He rejected the Plaintiff's testimony that he did not touch the trigger, as he believes, based on the position of the nail in the Plaintiff's sternum and his understanding of physics. (*Id*. at 29-30, 44-46.) Because the incident occurred so quickly and the Plaintiff entered into a state of shock immediately thereafter, Dr. Paul's testimony is not necessarily inconsistent with the Plaintiff's testimony; instead, it "filled in the blanks" that were missing from Mr. Beijar's recollection of the events.

39.     Paul testified that "this accident happened differently from either what Mr. Beijar says

or what the two [sic] eyewitnesses say.  The reasons for that are essentially the laws of

physics and where the nail entered [Beijar's] chest."  (Ex. 6, Paul Dep. at 33.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in paragraph 39**

**are not in dispute.**

40.     Paul claims that the nailer must have gotten caught on a bracket supporting a plank

(ex. 6, Paul Dep. at 40, 44-45, and ex. 17, sketches of nailer superimposed over

photographs of scaffold, part of Paul Dep. Ex. No. 3), but this position is flatly

contradicted by Pinard's testimony and sketches (ex. 16) and Beijar's own sketch (ex.

15).

**PLAINTIFF'S RESPONSE: The Plaintiff states that the facts set forth in**

**paragraph 40 are stated in a misleading manner.  Mr. Beijar testified that he did not**

**know the exact position of the nailer while he prepared the drawing.  (Ex. 2, Beijar Dep.**

**at 52, 67.)  In addition, Dr. Paul testified that the hose, not the nailer, must have been**

**caught on a bracket.  (Ex. 3, Paul Dep. at 45.)**

41.     Paul suggested in his deposition testimony that Beijar may have inadvertently stepped

on the air hose while walking by it, causing the nailer to fall.  (Ex. 6, Paul Dep. at 46.)

Paul was forced to admit, however, that there is no basis in any eyewitness testimony

that this scenario occurred.  (*Id.* at 46.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in**

**paragraph 41 are not in dispute.**

42.     Paul admits that the hypotheses he offers are inconsistent with the deposition

testimony of Beijar, Beijar's post-accident statements, Pinard's deposition testimony,

and the witness statements of the two other Care Free eyewitnesses.  He acknowledges that none of the scenarios he offers – that Beijar's elbow contacted the trigger all the way to his chest, or that the Beijar stepped on an air hose – are supported by any testimony whatsoever.  (*Id.* at 33, 46.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in paragraph 42 are in dispute.  Dr. Paul's version of the accident is supported by his physical reconstruction of the accident.  (*Id*. at 37, 44-46.)  He also considered photographs of the scene and physical evidence such as X-rays.  (*Id.* at 29-30, 44.)  He rejected the Plaintiff's testimony that he did not touch the trigger, as he believes, based on the position of the nail in the Plaintiff's sternum and his understanding of physics. (*Id*. at 29-30, 44-46.)  Because the incident occurred so quickly and the Plaintiff entered into a state of shock immediately thereafter, Dr. Paul's testimony is not necessarily inconsistent with the Plaintiff's testimony; instead, it "filled in the blanks" that were missing from Mr. Beijar's recollection of the events.**

43.    Pinard put the nailer back into service six to eight months after the accident and never had any problem with it until the parties to this litigation took the nailer in 2004.  (Ex. 1, Pinard Dep. at 17.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in paragraph 43 are stated in a misleading manner.  While Mr. Pinard testified that Care Free personnel never had a problem with the nailer, the Plaintiff states that he is not asserting that the nailer did not operate as designed or somehow failed to driver nails when the trigger and contact tip were depressed.  The Plaintiff is asserting that the safety features of the nailer were not designed properly, rendering the nailer unsafe if it**

**falls from overhead and comes into contact with a worker.  The Plaintiff is not asserting**

**that this foreseeable event occurred other than on February 1, 2001.**

44.    Paul himself admits that there is nothing wrong with the nailer, that it works properly

and as designed, and that it conforms to all applicable industry standards.  (Ex. 7, Paul

Rpt. At 3; Ex. 6, Paul Dep. at 15-18.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in**

**paragraph 44 are stated in a misleading manner.  While Dr. Paul concluded that the**

**nailer "operated the way it was supposed to operate, that it was designed to operate," he**

**also set forth several ways in which the nailer was not properly designed.  (Ex. 3, Paul**

**Dep. at 54-56.)**

45.    Matthew Ponko, Senior Project Engineer at Stanley, performed a series of tests on the

nailer on April 22, 2004.  (See Ex. 18, Stanley Fastening Systems Engineering

Laboratory Test Procedure, Instructions, and Work Request Form, Test Lab No.

08815-00, Bates nos. 016 Stan 0000199-0000126.)  Stanley's testing concluded that

despite physical external wear,

There were no unintentional actuations or incidents produced.
The tool functioned as was intended by design.

(*Id.* at page 3, bates no. 016 Stan 0000111.)  Mr. Ponko confirmed this finding in his

Expert Disclosure.  (Ex. 12, Ponko Rpt. at 3.)  He further confirmed that the nailer

conformed to all applicable industry standards and regulations.  (*Id*. at 3.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in**

**paragraph 45 are stated in a misleading manner.  The Plaintiff states that he is not**

**asserting that the nailer did not operate as designed or somehow failed to driver nails**

**when the trigger and contact tip were depressed.  The Plaintiff is asserting that the**

**safety features of the nailer were not designed properly, rendering the nailer unsafe if it falls from overhead and comes into contact with a worker.**

46.     Robert Olmstead, Stanley's former Chief Engineer and current consultant, also concluded that the nailer worked properly and as designed, and conformed to all applicable industry standards and regulations.  (Ex. 13, Olmstead Rpt. At 3.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in paragraph 46 are in dispute.  Dr. Paul has testified regarding several ways in which the nailer was not properly designed.  (Ex. 3, Paul Dep. at 54-56.)**

47.     Beijar did not notify Stanley of the accident at the time it happened.  He did not provide notice until his attorney wrote Stanley a letter on January 21, 2004, almost three years after the incident.  (Ex. 9, Beijar's Answer to Int. No. 23.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts set forth in paragraph 47 are not in dispute.**

48.     Yet, it is clear that within days of the accident, Beijar was contemplating legal action against Stanley.  In an article published in the Cape Cod Times on February 7, 2001 – just six days after the accident – Beijar recounted the accident.  The article then when on to state:

> Beijar is considering legal action against the nail gun
> manufacturer, because the gun is supposed to discharge only
> when pressure is applied to the trigger and the nose of the gun.
> But the gun discharged upon hitting his chest, with no pressure
> applied to the trigger, he [Beijar] said.

(Ex. 19, "Man shot in heart with nail gun leaves hospital after surgery," by Cynthia McCormick and Noelle Barton, Cape Cod Times, pages A-1, A-9, February 7, 2001.)

**PLAINTIFF'S RESPONSE:  The Plaintiff states that the facts in paragraph 46 are set forth in a misleading manner.  While Mr. Beijar may have considered the possibility of legal action following the accident, the referenced facts do not indicate when Mr. Beijar made the final decision to pursue legal action.**


**In addition, the Plaintiff states that the facts set forth in the editorial headings in the Defendant's Statement of "Undisputed" Facts are in dispute.**

Respectfully submitted,
JONATHAN BEIJAR,
By his attorney,


/s/  Scott W. Lang
Scott W. Lang, Esq.  BBO#285720
Lang, Xifaras & Bullard
115 Orchard Street
New Bedford, MA 02740
(508) 992-1270

Dated: November _____, 2005