Exhibit 1

```
                                00001
1           Exhibits 1 - 5    Vol. 1, Pgs. 1 - 53
2               UNITED STATES DISTRICT COURT
3                 DISTRICT OF MASSACHUSETTS
4               Civil Action No. 04-10233-RCL
5           -----------------------------------
6    JONATHAN BEIJAR
7                    Plaintiff
8    vs.
9    STANLEY FASTENING SYSTEMS, L.P.
10                   Defendant
11          -----------------------------------
12
13              DEPOSITION of WAYNE PINARD
14          Monday, May 17, 2004, 10:10 a.m.
15               Lang, Xifaras & Bullard
16                 115 Orchard Street
17               New Bedford, Massachusetts
18
19
20
21          -----------------------------------
22          Reporter:  David A. Arsenault, RPR
23          Farmer Arsenault Brock LLC, Boston, MA
24                   (617) 728-4404
```

```
00010
  1   years.
  2         Q.    Do you know where he lived when he was
  3   working for you?
  4         A.    In New Bedford, I believe.
  5         Q.    When was he last employed by Care Free
  6   Homes?
  7         A.    I think he was with me probably another
  8   five or six months after that incident.
  9         Q.    Now, you said that you witnessed the
 10   accident to Mr. Beijar?
 11         A.    Yes, I did.
 12         Q.    What did you see?
 13         A.    What I saw, we were cutting rafters,
 14   leaning them up against the house.  We had a
 15   staging plank up about 7 feet off the ground.  It
 16   was the Bostitch nailer on the plank.  We were
 17   nailing rafters up at the time.  And when we were
 18   standing the rafters up, they hit the plank.  They
 19   were bumping into the plank and the gun was
 20   starting to fall off, hanging off the plank a
 21   little bit.  That's when I asked Jon Beijar to fix
 22   the gun, push it on the plank before it fell.
 23         Q.    What happened?
 24         A.    He apparently couldn't reach it.  He
```

00011
```
 1    grabbed the line with his left hand and he pulled
 2    it.
 3          Q.    He pulled what?
 4          A.    The air line, it was attached to the gun.
 5    It was hanging down.  He pulled the air line off,
 6    and he pulled the gun off and it fell.  As it fell,
 7    he caught it with his right hand and pulled the
 8    trigger and caught it like a football and pulled it
 9    into his chest, and that's when I heard it fire.
10          Q.    What time day was it when the incident
11    occurred?
12          A.    It happened in the morning somewhere
13    around 9:00 or 10:00.
14          Q.    Where were you at that time?
15          A.    I was cutting rafters with the saw.
16          Q.    Was anybody working with you cutting
17    rafters?
18          A.    Dave Santos.  He was at the other end.
19    We cut the rafters at the same time, one on each
20    end.
21          Q.    What was Mr. Beijar's job?
22          A.    He was just a laborer.  He was a laborer.
23    He was carrying the rafters, standing them up.
24          Q.    So Mr. Beijar was picking up the rafters
```

```
00026
   1        Q.   Where were you and Mr. Santos working
   2   when you were cutting the rafters?
   3        A.   We were roughly 20 to 30 feet away.
   4   There was a set of sawhorses with rafters on it.
   5   Do you want me to put the rafters in?
   6        Q.   Sure, why not.  Could you put your
   7   initials where you were standing, as best you can
   8   recall.
   9        A.   (Witness complies.)
  10        Q.   And circle that, please.
  11        A.   (Witness complies.)
  12        Q.   And Mr. Santos was on the other end?
  13        A.   Yes.
  14        Q.   Have you now placed yourself and
  15   Mr. Santos in your drawing?
  16        A.   Yes.
  17        Q.   And you were roughly 20 feet away from
  18   the point of the accident?
  19        A.   Yes.
  20        Q.   Can you put in where the tool was just
  21   prior to Mr. Beijar bumping into the planking.
  22        A.   The tool was on the plank on the sidewall
  23   brackets.  "T" is for tool.
  24        Q.   Have you done that?
```

```
00041
  1   tool --
  2        A.   Yes, it was.
  3        Q.   -- as it is upside down?
  4        A.   Yes.
  5        Q.   And his right thumb hit the trigger?
  6        A.   Yes.
  7        Q.   Could you tell whether or not his thumb
  8   hit the trigger before it hit his chest?
  9        A.   No, I couldn't.  He was facing away from
 10   me.  All I saw him do was grab it in that manner
 11   with his right hand.
 12        Q.   It could have been when he grabbed it
 13   with his right hand, his fingers on the outside of
 14   the tool, his thumb hit the trigger?
 15        A.   Yes.
 16        Q.   His thumb hit the trigger either before
 17   the tip hit his chest or after the tip hit his
 18   chest.  You couldn't tell that.
 19        A.   I couldn't tell that.  He was facing way
 20   from me.  His back was facing me.
 21        Q.   Was there anything impeding your view of
 22   Mr. Beijar's hand as you described his hand on the
 23   handle and his right thumb on the trigger?
 24        A.   No, I saw his right hand grab the gun,
```

```
00046
  1        Q.   Do you know if your wife typed this
  2   statement?
  3        A.   I can't say for sure.  I know I went over
  4   it with her.  She took it down.  I don't know if
  5   she typed it or somebody at Care Free Homes typed
  6   it.
  7        Q.   Do you recall what work Ryan Cordeiro was
  8   performing on the morning of February 1st?
  9        A.   He was a laborer too.
 10        Q.   Do you recall what his assignment was
 11   that morning?
 12        A.   I can't remember.  I'm not sure.  I had
 13   him doing something but I can't remember.
 14        Q.   At the time of the accident was the air
 15   hose, did it run behind the plank towards the house
 16   or was it running away from the house?
 17        A.   It was in front of the plank away from
 18   the house.
 19        Q.   Could you see the trigger at the time the
 20   accident occurred?
 21        A.   I could see the trigger.  It was about 20
 22   feet away.
 23        Q.   Can you just show me how the tool was
 24   positioned towards Jonathan Beijar at the time of
```

```
00047
  1   the accident.
  2          A.   As it was falling?
  3          Q.   When he caught the tool.
  4          A.   It was facing like this (indicating).  It
  5   was falling.  The air line was attached to this.
  6   That's what he pulled on.  It fell that way first.
  7          Q.   If you can hand the tool to me.  If I'm
  8   in -- was Jonathan Beijar -- he was facing away
  9   from you at the time of the accident?
 10          A.   He was facing towards the house.  I was
 11   behind him.
 12          Q.   And you were facing his back?
 13          A.   Yes.
 14          Q.   And you were able to see the trigger from
 15   where you were positioned?
 16          A.   Well, I could see the whole gun clearly.
 17   I could see the trigger.
 18          Q.   What were you doing at the time of the
 19   accident?
 20          A.   I was cutting more rafters.
 21          Q.   And were you in the process of cutting
 22   rafters when the accident occurred?
 23          A.   No, I wasn't.
 24          Q.   What were you doing when the accident
```

```
00050
  1          Q.   That's it.
  2               EXAMINATION
  3     BY MS. DAVIS:
  4          Q.   I just have one more question.  Was
  5     Jonathan Beijar's body in between you and the
  6     nailer at the time the accident occurred?
  7          A.   Yes, it was.
  8          Q.   That's it.
  9               (11:19 a.m.)
 10
 11
 12
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
```

Exhibit 2

```
00001
  1                                    PAGES 1 - 113
  2                                    EXHS. 1 - 11
  3              UNITED STATES DISTRICT COURT
  4           FOR THE DISTRICT OF MASSACHUSETTS
  5     * * * * * * * * * * * * * *
  6   Jonathan Beijar           *
  7   v.                        *     Civil Action
  8   Stanley Fastening Systems, *  No. 04-10233-RCL
  9   L.P.                      *
 10     * * * * * * * * * * * * * *
 11
 12
 13              Deposition of Jonathan Beijar
 14              Tuesday, April 27, 2004
 15                Smith & Duggan LLP
 16             Lincoln North - 3rd Floor
 17               55 Old Bedford Road
 18            Lincoln, Massachusetts 01773
 19
 20
 21   ----------  J. EDWARD VARALLO, RMR, CRR  -----------
 22                  COURT REPORTER
 23        FARMER ARSENAULT BROCK LLC, BOSTON, MASS.
 24                   617.728.4404
```

```
00027
  1    Right?
  2         A.    Yes.
  3         Q.    Okay.  Now, one of the instructions, I
  4    take it, that you knew was not to pull the tool by
  5    the airhose.  Right?
  6         A.    Yes.  But I never pulled a nailer by the
  7    hose.
  8         Q.    I understand that.  But you knew you were
  9    not supposed to pull the tool by the airhose,
 10    particularly while it was connected to the
 11    compressor.  Right?
 12         A.    Yes, sir.  And I never did.
 13         Q.    And you wouldn't do that, would you?
 14         A.    No.
 15         Q.    Because if you did, it might swing and hit
 16    you and hurt you.  Right?
 17         A.    Well, you're not supposed to pull anything
 18    by its cord.
 19         Q.    Sure.  And particularly the reason you
 20    don't want to pull a pneumatic tool like the nailer
 21    by the airhose while it is under compression is that
 22    it might go off.  Right?
 23         A.    I guess.
 24         Q.    And it might cause you serious injury.
```

```
00028
   1   Right?
   2        A.     I guess so.
   3        Q.     And that's one of the reasons why you
   4   would never pull a tool by the airhose, would you?
   5        A.     I never did.
   6        Q.     Right.  And you wouldn't do it, would you?
   7        A.     No.
   8        Q.     And you knew that prior to January of
   9   2001, didn't you?
  10        A.     Yeah.
  11        Q.     All right.  Because to do something like
  12   that would be to misuse this tool, wouldn't it?
  13        A.     Yes.
  14        Q.     To use the tool in a way it was never
  15   intended to be used.  Isn't that true?
  16        MS. DAVIS:  Objection.
  17        A.     Yes.
  18        Q.     Did you read the operator's manual before
  19   you started using the tools that were on the
  20   jobsite?
  21        A.     No.
  22        Q.     Were you given the opportunity to do so?
  23        A.     No.
  24        Q.     Did you ask to do so?
```

```
00037
   1        A.      Yes.
   2        Q.      Did you hit it?
   3        A.      I touched the hose about a foot and a
   4   half, two feet from where it connects to the nail
   5   gun.
   6        Q.      Did you hit any other part of the tool?
   7        A.      No.
   8        Q.      How do you know you didn't hit the
   9   trigger?
  10        A.      Because I know my left hand was down to my
  11   side and my right hand had gone up and touched the
  12   hose.
  13        Q.      But as the tool was coming towards you,
  14   you put your right hand up to deflect the tool.  Is
  15   that right?
  16        A.      Yes.
  17        Q.      As you put your right hand up -- And the
  18   tool was moving towards you.  Is that right?  Do I
  19   have this right?
  20        A.      It was right in front of me.
  21        Q.      But it was moving towards you.  Correct?
  22        A.      Correct.
  23        Q.      As it was moving towards you and you put
  24   your right hand up to deflect it and you hit the
```

```
00040
   1       Q.    You have the tool now, Exhibit 2, in your
   2   right hand.  Correct?
   3       A.    Yes.
   4       Q.    And you've got the tip of the tool
   5   pointing down towards your sternum at about a
   6   30-degree angle from your body.  Would that be
   7   correct?
   8       A.    I'm not exactly sure what angle it was at
   9   but it was coming down this way.
  10       Q.    With the tip pointed towards the ground?
  11       A.    Correct.
  12       Q.    And the back of the tool up towards your
  13   head?
  14       A.    Yes.
  15       Q.    And then the cartridge went from the tip
  16   off to the right at an angle of some sort.  Correct?
  17       A.    Correct.
  18       Q.    And the trigger is right in front of your
  19   eyes?
  20       A.    Correct.
  21       Q.    And that was where it was when you saw the
  22   tool.  Right?
  23       A.    I'm sorry?  I don't know what you mean.
  24       Q.    You've just described for me the position
```

```
00041
 1   of the tool when you first saw it on the day of your
 2   accident.  True?
 3        A.   Yes.
 4        Q.   And how far was it away from you?
 5        A.   I don't know.  It was right about here.
 6   I'm not really sure of how close it was.  I mean, I
 7   looked to my left and when I looked back to my
 8   right, it was right here, right around eye level.
 9        Q.   Right around eye level and within twelve
10   inches of you?
11        A.   Yes.
12        Q.   Pointing down?
13        A.   Pointing down.
14        Q.   And moving towards you?
15        A.   Yes.
16        Q.   And you put your right arm up?
17        A.   Yes.
18        Q.   What part of the tool did you hit with
19   your right arm?
20        A.   I didn't touch the tool, I touched the
21   airhose.
22        Q.   How do you know that you didn't brush the
23   trigger on the way by?
24        A.   I don't see how I could have when my left
```

```
00042
  1    hand was down here and as soon as I turned to my
  2    right, my right hand went up.  I don't see how I
  3    could have even came close to the trigger.
  4         Q.    Are you saying that you don't see how you
  5    could have touched the trigger?
  6         A.    I know I didn't touch the trigger.
  7         Q.    All right.  How do you know you didn't
  8    touch the trigger?
  9         A.    Because I never touched the trigger.  I
 10    know I didn't.
 11         Q.    Was anything in your hands at the time?
 12         A.    No.
 13         Q.    Who was nearby you?
 14         A.    The fellow workers.  I don't know exactly
 15    who was right there because I went into shock as
 16    soon as it hit me.  I don't remember their names.
 17    I don't know -- I know there was at least one person
 18    close to me.  I don't know if he was watching or....
 19    I couldn't tell you.
 20         Q.    But you don't know who it was?
 21         A.    No.  I don't remember their names.
 22         Q.    And the tool hit you, I take it?
 23         A.    Yes.
 24         Q.    After the tool hit you, did you ever see
```

```
00052
   1        A.      Correct.
   2        Q.      That was your job at that time?
   3        A.      Yeah, I believe so.  I'd say so.
   4        Q.      How many trips had you taken from the
   5   cutting board area over to the side of the house?
   6        A.      Two, three.  I'm not really sure.
   7        Q.      Was there somebody working on the staging
   8   above the window?
   9        A.      No, there was nobody up top, because we
  10   were just getting ready to break for lunch.
  11        Q.      Where was the nailer?
  12        A.      It was somewhere up here.  I don't know
  13   where.  I don't know if it was on the staging or if
  14   it was on the top of the wall.  I'm not really sure.
  15        Q.      It was connected to an airhose, though,
  16   obviously?
  17        A.      I believe so, yes.  Must have been.
  18        Q.      Can you put the initials PN with a circle
  19   roughly in the area where you think it was?
  20        A.      Sure.  Like I said, I don't know if it was
  21   on the staging or on the top of the wall so I'll
  22   just put it between.
  23        Q.      Fair enough.
  24        A.      (Witness complied.)
```

```
00061
   1        A.      About, yes.
   2        Q.      Almost right in front of your nose.
   3   Right?
   4        A.      Yes.
   5        Q.      That's where you were and it was twelve
   6   inches away from you about?
   7        A.      I'm guessing.  I'd say.  I'm not really
   8   sure how far away it was.
   9        Q.      That's where it was when you described it
  10   to me earlier, though.  Correct?
  11        A.      Yes.
  12        Q.      And you moved your right hand up to try to
  13   deflect the tool?
  14        A.      Out.
  15        Q.      Out to the right?
  16        A.      Not really up but more (indicating).
  17        Q.      Out to the right?
  18        A.      Yes, up and out to the right.
  19        Q.      Didn't touch the tool at all.  Is that
  20   your testimony?
  21        A.      No.
  22        Q.      So is that correct?
  23        A.      Correct.
  24        Q.      When the tool hit you, did you hear
```

```
00062
  1   anything?
  2        A.    No.
  3        Q.    Didn't make a sound?
  4        A.    I'm sure it did because it fired.  I don't
  5   remember a sound, though.
  6        Q.    Do you remember anybody who was standing
  7   anywhere near where you were?
  8        A.    I don't really remember much after it went
  9   off.  It was more of a, I don't know how to describe
 10   it, like I just got I guess you'd say like
 11   adrenaline rush.  And I was kind of foggy on where I
 12   was and all I know is somebody said, you know, "Are
 13   you all right?"  And, you know, I said "I guess so."
 14   And someone else had asked me if it went off, and
 15   that's when the pain in my chest was really starting
 16   to kick in and I could feel it, and that's when I
 17   looked down and there was a hole in my sweatshirt,
 18   and then that's when I really started to get
 19   paranoid.
 20        Q.    Did you see anybody near where you were
 21   just before the accident?
 22        A.    No.
 23        Q.    Could you sign and date your diagram for
 24   me, please?
```

```
00063
  1        A.    Sure.  (Witness complied.)
  2            MR. DUGGAN:  And we'll mark that as
  3   Exhibit 3.
  4            (Beijar Exhibit 3 marked for
  5   identification.)
  6   BY MR. DUGGAN:
  7        Q.    A couple more questions about the scene.
  8   How high up was the staging?
  9        A.    I couldn't begin to tell you.  I'm not
 10   sure.
 11        Q.    Could you touch it if you put your hand
 12   up?
 13        A.    I don't believe so.  I can't remember.  I
 14   know it was overhead.  But how high, I don't believe
 15   that you could've grabbed it, the staging or the
 16   planks, by hand.
 17        Q.    Would that be more than ten feet high?
 18   Would that be a fair estimate?
 19        A.    I'd say so, yes.
 20        Q.    Mr. Beijar, you were kind enough, you were
 21   about to draw another diagram and I stopped you, and
 22   I don't mean to interrupt you.  What was the other
 23   diagram you were going to draw?
 24        A.    I was just going to show you from looking
```

```
00066
  1   those photographs?
  2        A.    Yes, sir.
  3        Q.    Do those photographs fairly and accurately
  4   depict the house you were building?
  5        A.    Yes.
  6        Q.    Can you show me where on those photographs
  7   it was that your accident happened?
  8        A.    Yes, sir.  It was this corner right here,
  9   sir.
 10              MR. DUGGAN:  Let's mark this as the next
 11   exhibit.
 12              (Beijar Exhibits 5 through 8 marked for
 13   identification.)
 14   BY MR. DUGGAN:
 15        Q.    You have picked out four photographs for
 16   me that we've marked as Exhibits 5, 6, 7 and 8?
 17        A.    Yes.
 18        Q.    These photos show the area of your
 19   accident?
 20        A.    Yes.
 21        Q.    And these fairly and accurately depict the
 22   condition as it appeared when you were hurt?
 23        A.    Yes.  I believe there was more snow on the
 24   pile itself, but yes.
```

00067
```
 1        Q.    Does Exhibit 5, for example, show the pile
 2   of snow you were testifying about?
 3        A.    Yes.
 4        Q.    Now, you told me when you were testifying
 5   earlier that the nailer was somewhere over your
 6   head, either on the staging or the scaffolding up
 7   here or --
 8        A.    Correct.  At the time of the accident
 9   these boards and the roof from the picture on
10   Exhibit 5, those boards were not there.  There was
11   just the top of the wall.  The roof was not present
12   and the bottom of the truss boards sticking out were
13   not there.  Those were the boards that we were
14   putting up.
15        Q.    So all of these trusses and the roof were
16   added after your accident?
17        A.    Correct.
18        Q.    And you don't know whether the nailer was
19   on the planking that we see here or actually on the
20   top of the wall?
21        A.    Correct.
22        Q.    But, in any event, it was in either one of
23   those places and there was a hose coming down
24   someplace?
```

```
00070
  1      Q.     Did you ever ask anyone to see it?
  2      A.     I never actually asked anyone to see it,
  3  no.
  4      Q.     Do you know if anybody tested it?
  5      A.     No.
  6      Q.     Do you know if anybody used it?
  7      A.     I don't know.  I have no idea if anybody
  8  used it or not.
  9      Q.     Would it be fair to say that things got
 10  pretty fuzzy in your mind after you got hit with the
 11  tool?
 12      A.     A little, yes.
 13      Q.     You mention you had an adrenaline rush?
 14      A.     Yes.
 15      Q.     And then when you saw the nail, you
 16  said --
 17      A.     Well, I didn't actually see the nail.
 18  There was just a hole in my chest.
 19      Q.     And then what happened to you?
 20      A.     That's when I started to basically just
 21  get a little scared.  You know, I didn't know where
 22  the nail was or if it had gone through or....  I
 23  just got scared at that time.
 24      Q.     Sure.  And obviously at that point you
```

```
00071
  1    were more worried about your personal safety than
  2    anything else?
  3        A.    Yes.
  4        Q.    Would it be fair to say the details of
  5    things got a little fuzzy?
  6        A.    I don't understand what you mean by that.
  7        Q.    Well, you were focused on the fact that
  8    you may have a nail in you.  Correct?
  9        A.    Yes.
 10        Q.    You were focused on the fact that you may
 11    be pretty seriously hurt?
 12        A.    Yes.
 13        Q.    You didn't know how seriously hurt?
 14        A.    Yes.
 15        Q.    But you were scared?
 16        A.    Yes.
 17        Q.    And that's what you were concerned with.
 18    Right?
 19        A.    Yes.
 20        Q.    Did things get fuzzy at that point?
 21        MS. DAVIS:  Objection.
 22        Q.    In your mind.
 23        A.    Not really.  I mean, the whole thing was
 24    just confusing.  It was, you know, just a lot of
```

```
00072
  1    things going on, the pain in my chest and having
  2    trouble breathing.
  3        Q.    Backing up a few seconds before that, from
  4    the time you heard the person yell "Look out" until
  5    the time that the tool hit you -- Do you remember
  6    the tool hitting you, by the way?
  7        A.    I don't physically remember it hitting me,
  8    but....
  9        Q.    From the time you heard somebody yell
 10    "Look out" until the time you saw the tool right in
 11    front of your eyes, how much time elapsed?
 12        A.    I don't know.  We're talking maybe
 13    seconds.
 14        Q.    Things happened very quickly, didn't they?
 15        A.    Yes, sir.
 16        Q.    A lot of things happened in a very short
 17    period of time?
 18        A.    Yes.
 19        Q.    And a lot of things went through your mind
 20    in a short period of time.  Right?
 21        A.    Yes.
 22        Q.    Would it be fair to say that maybe you
 23    don't remember everything that happened?
 24        A.    No, I pretty much remember everything that
```

```
00080
  1   warnings:  "In addition to other warnings contained
  2   in this manual, observe the following for safe
  3   operation."  Right?  There's a list of things.
  4        A.    Yes.
  5        Q.    And one of them, the fourth bullet, is
  6   "Always carry the tool by the handle; never carry
  7   the tool by the airhose."
  8        A.    Yes.
  9        Q.    Is that something you knew prior to your
 10   accident?
 11        A.    Yes, sir.
 12        Q.    And what's the purpose of not carrying the
 13   tool by the airhose?
 14        A.    I'm not really sure.
 15        Q.    Do you think it might have something to do
 16   with safety?
 17             MS. DAVIS:  Objection.
 18        A.    Possibly.
 19        Q.    And you knew that if you carried the tool
 20   by an airhose and it was activated, it might go off?
 21             MS. DAVIS:  Objection.
 22        A.    I never carried it by the airhose.
 23        Q.    Why wouldn't you?
 24        A.    I never carried it by the airhose.
```

00088
```
 1   that properly?
 2        A.    You read what's written, yes.
 3        Q.    Now, I understand that that's not the way
 4   you remember this accident happening?
 5        A.    Nope.
 6        Q.    Would I be correct that it would be a
 7   misuse of the product to pull on the airhose if
 8   you're trying to get something down from planking?
 9        A.    That is a misuse.  But that's not how it
10   happened.
11        Q.    I understand that.
12              That would be using that tool in a way it
13   was never intended to be used.  Isn't that true?
14        A.    Yes, it would be.
15        Q.    And according to this narrative here, the
16   tip or the foot as they put it depressed against
17   your chest and then your other hand hit the trigger.
18   Right?
19        A.    That's what it says there.
20        Q.    And that would be in sequence tip hitting
21   first, then your hand hitting the trigger.  Right?
22        A.    That's what it says.
23        Q.    And that would drive a nail.  Right?
24        A.    I guess so.  I'm not sure.  That's not
```









EXHIBIT

Benjar 6
4-27-04







