Exhibit 3

1

Exhibits:  1 - 11        Volume 1, Pages 1 - 81

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-10233-RCL

---------------------------

JONATHAN BEIJAR

            Plaintiff

vs.

STANLEY FASTENING SYSTEMS, L.P.

            Defendant

-----------------------------

VIDEOTAPED DEPOSITION OF IGOR PAUL

Tuesday, September 6, 2005, 10:35 a.m.

Smith & Duggan LLP

Lincoln North

55 Old Bedford Road

Lincoln, Massachusetts


------- Reporter:  David A. Arsenault, RPR -------

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  fax 617.728.4403

1      A.  Legal-related consulting, I don't think

2  I've ever earned more than a hundred thousand.  It

3  was always lower.

4      Q.  Doctor, tell me all of your experience in

5  designing pneumatic nailers.

6      A.  I don't think I have designed a pneumatic

7  nailer from scratch.  In terms of designing

8  pneumatic tools and pneumatic impact tools, I

9  consulted for Ingersoll-Rand over a period of about

10  four or five years developing impact kinds of tools,

11  which were actually jackhammers, to reduce the

12  recoil of jackhammers and actually put in a dynamic

13  vibration and impact negator, which is essentially a

14  mass which moves in the opposite direction to the

15  piston, to the driving piston, so that the recoil of

16  the driving piston is minimized.  So that dealt with

17  pneumatic impact tools.

18          Actually, that extended also to

19  hand-held chisels, pneumatic chisels for

20  Ingersoll-Rand.  At some point, I think it was in

21  the late '70s or early '80s, I worked for Hitachi,

22  again as a consultant.  And that started when I was

23  hired by them in a legal matter.  And that

24  essentially became a nonlegal consulting matter,

1   because they were having some problems with their

2   trigger mechanism, particularly their sequential

3   trigger mechanism.  So I essentially solved their

4   problem with respect to that.

5           I think that's really the only hands-on

6   design experience that I have in terms of pneumatic

7   nailers or pneumatic drive-type tools.  I've

8   consulted on various other pneumatic tools, but one

9   that essentially has a hammer blow or piston

10  pneumatic drive with the associated controls, that's

11  been limited to that.

12          I've had about a dozen cases over the

13  years which were on the legal side, essentially, as

14  a consultant involving accidents with pneumatic

15  nailers; and also some, in addition to that,

16  involving electric staplers and nailers.

17      Q.  But you never designed ground up a

18  pneumatic nailer.  Is that true?

19      A.  Certainly not.

20      Q.  Have you ever worked as an employee of

21  pneumatic nailers?

22      A.  No, other than as a consultant.

23      Q.  But I said as an employee.

24      A.  No.

1     Q.  Have you ever worked with pneumatic nailers

2   building homes, woodworking or anything like that?

3     A.  Yes, only on my two homes that I have

4   helped build.

5     Q.  Which homes were they?

6     A.  Well, one was in Andover, Massachusetts.  I

7   forget the address, as I sit here.  The one is the

8   one I live in now, five years ago.

9     Q.  You actually did some of the construction

10  yourself?

11     A.  Yes, quite a bit.

12     Q.  What kind of pneumatic tools, pneumatic

13  nailers did you use?

14     A.  Actually, the contractor had Hitachi tools.

15  I think he may have also had a Stanley tool.  But at

16  the time I wasn't paying attention.

17     Q.  Okay.

18     A.  So, I'm not sure.

19     Q.  Who is the contractor up in New Hampshire,

20  do you know?

21     A.  Yes.  That's horrible, because I still talk

22  to him.  I'll have to get it to you.

23     Q.  Would you do that?

24     A.  Yes.

1     Q.  In other words, it can't fire without the

2   trigger being depressed.

3     A.  That was my conclusion.

4          So then in either scenario, whether he

5   pulled it or didn't pull it, it couldn't fire

6   without the trigger being depressed.  So at that

7   stage, I have to say -- you know, he was the closest

8   to the gun when it hit him.  So he has a description

9   of how it happened.

10          There is another description by, you

11   know, two other people, three other people, although

12   only one of them was deposed, that indicate that he

13   pulled it with his left hand and caught it with his

14   right hand.  So then I did have to get into some

15   reconstruction, A, to see, you know, whether either

16   scenario would allow the trigger to be depressed

17   accidentally while he is either catching or being

18   hit by the gun.  So I essentially looked at the two

19   scenarios.

20     Q.  Okay.  When you say two scenarios, are you

21   talking about one scenario being the three

22   eyewitnesses and the other being that of Mr. Beijar?

23     A.  The tool hitting him where it hit him,

24   according to the x-rays -- the x-rays are really the

1   only, you know, physical evidence that's here.  So

2   beyond that, I have to look at physical principles

3   and how the scenario could have developed.

4       Q.  But when you said two scenarios --

5       A.  Yes.

6       Q.  -- the two scenarios you are talking about

7   are, one is Mr. Beijar's scenario, and the other

8   scenario is the scenario given by the three

9   eyewitnesses.  Is that what you meant by the two

10  scenarios?

11      A.  Well, as a starting point, yes.

12      Q.  Okay.

13      A.  The starting point being that one is that

14  he doesn't consciously pull on anything.  Somebody

15  yells watch out, or he turns around and he sees this

16  thing coming towards him.

17      Q.  That's Mr. Beijar's scenario?

18      A.  That's Mr. Beijar's scenario.

19      Q.  The three other eyewitnesses have a

20  different view?

21      A.  Well, they all seem to have exactly the

22  same view, that he pulls the hose with his left

23  hand.

24      Q.  To get the tool --

1    as to how this accident happened?

2        A.  No, not that I know of.

3        Q.  Did you come to an opinion as to how the

4    accident happened as part of trying to reconstruct

5    this accident?

6        A.  I have come to an opinion as to my opinion

7    how the accident most likely happened.

8        Q.  I'm going to ask you to give that opinion.

9    I know that you mentioned that you wanted a break

10   after an hour.  I think this is probably a good

11   time.

12       A.  I can keep going.

13       Q.  Okay.  Great.  Can you illustrate for me,

14   can you show me by using the tool -- and I brought a

15   hose here for you to use -- how you think this

16   accident happened.

17       A.  Well, I think this accident happened

18   differently from either what Mr. Beijar says or what

19   the two eyewitnesses say.  The reasons for that are

20   essentially the laws of physics and where the nail

21   entered his chest.

22       Q.  Can you show me how you think the accident

23   happened?

24       A.  Okay, sure.  Essentially the tool --

1    eyewitnesses' description is that he pulls the gun,

2    pulls it by the hose -- incidentally, this staging

3    is about ceiling height here.  He can't quite reach

4    the gun.  So according to the two -- to the one

5    eyewitness who was actually examined on it under

6    oath, he pulls it down with his left hand and pulls

7    it toward him and catches it like a football, he

8    says.  He says that he sees him catch it like that

9    (indicating), as it is coming down, and he hits the

10   trigger with his thumb and then pulls the thing in.

11   He had to actually pull it down like that

12   (indicating) and that's when it fired.  I don't

13   think that's consistent with physical principles.

14       Q.  Is there any witness who testifies whether

15   the trigger was depressed before or after the tip of

16   the tool hit him on the chest?

17       A.  Well, I think actually both Mr. Pinard and

18   Mr. Edwards, who -- I think it was Wayne Edwards --

19   who says based on what he had heard -- he was

20   reconstructing it, and he says that probably the

21   trigger was depressed before -- it had to be

22   depressed before it hit his chest.

23       Q.  Could you show me where in Mr. Pinard's

24   deposition he says that?

1      A.  It still could not swing towards him.

2      Q.  Right.  But if he pulled it down with his

3  left hand and pulled it in with his right, that

4  would be another way the tool could get to his

5  chest; is that true?

6      A.  Except, it is against physical principles.

7  If he pulled on the hose, then the gun would come

8  off the scaffolding not in the position that hit his

9  chest.

10      Q.  Unless he pulled it into him.

11      A.  Even if he pulled it into him.  Because if

12  it is lying in any orientation on the plank and you

13  pull on the hose, the hose is going to be what's

14  towards you, not the tip of the gun.  So if you pull

15  it down, there's no other way the gun can come off

16  the plank except hose first, because you are pulling

17  on the hose.  So if it comes at you this way, if he

18  catches it this way, then he would have to turn it

19  around and bring it in like this.  I just don't

20  think that can happen.  Eyewitness or not, I mean,

21  he's 20 feet away facing the guy's back.

22  Physically, it cannot happen that way.

23      Q.  Let me ask you a question, Doctor.  Do you

24  think that it is a reasonable thing to do to pull

1    leaned the plank against what he thought was the

2    house -- I think he actually leaned it against the

3    house and the plank or just the plank -- and as per

4    the eyewitnesses, the gun was teetottering on the

5    edge of the plank.  And that's according to

6    Mr. Pinard, why he told him to put the tool back and

7    said that he couldn't reach it.  But that's not the

8    plaintiff's recollection.

9           The plaintiff's recollection is that he

10   turns around and the tool is coming towards him.

11   Now, I think that may very well have happened if his

12   foot got entangled with the hose.  But it wouldn't

13   have pulled the tool down.

14       Q.  What hose?

15       A.  This hose, the air hose.  If you look in

16   the pictures the next day, they have a tool lying up

17   there.  It is to the right of the bracket.  Now, I

18   don't know if they were trying to put the tool, you

19   know, in some position there like it was at the time

20   of the accident.  But it is certainly consistent

21   with all the exhibits that they mark at their

22   deposition, that the tool was at the end of the

23   plank.  So it was probably beyond the bracket.

24           And you see, you know, the hose coming

1   down and Mr. Pinard said the hose was in front of

2   the plank.  So if that tool falls off the plank, it

3   is going to go down like this, gravity will just

4   pull it straight down.  But because of the hose up

5   there, it starts swinging towards him.

6          Now, where it hits his chest -- or where

7   he was pulling it as a football, the gun has already

8   fallen about 4 feet, it had fallen at least 4 feet.

9   So it had quite some energy.  Now, even if he

10  reached up, according to Mr. Pinard, and caught the

11  gun up there, which was still about 1 1/2 feet after

12  it dropped from the plank, and then brought it down

13  and pulled it in, he already had his finger on the

14  trigger.

15         So either scenario, I don't think that

16  Mr. Pinard's scenario could have happened based on

17  physical evidence and physical principles.  He could

18  have pulled it down, but then that's not how the gun

19  swung into his chest.  He could have tried pulling

20  on it and the thing fell off and swung into him.  He

21  could have just touched the, a hose while he was

22  going by.  The thing was partially off the plank.

23  Or the plank could have started its drop.

24         Now, for any object to drop about 4 feet

46

1  -- okay? -- that chart is in there too, it takes

2  close to a second.  So the time sequence was

3  certainly there, that the plaintiff turns around,

4  sees the thing coming towards him.  Although he sees

5  it wrong as well.  It couldn't have come at him this

6  way, the way the witnesses -- or one witness says.

7      Q.  The way Mr. --

8      A.  Mr. Picard (sic).  It couldn't have come

9  this way if he pulled on the hose.

10     Q.  I'm getting lost here.  Let me try again.

11     A.  Yeah.

12     Q.  My first question was, in your

13  reconstruction, do you have a view whether or not

14  Mr. Beijar pulled on the hose?

15     A.  I don't think he purposely pulled on the

16  hose near the plank.  He may have stepped on the

17  hose on the ground and disturbed the hose.

18     Q.  Is there any evidence from Mr. Beijar,

19  Mr. Pinard, from any of the witnesses, Mr. Cordeiro,

20  Mr. Santos, that Mr. Beijar stepped on the hose,

21  anywhere?

22     A.  No.

23     Q.  Is there any evidence that he pulled on the

24  hose?

54

1    in front of you, Mr. Beijar's tool.

2        A.  Yes.

3        Q.  Could you please list for me all the ways

4    in which you think this tool is not properly

5    designed that had anything to do with this accident.

6        A.   Well, in my professional opinion, this

7    tool, which is a contact trip tool, should have a

8    dual-action trigger to make up for the fact that a

9    contact trip mechanism essentially removes the

10   second safety aspect of the trigger.  And in this

11   particular case, it would have prevented the

12   accident.

13          In terms of disconnecting the hose when

14   not in use, I think that is an instruction which is

15   not practical in the field and which is not done in

16   the field.  And even Mr. Pinard essentially says

17   that he connected it in the morning because we are

18   going to need it later on.  So you have the tool

19   ready for use.  And it frequently lies around with

20   power on.  So I don't think that just an instruction

21   or warning to remove the hose is adequate.

22          If, indeed, Stanley or Bostitch want it

23   as a safety issue, then they could very easily

24   provide an automatic power shutoff when the

1    pneumatic is connected.  So that if you don't use

2    the tool for whatever period of time they would

3    think is reasonable, the pneumatics would be

4    disconnected from the driving hammer.  And to

5    restart it, all you would have to do is to depress a

6    push-button or you could have a handle so that when

7    you grasp the tool you automatically activate the

8    power.

9             So I think those are essentially the two

10   defects.  In my report I mention a number of ways in

11   which a contact trip actuating mechanism can be made

12   into essentially a sequential trip device.  Even in

13   the manual itself, Bostitch and the industry in

14   general agrees that the sequential type of actuation

15   of pneumatic tools is safer than the contact trip.

16   The only reason that the contact trip is really done

17   is to be able to bump fire during a roofing

18   application, which is fine.  I think it is a great

19   feature that you can just grab the trigger and bump

20   fire a number of nails in a row without stopping.

21             And a sequential operation doesn't allow

22   that to happen.  You would have to let go of the

23   trigger every time, apply it, and so on.  But by its

24   very nature the contact trip takes away that second

56

1    independent function of the hand.  And on at least

2    five construction sites I have seen these tools tied

3    down.  That's why presses in industry have an anti-

4    tiedown feature, so that you cannot tie down a

5    safety function.  In the contact trip design, it is

6    very easy to defeat this function, and it gives the

7    tool a much bigger utility, but it completely

8    bypasses the safety function.

9            So for contact trip tools, in my

10   professional opinion, you should have the dual-

11   function trigger, which makes you do two things

12   before the trigger can actually be depressed.  You

13   can still after you do that, do your bump nailing.

14   All it does is it puts the sequential -- and it has

15   to be a conscious, two-step function to start the

16   trigger.  Either for a series of contact, of impact

17   trip nailings or a single nail.  And it does not

18   take away from either the utility or function or

19   quickness of how you do it.  All it does is

20   essentially doubles the safety.

21       Q.  Have you now given me a list of all of your

22   problems with the tool as far as it applies to this

23   case?

24       A.  I think so.

1      A.  Well, also most trigger-operated tools have

2  a guard over the trigger so that you can't, or it is

3  very difficult to activate the trigger accidentally.

4  You have to actually insert your finger into a

5  limited space.

6      Q.  Okay.

7      A.  So instead of being able to hit against

8  this, either with the thumb or your elbow, it would

9  have a trigger guard so that you would be hitting

10  the trigger guard.  Now, you still could insert your

11  thumb this way and push it down, but it is

12  essentially a trigger guard against accidental

13  actuation of the trigger.  You have them on

14  handguns.  You have them on rifles.  You have them

15  on handtools.  But, of course, a dual-action trigger

16  is even better.

17      Q.  Is it your testimony, Doctor, that if this

18  tool had a trigger guard, as you've just described,

19  that it would be reasonably safe for its intended

20  uses?

21      A.  In my opinion, no.  I think it still would

22  have to have the dual-action trigger.  But in this

23  accident, in my opinion, the trigger guard would

24  have prevented it.

**Igor L. Paul, Sc.D., P.E.**
Engineering Consultant
P.O.Box 178, 844 Lakeshore Drive
Elkins, NH 03233-0178



| Home Office: | | Home (Private): |
|---|---|---|
| Phone (603) 526-6631 | igpaul@mit.edu | Phone (603) 526-6802 |
| Fax     (603) 452-8686 | igpaul@adelphia.net | Cell    (603) 748-1292 |

August 8 , 2005

Mr. Scott W. Lang                                    Re: Beijar  v.
Lang, Xifaras & Bullard                                   Stanley Fastening Systems
115 Orchard Street
New Bedford, MA 02740

Consulting fees in conjunction with above case since last billing on 3/24/05:

| | | |
|---|---|---|
| 4/5-4/10/05 | Review of Stipulation etc. delivered with tool on 4/4/05; inspection and photos of subject nailer; rental of exemplar nailer and air compressor, insp., photo and testing of exemplar nailer; testing and comparison of subject nailer; comparison with Ponko test report; request for additional  test protocols, review of additional depositions | 2.5 hrs |
| Thru 8/8/05 | Review of materials received June 18/05 including protective order, Stanley specifications and SOP's ; sign protective order; phone conf's with Mr. Lang; final professional opinions and report; copy photos onto CD | 1. 5 hrs |

**Consulting fees since last billing on 3/24/05:**

| | | |
|---|---|---|
| 4  hrs active work on file @ $ 300/hr | $ | 1, 200 |
| Expenses: Tool Rental ($ 144) | $ | 144 |
| **TOTAL WORK SINCE 3/24/05** | $ | 1, 344 |
| **LESS CREDIT FROM 3/24/05 Bill** | $ | - 600 |
| **TOTAL DUE** | $ | 744 |

Igor Paul
Soc. Sec. Nu.: 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

## Biographical Sketch
### Igor L. Paul, Sc.D., P.E.
Professor of Mechanical Engineering (Retired)
Massachusetts Institute of Technology
Cambridge, Massachusetts 02139

**Personal**      Born  1936, married, three grown children

**Languages**   Fluent in Russian and German

**Education**    B.S. in Mechanical Engineering,  MIT,  1960
M.S. in Mechanical Engineering,  MIT,  1961
Sc.D in Mechanical Engineering,  MIT,  1964
Shell Foundation Fellow;  Ford Foundation Post-Doctoral Fellow

**Employment History**
Mechanical Engineering Department Faculty, MIT; 1964 to June 30, 2003

**Professional Memberships**
Registered Professional Engineer (Mass.); ASME; ASEE; SAE; NSPE;
Biomedical Engineering Society;  Orthopedic Research Society; N.Y.
Academy of Sciences; American Society of Biomechanics; PI TAU
SIGMA,  SIGMA XI —Treasurer (Honorary Societies)

**Teaching**      Design and Manufacturing I and II; Product Engineering Process; Mechanical
Design ; Mechanics & Materials ; System Modeling, Control and Dynamics;
Measurement and Instrumentation; Biomechanics; Quantitative Physiology
(Musculo-Skeletal Systems & Human Factors in Design); Real World Ethics
(Professional Responsibility, Safety in Product Design, Intellectual Property)

**Professional Interests**
Product and Machine Design and Safety, Control Systems; Engineering
Computers and AI in Product Design and Education; Robotics; Biomechanics,
Ergonomics and Human Factors in Product Design

**Research Interests**
**Transportation & Solid Waste Disposal:** Studies of advanced ground
transportation systems and solid waste disposal technology ( in 1960-1970's)
**Bio-Engineering:** Orthopedic devices and implants. Biomechanics of musculo-
skeletal system, skeletal impact absorption, osteoarthritis. Human factors and
ergonomics in product design. Impact trauma biomechanics; impact attenuation
effectiveness of protective helmets and sports equipment.
**Product and Machine Design & Design Education:** Application of computers
and AI to product design, safety in product design education; simulation of
mobile robot environments; computer control of servo-systems

**Consulting**   Product and machine design (consumer and industrial products and machinery,
transportation systems and equipment, biomedical devices). Expert
witnessconsulting in areas of product design, safety and human factors in
product and industrial design, automated machinery, biomechanics of musculo-
skeletal trauma and protective and sports equipment, patent litigation (product
design)

**Publications** Over eighty publications in areas of Design, Eng'g. Education, Solid Waste
Disposal, Transportation, Bio-Engineering and Orthopedics. Past Machine
Design Ed. for Prod. Safety News and Ed. Board of Ji. of Products Liability

Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-10233-RCL

JONATHAN BEIJAR
    Plaintiff

v.

STANLEY FASTENING SYSTEMS, L.P.
    Defendant

**PLAINTIFF, JONATHAN BEIJAR'S ANSWERS TO DEFENDANT'S**
**INTERROGATORIES**

1.    Please state your full name, present address, date of birth and social
security number.

A.    Name:                   Jonathan Beijar
    Address:               61 Laura Keene Ave.
                                Acushnet, Massachusetts
    Date of Birth:         12/8/1977
    Social Security Number:  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

2.    Please set forth in full detail the facts of the incident giving rise to this
lawsuit, including but not limited to:

        a.  where the incident occurred;
        b.  how the incident occurred; and
        c.  when the incident occurred.

A.    a.    Lot 14-5 Pirates Cove Road, Osterville, Massachusetts
    b.    A Stanley Bostitch pneumatic nailer fell from an overhead staging
          plank at my worksite as I was walking on the ground in the area
          below the staging.  I attempted to avoid being struck by the nailer,
          but the barrel of the nailer struck my chest and spontaneously
          discharged, firing a three and a half inch roofing nail through my
          sternum, piercing my right ventricle, and lodging into my heart.
    c.    February 1, 2001, at approximately 12:20 P.M.

3.    Please identify by full name and address every person who has
information about the incident, including but not limited to eyewitnesses,
and briefly state for each the nature of their information.

11

all treatments, the nature of all treatments, and your understanding of the
purpose of all treatments.

A.   I am not presently being treated for the injuries that I sustained as a result
of the February 1, 2001 incident.

21.  For the period of February 1, 1996 through to the present, set forth
whether you have suffered from any disease, injury, illness, or other
condition and, if so, provide the name or a description of the disease,
injury, illness or other condition; the date when each such disease, injury,
illness or other condition began and ended; the name and address of each
physician or other health care provider from whom you received treatment
for each such disease, injury, illness, or other condition together with the
dates of treatment rendered; the name and address of each hospital or
other institution to which you were admitted or from which you received
treatment together with the dates of admission.

A.   To the best of my recollection, I did not suffer any significant injuries or
illnesses during the stated time period.

22.  Please identify each person whom you expect to call as an expert witness
at trial, state the subject matter on which each expert is expected to
testify, state the substance of the facts and opinions to which each expert
will testify, and summarize the grounds for each opinion.

A.   Information regarding expert witnesses, if not privileged, will be furnished
seasonably.

23.  Please state the basis for the contention in Paragraph 24 of your
Complaint that "due notice" of "any and all breaches or warranty" was
provided to Stanley, including in your answer:

    a.  The nature of the "due notice;"
    b.  By and to whom the "due notice" was provided; and
    c.  The date(s) on which "due notice" was provided.

A.   On January 21, 2004, my attorney wrote to Stanley Fastening Systems,
L.P.'s General Partner detailing the February 1, 2001 incident, describing
the nailer, and identifying my resulting injuries.

24.  Please identify each occasion on which you used the product, or any
similar product, including in your answer the purpose for which you used it
and the length of time you used it.

A.   I used pneumatic nailers on a few home remodeling projects. I do not
recall the length of time that I used the nailers.

12

To the best of my recollection, I used a pneumatic nailer at the Care Free Homes, Inc. worksite at Lot 14-5 Pirates Cove Road, Osterville, Massachusetts on a couple of occasions. I do not recall the exact number of occasions on which I used a nailer at the Pirates Cove Road worksite, nor do I recall which nailer(s) I used or for how long I used the nailer(s). I did not use a nailer on February 1, 2001.

25. Were you using any safety equipment at the time the incident occurred? If so, please identify each type of safety equipment you were using and its/their present location.

A. No.

Signed under the penalties of perjury this _15TH_ day of October, 2004.

Jonathan Beijar

As to Objections:

JONATHAN BEIJAR
By his attorney,

Scott W. Lang, Esquire  BBO #285720
Lang, Xifaras & Bullard
115 Orchard Street
New Bedford, MA  02740
(508) 992-1270

Dated: October _18_, 2004

13

## CERTIFICATE OF SERVICE

I, Scott W. Lang, Esquire, hereby certify that I have served the within **PLAINTIFF, JONATHAN BEIJAR'S ANSWERS TO DEFENDANT'S INTERROGATORIES** on the defendant by mailing a copy to its attorney of record: Christopher Duggan, Esquire, at Smith & Duggan, LLP, 2 Center Plaza, Boston, MA 02108, by first class mail, this 18th day of October, 2004.

Scott W. Lang, Esquire