Exhibit 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JONATHAN BEIJAR,
    Plaintiff

v.

                                        Civil Action No.04-10233-RCL

STANLEY FASTENING SYSTEMS, L.P.,
    Defendant

### AFFIDAVIT OF JONATHAN BEIJAR

I, Jonathan Beijar, of 17 Swift Street, Apt. 11, New Bedford, Massachusetts, on oath depose and state that the following is true, based upon my personal knowledge:

1. On February 1, 2001, I was working for Care Free Homes, Inc. as a laborer, on a home construction job site in Osterville, Massachusetts.

2. I was wearing a black hooded sweatshirt with long sleeves, because it was cold outside.

3. On that day, sometime before lunch, I was moving boards from one area to another. The boards were being cut by another worker and I was carrying them to lean against the side of the house.

4. As I walked back and forth, I had to walk under staging on the side of the house, because there was a pile of snow where the deck had been cleared off.

5. After I put up a board and walked back to my right, around the pile of snow, I heard someone say "look out".

6. I looked to my left, toward the side of the house, because I thought one of the boards I had put up was falling.

7. Then I turned to my right and I saw a nail gun right in front of my face.

8. In that instant, I put my right hand up to try to deflect the nail gun.

9. My right hand came into contact with the air hose but not the nail gun itself.

10. I definitely remember feeling the cold plastic of the air hose with my right hand. I do not remember feeling my right arm hitting the nail gun. But, because the whole event happened so quickly and so long ago, I can't be certain whether or not the nail gun hit my arm.

11. I also can't remember whether my right elbow was bent or not when I put my hand up.

12. Even though I had put my right hand up, the nail gun was still coming toward me.

13. I felt the nail gun hitting me in the chest but I didn't hear it go off.

14. The whole event was extremely fast and I felt shocked immediately afterwards.

15. I wasn't even sure the nail gun went off until I saw the hole in my sweatshirt, and then I felt afraid.

16. I did not pull on the nail gun's airhose before the nail gun fell. I was simply walking past the staging when the nail gun fell. I don't know why the nail gun fell from the staging.

17. When the nail gun fell, I didn't press the nail gun against my chest.

18. After the accident happened, I didn't know what brand of nail gun it was, and I didn't know who manufactured it. The nail gun belonged to Care Free Homes and they kept it after the accident.

Signed under the penalties of perjury this 10th day of November, 2005.

_____
JONATHAN BEIJAR

COMMONWEALTH OF MASSACHUSETTS

Bristol, ss.

On this 10th day of November, 2005, before me, the undersigned, notary public, personally appeared Jonathan Beijar proved to me through satisfactory evidence of identification, which was Mass. Drivers License, to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

_____
Notary Public
My commission expires: 10/5/2012

GIGI D. TIERNEY
Notary Public
Commonwealth of Massachusetts
My Commission Expires
October 5, 2012

Exhibit 6

### Igor L. Paul, Sc.D., P.E.
#### Engineering Consultant
P.O.Box 178, 844 Lakeshore Drive
Elkins, NH 03233-0178

<table>
<tr><td>Home Office:</td><td></td><td>Home (Private):</td></tr>
<tr><td>Phone (603) 526-6631</td><td>igpaul@mit.edu</td><td>Phone (603) 526-6802</td></tr>
<tr><td>Fax     (603) 452-8686</td><td>igpaul@adelphia.net</td><td>Cell   (603) 748-1292</td></tr>
</table>

July 30 , 2005

Mr. Scott W. Lang                                   Re: Beijar  v.
Lang, Xifaras & Bullard                                 Stanley Fastening Systems
115 Orchard Street
New Bedford, MA 02740

Via Fax: (508) 993-8696 and US Mail

Dear Mr. Lang:

    Based upon my review of the materials you forwarded with respect to this case, including the depositions of the plaintiff and Mr. Ponko (with exhibits) , the production documents received from the defendant , my inspection and testing of the Model N79WW Bostitch nailer which was involved in Mr. Beijar's accident and an identical model nailer rented for comparison and test purposes , based upon my knowledge , inspection and testing of other manufacturers' pneumatic nailers , and based upon my education , background and experience , the following summarizes my professional opinions on the inadequate, defective and inherently dangerous design of the Bostitch Model N79WW pneumatic nailer and its involvement in Mr. Beijar's accident and injuries.

    Mr. Beijar was seriously injured on February 1, 2001 on a jobsite in Oyster Harbor, MA as he was walking near or under a work platform and a Bostitch Model N79WW pneumatic nailer fell from the platform or an adjacent wall , hit him in the chest , and drove a nail into his heart. Although the pneumatic nailer was not being used at the time, it was apparently still connected to the pressurized air hose . The Bostitch nailer does not have a convenient "ON/OFF" switch or lever to shut off pneumatic power to the tool when it is not being used and must be physically disconnected from the air hose to disconnect it from the compressed air source. This is inconvenient and not usually done on construction sites during breaks.

    Mr. Beijar testified that as he was walking  between a wall and a pile of snow , he heard somebody shout "look out". As he turned to his right, he saw the nailer in front of him and coming towards him with the nail driving end generally pointing down and the cap assembly and hose connection pointing up. His recollection was that he shot out his right arm to try to push the nailer away, making contact with the hose some 1-1/2 to 2 feet above the hose coupling. The nailer

hit him in the chest and discharged a nail into his heart. Mr. Beijar testified that he did not hit the trigger with his hand because he only had time to use his right hand and that was in contact with the hose and was never near the trigger. He did not remember the exact orientation of the nailer when it made contact with his hand and arm, and when it hit his chest , or anything else about the nailer after it hit his chest and fell to the ground.

As described in the Bostitch Operating Manual , modern Bostitch nailers (as most other manufacturers' pneumatic nailers) including the N79WW model nailer , come with two types of actuating mechanisms for "sequential trip operation" and "contact trip operation".    Both mechanisms use a "contact tip", which has to be compressed against a surface with a force of about 14 pounds , and a finger "trigger",   which has to be pulled with a relatively small finger force,  to fire a nail. Both the compression of the "contact tip" and the pulling of the "trigger" have to occur concurrently (just for an instant) for the nail to be fired. This tool actuation by two distinct and separate actions, is a safety requirement mandated by the extreme dangers posed by an unintended or accidental firing of a nail.

With a "sequential trip" dual action actuating mechanism the two distinct actions have to be performed "in sequence" to fire a nail and have to be BOTH "released" before another nail can be fired by again performing both distinct actions "in sequence". The "contact tip" has to be compressed FIRST against a surface (with a force of about 14 pounds) and that allows pulling of the "trigger" to fire the nail. After firing a nail, the "trigger"  has to be released before the two sequential actions can be repeated to fire another nail. This is the safer of the two types of "trip" mechanisms as stated in the Bostitch nailer operating manuals.

The Bostitch nailer which fell on Mr. Beijar had a "contact trip" type of two step actuating mechanism (admittedly the less safe option) . To fire a nail, both the "contact tip" has to be depressed  and the trigger has to be pulled , but these actions can be done in either sequence and the "trigger"  does not have to be released between firings. The "contact trip" actuating mechanism on the Bostitch nailer allows the two step actuating sequence to occur in either order, i.e. one can push the compression tip against the work surface (or any other surface) and then pull the trigger to fire the nail , or, one can first hold down the trigger and then hit the "contact tip" against a surface to fire the nail. This feature  allows the nailer to be used in a so-called "bump-fire" mode, i.e. one can just hold down the trigger continuously  (or "tie" or tape it in the pulled position ) and then the nailer will fire a nail whenever the contact tip is compressed against a surface. The "contact trip" actuation mechanism allows "bump-firing" of the tool, which saves some time on a construction site because a series of nails can be driven without removing ones finger from the trigger, **but it completely defeats the safety purposes of a two-step actuating sequence**.

Neither of the of the two actuating  mechanisms offered by Bostitch provide any kind of trigger guard or trigger lock to prevent accidental actuation of the trigger by bumping against it and

2

neither has a power shut-off switch or lever to shut off the pneumatic power at the nailer. The "contact trip" mechanism on the accident nailer allows "tying down" the trigger, in which case only compression of the "contact tip" will fire a nail. The alternate "sequential trip" mechanism does not allow "tying down" the trigger, insuring that two distinct sequential actions have to be performed by the operator to fire each nail.

My inspection and testing of the Bostitch nailer allegedly involved in Mr. Beijar's accident and an identical model exemplar nailer for comparison, showed that although the accident nailer was well used, the "contact trip" firing mechanism operated as designed and intended over the full range of air supply pressure and the "trigger" had to be physically depressed to allow the nailer to fire a nail. A nail could be fired by holding down the trigger and impacting the "contact tip", or a nail could be fired if the trigger was even instantaneously touched or hit while the "contact tip" was compressed. Drop tests producing dynamic impacts to the "contact tip" significantly exceeding those that could have been produced when it hit Mr. Beijar's chest, showed that the nailer would not fire a nail unless the trigger was depressed when the impact occurred. This was also confirmed by an analysis of the dynamic forces produced on the pneumatic head valve (which releases the nailing piston) when the tool is impacted on the nailing tip. Accidental release from impact to the tool could only occur when impact occurs on the cap end of the nailer (i.e. if it is dropped on the cap end or the cap end of the nailer is used as a hammer).

### Professional Opinions

Based upon my review of the materials and deposition testimony available to me to date, my inspection and testing of the subject nailer, and my evaluation of the nailer design, I state the following professional opinions to a reasonable degree of engineering and scientific certainty:

1- The accidental firing of the nail into Mr. Beijar's heart was caused by the unguarded "trigger" of the nailer hitting Mr. Beijar's right arm (probably near the elbow) as he was trying to deflect the falling nailer with his right hand, depressing the "trigger" and keeping it depressed as the "contact tip" compressed against his chest. When his right hand contacted the hose above the hose coupling to the nailer (with the contact tip generally pointing down as per his testimony), the nailer started pivoting around the hand-held hose section with the "contact tip" pointing towards the left side of his chest. However, to actually hit his left chest in the vicinity of the heart, portions of the nail magazine and the nailer handle grip above the magazine in the vicinity of the exposed "trigger" had to contact and interact with his raised right arm in the vicinity of his elbow. It was this continuing contact force which compressed the "trigger" and kept it compressed, but was unable to prevent the "nailer's" continued motion towards the impact with his chest. As the "contact

3

tip" was depressed against his chest , the nailer essentially "bump-fired" the nail into his heart. The absence of a trigger guard allowed the accidental contact and actuation of the trigger as Mr. Beijar was trying to ward off the falling nailer, and the "contact trip" mode of the nailer firing mechanism allowed the accidental firing of the nail into his heart.

2- In my professional opinion the design of the Bostitch Model N79WW pneumatic nailer with the "contact trip" actuating mechanism  was improper, inadequate, defective and inherently and unreasonably dangerous as follows:

a) In failing to provide a trigger guard or dual action "trigger" actuating mechanism on the nailer to prevent unintended and accidental contact with and actuation of the trigger while handling the nailer (during nailing operations, while connecting or disconnecting the nailer from the pneumatic supply hose, while moving the nailer between nailing locations,  while trying to gain control of it after a fall etc.). Trigger guards and dual-action triggers (like those found on hand-held saws, grinders and other powered hand-tools) have been known and used for decades to prevent accidental trigger actuation and such a trigger safety should have been provided on this Bostitch nailer. Either a trigger guard or a dual-action trigger would have prevented this accident and injuries.

b) In failing to , alternatively,  provide a self-actuating shut-off mechanism on the nailer to automatically lock out the power or the firing mechanism on the nailer after a period of none-use (while still connected to the pneumatic power source). Such a safety would engage either the "trigger"  or one of the two pneumatic firing valves making them inoperable until they were manually released prior to use. Dual-action triggers are one type of such a safety device which actually locks out the "trigger" after each use, requiring a manual release before a nail could be fired. The pneumatic pressure of a connected nailer could also be used to provide a "delayed" automatic engagement of a trigger or pneumatic valve safety lock requiring manual release before use of the nailer. Such a safety device would have prevented Mr. Beijar's accident and injuries.

c) In failing to , alternatively , provide a convenient manual shut-off switch, button, or lever on the nailer (with appropriate instructions on the nailer and in the operating manual) to allow the nailer to be easily "shut off" between uses and/or while handling it , and/or moving it between locations etc., without having to disconnect it from the pneumatic hose . A manual trigger

4

lock-out pin (which can be pushed in to lock out the trigger and pulled out to release it) or a manual valve locking pin or lever (which disconnects or locks out the pneumatic valve) are examples of simple, practical and economical ways of providing such a "shut off" function.

d) In failing to provide a "sequential trip" and/or "anti-tie down" feature on the "contact trip" actuated nailer which would not allow the trigger to be permanently "tied down" in an engaged position and would require the trigger to be released after each "bump-fired" series of driven nails, and re-engaged before firing the next nail (in any firing mode "contact trip" or "bump-fired"). Because the "contact trip" actuating mechanism allows easy "tying down" of the trigger to facilitate "bump-firing"of the nailer, completely by-passing and defeating the safety function of a dual action firing mechanism, "contact trip" equipped nailers should include an "anti-tie down" and/or "sequential trip" feature to insure that two distinct and separate sequential manual actions are required each time a nail is fired, either as a single nail, or as the first nail in a series of "bump-fired nails". A "sequential trip" and/or "anti-tie down" safety feature on the accident nailer would have prevented Mr. Beijar's accident and injuries.

In my professional opinion, Mr. Beijar was an innocent and completely helpless victim of the improper, inadequate, defective and inherently and unreasonably dangerous design of the Bostitch "contact trip" nailer. Feasible, practical, and economical state-of-the-art safety design of the nailer would have prevented this accident and injuries.

Sincerely yours,

Igor Paul

P.S.: Under separate cover I am sending you copies of the digital photographs taken of the Bostitch nailers during inspection and testing. The subject nailer can be picked up at my home office in NH.

5

Exhibit 7

```
0001
 1              UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF MASSACHUSETTS
 3      NO. 04-10233-RL
 4
 5      ---------------------------------------------
 6      JONATHAN BEIJAR,                           )
 7                          Plaintiff,             )
 8                                                 )
 9              vs.                                 )
10                                                 )
11      STANLEY FASTENING SYSTEMS, L.P.,           )
12                          Defendant.             )
13       ---------------------------------------------
14
15              DEPOSITION OF MATTHEW PONKO, taken in
16      behalf of the Plaintiff, pursuant to the
17      applicable provisions of the Massachusetts Rules
18      of Civil Procedure, before Sandra A. Viera,
19      Court Reporter and Notary Public in and for
20      the Commonwealth of Massachusetts, at the
21      Law Offices of Lang, Bullard & Xifaras,
22      115 Orchard Street, New Bedford, Massachusetts,
23      on Friday, October 29, 2004, commencing at
24      10:00 a.m.
```

```
0054
 1   surface and you've kept the trigger pulled --
 2        Q.   Right.
 3        A.   -- you may discharge a fastener if
 4   you -- that you may not want where it goes.
 5        Q.   Okay.  Now in order -- is there --
 6   how do you -- how do you switch the tool?
 7             You said it has two modes of
 8   operation; the contact mode and the sequential
 9   mode.  How do you switch it from either one?
10        A.   With this tool, you would be required
11   to switch the trigger out.
12        Q.   And tell me exactly what that means.
13        A.   Uhm, when the tool is sold, we give
14   you -- depending upon how the tool was sold,
15   in this instance, this was a contact trip tool,
16   and a sequential trigger kit, conversion kit,
17   would have been given away with the tool.
18             And if they wanted to configure
19   the tool to a sequential mode, all they needed
20   to do is basically drive out two pins and
21   swap the trigger; and then I think there's
22   a spring there, install the spring,
23   the trigger and insert the pin; and it's ready
24   to go again.  It typically takes five minutes
```

0068
1   want to leave -- you don't want to leave any
2   power tool unattended.
3         Q.  Because someone who doesn't understand
4   the operation could come upon it; is that what
5   you're saying?
6         A.  For a variety of reasons.  That's one
7   instance.  Again, it's not safe handling of
8   any kind of power tool to be left alone.
9         Q.  If the -- if the nail gun is --
10  comes dangling from a scaffolding, as it
11  allegedly did in this case, is the coupling
12  designed so that the nail gun will break
13  away from the -- in other words, will that
14  weight trigger a break away from the coupling
15  of the nail gun and the coupling of
16  the air hose?
17              Is there anything in the design
18  that allows it to break away?
19              MR. DUGGAN:  Objection to the form.
20        A.  No.
21        Q.  So the only way it will break away is
22  if you manually detach it?
23        A.  Yes, that's the way you would discouple
24  the tool -- would be a normal procedure for

```
0142
 1    OSHA, the tool is swinging towards the
 2    individual.  Is the trigger readily available
 3    for the -- individual to depress as the trip
 4    is striking him in the chest?
 5         A.  If you put your hand --
 6              MR. DUGGAN:  Objection.
 7         Q.  To deflect the tool?
 8         A. -- to stop it or to deflect it or to
 9    catch it, I could see how your hand could get
10    there and depress the trigger.
11         Q.  with three pounds of pressure?
12         A.  Sure; whatever that force is required,
13    yes.
14         Q.  And it would have to be simultaneous
15    with the trip on bottoming out?
16         A.  The trip would have to be bottomed out,
17    right.
18         Q.  And on the tool itself, there's no
19    trigger -- what would you call the circular
20    housing that a gun has around the trigger site?
21              And if you don't know, then I'll just
22     --
23         A.  I know what you're describing but I
24    don't know what the terminology is.
```

0143
```
 1        Q.  The trigger in this case is completely
 2   exposed.  The trigger on this N79 is completely
 3   exposed then?
 4            MR. DUGGAN:  Objection.
 5        Q.  There's no cap, cowling, around it.
 6   There's no trigger guard around the trigger.
 7            MR. DUGGAN:  Objection.
 8        A.  That -- that's correct.  There is no
 9   trigger guard.  And the way the tool is designed,
10   it's designed to be used with someone with
11   the intentions of using very thick gloves
12   because these tools are designed to be used
13   in the winter and all year-round; so we design
14   the tool to give the optimal ability for
15   the end user to get at the trigger, considering
16   numerous scenarios.
17        Q.  When you design it, do you consider
18   the scenario that someone in -- allegedly
19   catching the tool or trying to catch the tool
20   has complete access to the trigger?
21        A.  No, that would be -- I mean, No. 1,
22   it's, you know, again, blatant misuse of the
23   tool.  It implies that the tool is either
24   being thrown or being dropped at someone.
```

0148
1         A.  Well, you never want someone standing,
2    uhm, in front of the tool or around the tool
3    while you're using it.  In this particular
4    warning, what would immediately come to my
5    mind is, uhm, someone was nailing a board and
6    they were -- for instance, you were standing
7    there and I was nailing.  I nailed up at an angle
8    and it broke.  I hit too high of the edge of
9    the wood and it broke, it drove through the
10   wood.  I would be potentially driving a
11   projectile in your direction, a fastener,
12   and chips of wood and things like that;
13   and you just -- you don't want to have that
14   happen.
15        Q.  Okay.  Does the trip have to be square
16   on a surface for it to bottom out or can you
17   do it at an angle and it will bottom out?
18             In other words, does it have to be
19   at a direct 90 degree angle?
20        A.  No.
21        Q.  So -- so the edge of it can force
22   it to bottom out if you're pressing just the
23   edge?
24        A.  Yes.  It's designed that way

```
0149
 1   specifically for toenailing.
 2        Q.  Okay.
 3        A.  If you look at this tool, there's a
 4   very aggressive trip on it to allow it to be
 5   driven at angles.
 6        Q.  Do you have to make adjustments to that
 7   or is that the way it naturally is?
 8             In other words, do you have to make
 9   adjustments to the trip itself or is that
10   the way the trip's designed when it is given to
11   the customer?
12        A.  I'm sorry.  What does "adjustments"
13   mean?
14        Q.  Adjustments; in other words, you don't
15   have to set the trip at an angle?
16        A.  No.
17        Q.  You just tilt it.  You just tilt the --
18        A.  No.
19        Q.  You just tilt the gun; right?
20             MR. DUGGAN:  Objection.
21        A.  You would -- you would basically take
22   the tool and apply it in the direction that
23   you want to be driving the angle of the fastener
24   and it will go.
```