UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JONATHAN BEIJAR                                                  Civil Action No. 04-10233-RCL

    Plaintiff

v.

STANLEY FASTENING SYSTEMS, L.P.
    Defendant

**STANLEY FASTENING SYSTEMS, LP's MEMORANDUM
IN SUPPORT OF ITS MOTION TO EXCLUDE
THE PROPOSED EXPERT TESTIMONY OF IGOR PAUL**

INTRODUCTION

Stanley Fastening Systems, L.P. ("Stanley") moves to exclude plaintiff's trial expert Igor Paul's ("Paul") proffered testimony, on the grounds that it is speculative, unreliable, immaterial and contrary to the unrefutted evidence developed through discovery. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137 (1999); *Cipollone v. Yale Indus. Prod., Inc.*, 202 F.3d 376 (1st Cir. 2002) (subjective belief or unsupported speculation are not admissible under the *Daubert* standard.)

Paul's proposed testimony is inadmissible because (1) his opinion is based upon assumptions that are contrary to the undisputed testimony; (2) his reconstruction of the accident is based upon a series of fabrications that are contrary to all of the testimony, including that of his own client Mr. Beijar; and (3) his unsupported opinions are no more than a guess with no basis in fact or in science. With no factual basis to support his opinion, Paul's opinion is so fundamentally unsupported that it can offer no assistance to the jury and must be excluded on foundational grounds.

STATEMENT OF FACTS

A.    Plaintiff's Version of Events

Plaintiff, Jonathan Beijar ("Beijar"), alleges that on or about February 1, 2001, he sustained a personal injury while working for Care Free Homes, Inc. ("Care Free"), as a laborer at a home construction site at Lot 14-5 Pirates Cove Road, Osterville, Massachusetts. (Ex. 1, Amended Complaint at ¶¶ 9-10; Ex. 2, Plaintiff Jonathan Beijar's Answers to Defendant's Interrogatories No. 2a.) Beijar claims that he was "severely injured, when a nail gun … fell from an overhead staging plank as he was walking on the ground in the area below the staging." As he attempted to avoid being struck by the tool, the tip of the product struck his chest and tool spontaneously discharged, driving a framing nail through his sternum. (Ex. 1 at ¶ 10; Ex. 2, Answer No. 2b.)

To see clearly just how much of a story plaintiff's expert has fabricated, it is necessary first to set forth the critical aspects of plaintiff's own testimony about the accident, all of which Paul either rejects or ignores:

1.    The tool was laying on scaffold overhead and suddenly fell off without Beijar or anyone else touching it or hitting the scaffold. (Ex. 3, Deposition of Jonathan Beijar ("Beijar Dep.") at 36-37, 41-42, 73);

2.    The hose that supplies compressed air to the tool was draped under the scaffold and it was not wrapped around a bracket or anything else (Ex. 3, Beijar Dep. at ___);

3.    As the tool fell from a height of about ten feet, Beijar put out his right hand and grabbed the air hose about 18 inches above the handle of the tool, but he never touched any part of the tool, or the trigger, with any part of his body (Ex. 3, Beijar Dep. at 37, 61);

4.   When he grabbed the hose with his right hand, his right elbow was straight, not bent (*Id.*); and

5.   Although Beijar denies touching the trigger, his co-workers saw him catch the tool by the handle and bring it towards him almost like cradling a football. While they saw him pull the tool towards his chest, they could not tell whether he pulled the trigger before the tip hit his chest or immediately thereafter. (Ex. 4 Deposition of Wayne Pinard ("Pinard Dep.") at 10, 11, 38-41).

There is one fact upon which Paul and Stanley agree: the tool that day worked exactly as designed and intended. Paul's own testing proved that the product would not, and still does not, drive a nail unless both the safety trip at the tip of the tool and the trigger are depressed at the same time. (Ex. 5, Deposition of Igor Paul ("Paul Dep.") at 15-18). Therefore, Paul admits that Beijar's claim, that he did not touch the trigger, is wrong. If Beijar did not pull the trigger, the tool would not have cycled. (Ex. 5, Paul Dep. at 33).

Given this admission, Paul felt compelled to concoct a story about the accident that rejects both Beijar's version of the accident and the description given by the eyewitnesses. Paul claims that, as Beijar tried to catch the tool, he bent his right arm and somehow managed to depress the trigger with his elbow at the same time as the tool hit his chest. Of course, he has done no testing to see if this is even possible, let alone probable. At his deposition, Beijar testified that the tool fell off of the scaffold for no apparent reason, and that he caught it by the air hose as it moved towards him. Beijar swore that he never touched the handle or the trigger after he grabbed the air hose about 18 inches above the handle and held his elbow straight out away from him, but the tool cycled and drove a nail anyway. (Ex. 3, Beijar Dep. at 37, 61.)

B.    Description of Nailer

The pneumatic nailer[1] that Beijar alleges caused his injury on February 1, 2001 incident, is a model N79WW-1, serial no. 0357 047, manufactured by Stanley on December 22, 2000 (the "nailer").[2]  (Ex. 6, Stanley's Answers to Interrogatories, Ans. No. 10.)  This tool has a contact trip activating device.  It requires both that the trigger be pulled and that a spring-loaded trip at the tip of the tool to be depressed before the tool will cycle and drive a nail.  Contact trip tools will cycle and drive a nail each time the tip is pressed against a hard surface, as long as the user's finger remains on the trigger.  Thus, it is a useful tool for "bump firing" when doing jobs like decking, sheathing and pallet construction.  Stanley also provides another type of trigger, known as the "sequential trip" trigger, with this tool when it was sold.  Unlike the contact trip, the user must remove his finger from the trigger of a sequential trip device, then press the tip of the tool against one work piece, then pull the trigger before the tool will cycle - and it will cycle only once. (Ex. 7, N79WW Operation Manual at pp. 4 and 7, Stanley bates no. 016 Stan 000003-000004.)  The triggers are easily interchanged – it takes about two or three minutes to remove one and put the other on, if the user wishes to operate it with the sequential rather than contact trip trigger, for example.  Contractors overwhelmingly prefer the contact trip trigger, because it is easier to use, faster, and causes less stress on the operator's hand and fingers over time.  Indeed, the owners of Carefree Homes knew about the sequential trip trigger but deliberately chose to use the contact trip and, when they purchased a replacement tool for the one involved in Beijar's accident, they removed the sequential trip and put on the contact trip trigger.  (Ex. 4,

---

[1] Beijar calls the tool a "nail gun" even though the tool operates on compressed air to drive nails – it does not fire projectiles with percussion or explosives.  Even though the phrase "nail gun" has been adopted colloquially, it is not an accurate description of the product.  Therefore, in the memorandum, Stanley will use the phrases "tool", "product" or "nailer" to refer to the pneumatic tool that Beijar claims injured him.

[2] Beijar admitted at his deposition that he could not confirm the nailer referred to in this matter is the one that caused his injury. (Ex. 3, Beijar Dep. at 38-39.)  For purposes of this Motion only, Stanley proceeds as if Beijar properly identified the nailer.

Pinard Dep. at 18-20). Even Paul admits that the tool with the sequential trip is not defective. (Ex. 5, Paul Dep. 11-12, 15-18).

      C.    <u>Summary of Plaintiff's Proposed "Expert" Testimony</u>

Beijar retained an "expert," Igor Paul, who, in deposition, frankly admitted that Beijar's story is impossible. (Ex. 5, Paul Dep., at 33.) Indeed, Paul admits that the accident could not have occurred unless Beijar both pulled the trigger and depressed the safety on the tip of the tool against his chest. (Ex. 5, Paul Dep. at 15-18.) Paul acknowledges that the hypotheses he offers are inconsistent with the deposition testimony of Beijar, Beijar's post-accident statements, Pinard's deposition testimony, and the witness statements of the two other Care Free eyewitnesses. He further acknowledges that none of the scenarios he offers as to the cause of Beijar's accident – that Beijar's elbow contacted the trigger all the way to his chest, or that Beijar stepped on an air hose – are supported by any testimony whatsoever. (*Id*. at 33, 46.)

      1.    *Igor Paul Consciously Disregards And Discards Beijar's Own Testimony*

Rather than render an opinion based upon on Beijar's own version of the accident, Paul completely and deliberately disregards Beijar's account of the accident and makes an unsupported speculation as to how the accident occurred. (Ex. 8, Expert Report of Igor Paul dated July 30, 2005 ("Paul Rpt.") at 3; Ex. 5, Paul Dep. at 33.)

Beijar testified that the accident occurred as he was walking by the plank on some staging on which the nailer had been placed. (Ex. 3, Beijar Dep. at 36.) According to Beijar, the staging was high enough, perhaps ten feet off the ground, that he could not touch it from the ground. (*Id*. at 63.) He testified he heard someone yell "look out!" (*Id*. at 36.) He first looked to his left, then his right, and he suddenly found the nailer swinging down at him from the plank. (*Id*. at 36, 60-61.) According to Beijar's sketch of the plank and nailer, the nailer was not located at the far end of the plank, but more toward the middle of the plank. (Ex. 9, Beijar Dep. Ex. No. 3.)

5

Beijar testified that in an effort to ward off the nailer, he touched the hose with his right hand, about 18"-24" above the nailer itself. (Ex. 3, Beijar Dep. at 37.) His left hand remained at his side. (*Id*.) When he first saw the nailer, the trigger was level with his eyes. (*Id*. at 40.) It was within 12" of him, with the tip pointing down. He claims that he never touched the nailer prior to impact, only the air hose. (*Id*. at 41-42, 73.)

Differing from the plaintiff's own version of event, Paul claims that as the nailer descended, it contacted Beijar's right arm. More specifically, he claims that the trigger hit Beijar's right arm "probably near the elbow." (Ex. 8, Paul Rpt. at 3; Ex. 5, Paul Dep. at 35-36.) This assertion directly contradicts Beijar's deposition testimony in which Beijar stated that his arm was "up and out to the right" as the nailer was descending. (Ex. 3, Beijar Dep. at 61.) Paul further claims that Beijar's right arm kept the trigger depressed as the "contact tip" compressed against his chest. (Ex. 8, Paul Rpt. at 3; Ex. 5, Paul Dep. at 36.) Again, this factual assertion is impossible, as it directly contradicts not only Beijar's emphatic testimony that he never contacted the nailer prior to its impact against his chest (Ex. 3, Beijar Dep. at 41-42, 73), but Beijar's own testimony that his right arm was "up and out to the right." (*Id*. at 61.) When questioned about his assumptions, Paul stated that he bases his findings, which contradict all accounts of the incident, on "the laws of physics and where the nail entered [Beijar's] chest." (Ex. 5, Paul Dep. at 33). In on last attempt to salvage the credibility of his opinion, Paul opined that when Beijar repeatedly denied touching the nailer before it hit his chest, that it was only Beijar's "perception" that he did not touch it with his right arm as the nailer descended. In effect, Paul speculated that the accident scenario involved the nailer falling towards Beijar, Beijar grabbed the nailer by the air hose, bent his arm so that as the nailer came toward him, his elbow not only touched the trigger but remained on the trigger until the contact tip hit Beijar's sternum. (*Id*. at 51.) Nor did Paul do any testing to prove that his hypothesis is even possible. Unfortunately, this acrobatic feat is

completely unrelated to any eyewitness testimony, including Beijar's and cannot serve as admissible evidence under the *Daubert* standard.

        2.      *Igor Paul Ignores Inconvenient Testimony Of Three Eyewitnesses*

Not only is Paul's opinion based upon unsupported speculation, but he also rejects the sworn deposition testimony and the statements of the three witnesses present at the time of the accident. There were three other Care Free workers on site at the time of the accident, all of whom contradict Beijar's account of the accident and state that Beijar caused the accident himself by pulling the nailer down by the air hose from the plank with his left hand, catching it and cradling it with his right hand, which contacted the trigger as the nailer came toward his body, discharging a nail as the contact tip hit his chest.

With these undisputed eyewitness accounts of the accident, Paul has no basis for opining that Beijar hit the nailer with his right arm or elbow to depress the trigger. (Ex. 8, Paul Rpt. at 3; *see* Ex. 5, Paul Dep. at 36, acknowledging that there is no eyewitness source for the conclusion that Beijar's elbow hit the trigger.) Again, Paul admits that, "this accident happened differently from either what Mr. Beijar says or what the two [sic] eyewitnesses say." (Ex. 5, Paul Dep. at 33.) But facts are still facts, even when they are ignored. The fact that the eyewitness testimony is inconvenient does not justify any expert to ignore it. *See generally Vadala v. Teledyne Indus., Inc.*, 44 F.3d 36, 39 (1st Cir. 1995) (expert opinion must "fit" and be relevant to facts of case).

        3.      *Igor Paul Discounts and Dismisses the Undisputed Factual Evidence*

Paul also takes liberties with the facts. First, he tried to posit that the nailer must have gotten caught on a bracket supporting the plank (Ex. 5, Paul Dep. at 40, 44-45, and Ex. 9, sketches of nailer superimposed over photographs of scaffold, part of Paul Dep. Ex. No. 3), but his unfounded speculation is flatly contradicted by Pinard's testimony and sketches (Ex. 10) and Beijar's own sketch (Ex. 9). Paul then attempts to create the impression that Beijar inadvertently

stepped on the air hose while walking by it, causing the nailer to fall. (Ex. 5, Paul Dep. at 46.) Paul was forced to admit, however, that there is no basis in any eyewitness testimony that this scenario occurred. (*Id*. at 4)

Paul also tested the product and found that it could not drive a nail unless both a safety on the tip of the tool was depressed and the trigger was pulled – precisely as designed by Stanley. (*Id*. at 15-18; Ex. 8, Paul Rpt., at 3.) Paul further reveals the nailer worked properly and as designed. Paul agreed that the nailer complies with all applicable ANSI industry standards, and he could not identify a single standard, regulation, law with which the nailer did not comply. (Ex. 5, Paul Dep. at 11-12.)

When Paul tested this nailer in 2005, he found:

> My inspection and testing of the Bostitch nailer … showed that although the accident nailer was well used, the "contact trip" firing mechanism operated as designed and intended over the full range of air supply pressure and the "trigger" had to be physically depressed to allow the nailer to fire a nail. A nail could be fired by holding down the trigger and impacting the "contact tip," or a nail could be fired if the trigger was even instantaneously touched or hit while the "contact tip" was [sic] Drop tests producing dynamic impacts to the "contact tip" significantly exceeding those that could have been produced when it hit Mr. Beijar's chest, showed that the nailer would not fire a nail unless the trigger was depressed when the impact occurred. This was also confirmed by an analysis of the dynamic forces produced on the pneumatic head valve (which releases the nailing piston) when the tool is impacted on the nailing tip…

(Ex. 8, Paul Rpt., at 3; *see also* Ex. 5, Paul Dep. at 15-18, concluding that the nailer operated as designed.)

ARGUMENT

A.      **Standard For Admitting Expert Testimony**

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and, (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court has laid out a framework for analyzing proffered expert testimony in the so-called *Daubert* trilogy, which consists of *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993); *General Electric Co., v. Joiner*, 522 U.S. 136 (1997), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

*Daubert* dictates that under the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.' Relevance depends upon whether [that] reasoning or methodology properly can be applied to the facts in issue.'" *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1204 (10th Cir. 2002).

Thus, under *Daubert*, the court performs an important gatekeeping role in assessing scientific evidence. The purpose of the gatekeeping function is to "determine that the proffered expert is in fact qualified by training or experience to render an opinion . . . The trial judge must also insure that the expert's opinion is based upon 'more than subjective belief or unsupported speculation' . . . Proposed testimony must be supported by appropriate validation – i.e. 'good

ground,' based on what is known." *Polaino v. Bayer Crop.*, 122 F. Supp.2d 63, 66 (D. Mass. 2000) (quoting *Daubert*, 509 U.S. at 589-90); *see* Fed. R. Evid. 702.

As a "gatekeeper" the trial judge must determine whether reliability exists through a "preliminary assessment of (1) whether the reasoning or methodology underlying the testimony is scientifically valid; and (2) whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93

This two-pronged assessment of reliability examines not only methodological validity but also whether particular reasoning or methods properly can be applied to the facts in issue, an analysis of relevance of "fit." *Daubert*, 509 U.S. at 591. "To be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant, see Fed. R. Evid. 402, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling*, 161 F.3d 77, 82 (1st Cir. 1998). Where an expert opines only as to what "could have "caused a particular incident without an attempt to apply the particular facts in issue, the opinion is speculation and is insufficient as a matter of law. *See General Electric*, 522 U.S. at 146 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert").

**B.      Paul's Testimony Is Inadmissible Under *Daubert* And Rule 702**

     1.      Expert Testimony is Neither Relevant Nor Reliable if it is Based Upon Conjecture or Assumptions That Have No Support in Admissible Evidence

The court, as the "gatekeeper" of expert testimony, must ensure that the expert's opinion has "a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592. The reliability standards governing the admissibility of expert testimony apply to all expert testimony, even that based upon personal observations and experience. *Kumho Tire*, 526 U.S. at 147-49 (no distinction should be made for evaluation of expert testimony based upon "scientific

10

knowledge" or "technical knowledge" or "skill- or experienced-based observation"). An expert opinion is neither relevant nor reliable if it is based upon conjecture or assumptions that have no basis in evidence. *See General Electric*, 522 U.S. at 146.

An expert opinion as to how the accident *might* have happened does not relieve the plaintiff of the burden of showing that a defect attributable to the manufacturer caused the injury. *Cipollone v. Yale Indus. Prod., Inc.,* 202 F.3d 376, 380 (1st Cir. 2000). The goal of expert witness testimony, to assist the trier of fact in determining a fact in issue or in understanding the evidence, is not advanced by an expert opinion that rests upon conjecture and speculation. Paul makes numerous assumptions regarding how the nailer was depressed and triggered without any factual basis. Without any factual support, Paul assumes that Beijar's right arm kept the trigger depressed as the "contact tip" compressed against his chest. (Ex. 8, Paul Rpt. at 3; Ex. 5, Paul Dep. at 36.). Beijar and eyewitnesses, however, never testified that this occurred. As a result, Paul's expert opinion rests upon pure conjecture and speculation. *See Polaino,* 122 F. Supp.2d at 67 ("where an expert witness testifies that a causal relationship is 'possible,' 'conceivable' or 'reasonable,' that opinion, standing alone, does not satisfy a plaintiff's burden of adducing legally sufficient proof that a fact is more likely true than not true.") (*quoting Rotman v. Nat'l R.R. Passenger Corp.*, 41 Mass. App. Ct. 317, 320 (1996)).

Additionally, Paul's proposed expert testimony does not conform to any of the admissible evidence. (Ex. 5, Paul Dep. at 28-29, 33, 35-36, 44-45.) Paul's opinion does not make the sequence of events claimed by Beijar any more likely and cannot demonstrate that a differently designed nailer would have prevented the accident, it lacks probative value and is inadmissible. As a result, Paul's opinion must be classified as pure conjecture and is sheer "ipse dixit" and insufficient as a matter of law to establish that the actions of the defendant caused injuries to the plaintiff. *See Brown v. Wal-Mart Stores, Inc.*, 2005 U.S. Dist. LEXIS 31456 (Me. 2005) (expert

testimony excluded where opinion merely placed an "expert sheen on common sense"); *See also Cipollone*, 202 F.3d at 378. Thus, Paul's testimony fails the test for the admissibility of expert testimony, and he should not be permitted to testify.

    2.    <u>Paul's Opinion Assumes Facts Not In Evidence And Must Be Excluded</u>

Paul's unsubstantiated hypotheses of what he concludes must have happened, rejecting the sequence of events identified by Beijar, and the contradictory testimony of three eyewitnesses, (Ex. 5, Paul Dep. at 35-36, 46), must be excluded because he assumes a state of facts not based upon actual evidence. Paul flatly rejects what eyewitnesses say happened as being impossible, yet fails to offer another justification.

In a similar case, the First Circuit excluded plaintiff's expert testimony and granted summary judgment to the defendant after finding that the experts testimony was irrelevant because the expert had described a scenario that did not cause the injury to the plaintiff, as the plaintiff had described. *Cipollone*, 202 F.3d at 380. Specifically, in *Cipollone*, plaintiff's expert attempted to testify that the space between two guardrails was insufficient and dangerous, and that the space was too small for a person carrying something in his hand, as it created a shearing hazard. *Id*. at 380. Plaintiff, however, never offered a scintilla of evidence that he was carrying anything in his hand at the time of his accident. *Id*.

Similarly here, Paul based his opinion upon facts that, according to the eyewitnesses and plaintiff, could not have happened, and should similarly be excluded. Paul's guesswork cannot substitute for a reliable application of a sound forensic methodology that would determine what actually happened and how the actual events would have been prevented with a differently designed tool. See *Kumho*, 526 U.S. at 151-52, 153-57 (no error to exclude engineering expert's opinion based upon general methodology which could not determine distance tire had traveled as applied to particular matter to which expert testimony had to be directly relevant.)

     3.     Paul's Opinion Is Not Founded Upon Evidence Of Actual Conditions And Must Be Excluded

Finally, Paul disregards the actual conditions present here: the scenario of a falling nailer offered by Beijar, and the scenario of the grabbing of the air hose and the cradling catch of the nailer, and his testimony should be excluded. Paul latches onto a scenario he thinks might help Beijar get to a jury and rejects other scenarios that would prove devastating to Beijar's case. He has no scientific or technical basis for choosing his own version of the accident over those offered by actual eyewitnesses. Consequently, Paul opines as to what caused plaintiff's accident without an attempt to apply the particular admissible facts at issue.

In another similar case, the First Circuit upheld the lower court's decision to exclude the plaintiff's expert who "assumed" what happened to the plaintiff. *Bogosian v. Mercedes-Benz of North America, Inc.*, 104 F.3d 472 (1st Cir. 1996). In *Bogosian*, the theory of defect was "false park detent," meaning that a person shifting from drive to park would falsely believe the car was in park when in fact it was just short of it. The plaintiff suffered an injury when the car rolled back over her foot after she thought she had put it in park. *Id*. at 475. The plaintiff's expert "assumed" that the plaintiff had shifted the gear selector rapidly. He stated that there could be no defect if the plaintiff had in fact observed the selector lever in latched park. *Id*. at 479. The expert's opinion was rejected because it did not rest upon "a reliable factual and methodological foundation." *Id*. The Circuit Court found that the plaintiff offered no evidence as to the speed at which she shifted the lever and repeatedly testified that she looked at the console shift before existing the vehicle and saw the selector lever in latched park. These facts directly contradicted the expert's assumed facts. The First Circuit noted, "[t]he district court appropriately found it very odd that Bogosian would present an expert witness who would testify that her own unwavering testimony was incorrect." *Id*.

13

This is precisely the scenario that Beijar and Paul find themselves in. Beijar steadfastly maintains he did not touch the nailer with his right arm, and Paul just as strongly argues that he must have. Moreover, Paul's opinions directly contradict the three eyewitnesses to the incident. Consequently, because Paul's "expert opinion is not supported by sufficient facts to validate it in the eyes of the law, [and] indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brook Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

### III. CONCLUSION

For all of the foregoing reasons, defendant Stanley Fastening Systems, L.P. requests that this Court allow this motion to preclude the plaintiff's liability expert, Igor Paul, from testifying at trial.

                Respectfully submitted,

                Stanley Fastening Systems, L.P.
                By its Attorneys,

                */s/ Christopher A. Duggan*
                Christopher A. Duggan, BBO No. 544150
                Smith & Duggan LLP
                Lincoln North
                55 Old Bedford Road
                Lincoln, MA  01773
                (617) 228-4400

Dated:  January 30, 2006

### CERTIFICATE OF SERVICE

The undersigned certifies service of the foregoing on January 30, 2006 in accordance with Federal Rule of Civil Procedure 5(b)(2) and United States District Court for the District of Massachusetts Electronic Case Filing Administrative Procedure § E(2) as to all parties, having appeared in this action through counsel admitted to practice before this Court, identified by the Clerk as receiving Notice of Electronic Filing.

*Counsel for Defendant Stanley Fastening Systems, L.P.*