# EXHIBIT 5

Case 1:04-cv-10233-RCL    Document 29-6    Filed 01/30/2006    Page 1 of 13

Pag

Exhibits: 1 - 11          Volume 1, Pages 1 - 81

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-10233-RCL

-------------------------------

JONATHAN BEIJAR

        Plaintiff

vs.

STANLEY FASTENING SYSTEMS, L.P.

        Defendant

-------------------------------

VIDEOTAPED DEPOSITION OF IGOR PAUL

Tuesday, September 6, 2005, 10:35 a.m.

Smith & Duggan LLP

Lincoln North

55 Old Bedford Road

Lincoln, Massachusetts


------- Reporter:  David A. Arsenault, RPR -------

darsenault@fabreporters.com    www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   fax 617.728.4403

Page 10

1  because they were having some problems with their
2  trigger mechanism, particularly their sequential
3  trigger mechanism. So I essentially solved their
4  problem with respect to that.
5       I think that's really the only hands-on
6  design experience that I have in terms of pneumatic
7  nailers or pneumatic drive-type tools. I've
8  consulted on various other pneumatic tools, but one
9  that essentially has a hammer blow or piston
10 pneumatic drive with the associated controls, that's
11 been limited to that.
12      I've had about a dozen cases over the
13 years which were on the legal side, essentially, as
14 a consultant involving accidents with pneumatic
15 nailers; and also some, in addition to that,
16 involving electric staplers and nailers.
17     Q. But you never designed ground up a
18 pneumatic nailer. Is that true?
19     A. Certainly not.
20     Q. Have you ever worked as an employee of
21 pneumatic nailers?
22     A. No, other than as a consultant.
23     Q. But I said as an employee.
24     A. No.

Page 11

1      Q. What standards, if any, were applicable to
2  the pneumatic nailer that is involved in the case
3  that we have here today?
4      A. Well, there's an ANSI standard, which is
5  also the ISANTA standard or something like that.
6  Frankly, I don't remember the number. I think it is
7  in my references. That's the only one that I really
8  know of and/or have looked at.
9      Q. Did you review applicable ANSI or ISANTA
10 standards in coming to evaluate the tool which has
11 come to you in this matter?
12     A. I didn't specifically review them because I
13 was familiar with what the standards were relative
14 to the control and triggering mechanisms and use of
15 the tools. So I did actually look at the latest
16 version but found nothing new in it. I didn't
17 really use it in coming to my conclusions.
18     Q. Would I be correct, and tell me if I'm not,
19 that the tool that you examined at the behest of
20 Mr. Lang and Ms. Davis for Mr. Beijar complies with
21 all the applicable ANSI standards?
22     A. Yes, I do agree.
23     Q. Are you aware of any standard, regulation,
24 law or anything of the sort, industry practice, that

Page 12

1  the tool, as you examined it, did not comply?
2      A. No.
3      Q. Do you have any timesheets for the work
4  that you put in in this case?
5      A. I don't think I have actual timesheets. I
6  have itemized bills, copies of itemized bills.
7      Q. Do we have them here with us?
8      A. Yes, they are in the active folder.
9      Q. I didn't have a chance to look through it.
10 If you could pull them out for me.
11     A. (Witness complies.)
12     Q. You've shown me two documents from your
13 active folder.
14     A. Yes.
15     Q. They are both letters to Mr. Lang, one
16 dated March 24 of 2005 and the other August 8, 200:
17     A. That's correct.
18     Q. Do these fairly and accurately summarize
19 all of the work that you have done to date?
20     A. Except for preparing for this deposition
21 and organizing the file, yes.
22     Q. All the work that you did in evaluating the
23 tool and coming to your opinions and conclusions ar
24 accurately summarized on these two invoices, true?

Page 13

1      A. Yes. Except that I think I read
2  Mr. Edwards' deposition after that bill, after the
3  last bill. So I think there's another hour and a
4  half of reviewing materials after that last.
5          MR. DUGGAN: I will mark these two as
6  Exhibits 2 A and B.
7          (Marked, Exhibits 2 A and B, invoices.)
8      Q. Dr. Paul, just a couple of questions about
9  the bills. I notice the first entry you have is
10 through October '03?
11     A. Yes.
12     Q. And that's for one hour?
13     A. Yes.
14     Q. Do I understand correctly that up until
15 October of '03 you had done just one hour worth of
16 review on this matter; is that true?
17     A. That's correct.
18     Q. Had you come to any opinions or conclusions
19 related to the design of this tool before or up
20 through October of '03?
21     A. Not as far as -- the answer is no.
22     Q. Okay.
23     A. I think at that stage I didn't even know
24 what tool it was.

Page 14

1  Q. Can you tell me what work you did between
2  November 1st of 2003 and January 31st of 2004, if
3  any?
4  A. January 2004.
5  Q. In other words, the three months between
6  November 1st, this date here (indicating), and
7  January 31 of 2004.
8  A. I'm not sure I did any.
9  Q. Okay.
10 A. I don't think I did any.
11 Q. So would it be fair to say that as of
12 January 31st, 2004 you still did not have an opinion
13 as to whether or not this tool was reasonably safe,
14 properly designed or otherwise, true?
15 A. Okay, let me just look at what
16 correspondence I had at that stage.
17 Q. Sure.
18 A. As of January 1, 2004, no.
19 Q. January 31, 2004.
20 A. 31, 2004, not that I can recall.
21 Q. You hadn't come to any opinion as to the
22 design sufficiency of this tool as of that date,
23 true?
24 A. That's right, except I did, even before

Page 15

1  that, indicate to Mr. Lang that I don't think the
2  tool should have fired without touching the trigger,
3  any tool, any pneumatic nailer. So I had not
4  reviewed this particular tool. I think I still
5  didn't know what tool it was. This was based on the
6  OSHA report and a letter by Mr. Lang to me.
7  Q. And that's a letter that's in your file.
8  A. Yes.
9  Q. Your active file marked Exhibit 2?
10 A. Yes. So, you know, essentially at that
11 stage, that's where I was.
12 Q. Now, you've tested this tool, you've had it
13 in your possession and actually brought it with you
14 today?
15 A. Yes.
16 Q. And it is true, is it not, that this tool
17 will not drive a nail without both the tip of the
18 tool being depressed and the trigger being pulled?
19 A. Under the conditions of this accident, yes.
20 Q. So both of those things have to happen for
21 this tool to drive a nail, the tip has to be
22 depressed and the tool -- and the trigger has to be
23 pulled, true?
24 A. Yes, and the two have to overlap.

Page 16

1  Q. At the same time?
2  A. Yes. They don't have to happen at the same
3  time, but they have to overlap.
4  Q. All right. Did you try to make this tool
5  drive a nail without the trigger being depressed?
6  A. Yes.
7  Q. And you were unable to do that?
8  A. Yes.
9  Q. How did you try to do that?
10 A. Well, essentially three ways. One way I
11 was trying -- I changed the pressure. The inlet
12 pressure has an effect on the operation of both the
13 primary valve and the -- the trigger valve and the
14 hammer valve. So I went from 40 psi, shown in one
15 of those photographs, to 120 psi in steps of 20. I
16 essentially would depress the tip. And at one
17 point, after I tested, did the same tests on a
18 rental -- I had also rented an identical gun,
19 automatic nailer. After I had seen the scenario
20 from where the tool was falling and where it had
21 hit, I essentially said that a fall onto the tip
22 from a 2-foot height onto a 2-by-10 on a concrete
23 surface would provide a tip impact which would be
24 much more severe than you could possibly get from

Page 17

1  the impacting at the chest. So that's what I did.
2  I raised the tool 2 feet, dropped it on its tip. I
3  never got a misfire.
4     I mentioned three ways. The third way
5  is that I have the drawings of the pneumatic valves,
6  the triggering mechanisms in my file. Essentially,
7  impact firing of the tool would be due to components
8  of the valves accelerating when the tool hits a
9  surface. Those components are essentially little
10 pistons that control the big piston. And when you
11 hit it on the tip, the impact accelerates the piston
12 in one direction. In the design that is on the
13 Bostitch nailer, pneumatic nailer, if you hit it on
14 its tip, the direction of acceleration on the
15 control components is opposite to that that will
16 cause essentially a misfire. Okay? The way this
17 tool is designed, if the impact occurs on the back
18 of the tool, that's what can cause an impact-related
19 misfire; if you drop it on the back of the tool, you
20 could possibly get a misfire without depressing the
21 trigger. And in fact, Stanley has a test procedure
22 for that, which they didn't do on this tool but they
23 do on other tools. So that's another reason why I
24 confirmed with the testing, but also just from basic

WITNESS>
Volume VOLUME> - DATETEXT>

Page 18

1  logic, physical principles, it wouldn't misfire
2  hitting on the tip.
3     Q. Okay. And that aspect of this design, by
4  the way, is entirely appropriate, is it not?
5     A. Sure.
6     Q. Do you have any notes, Doctor, of the
7  testing that you did in your file?
8     A. I do not; only the photographs.
9     Q. You didn't take any notes or measurements
10 or things like that?
11    A. No. If I had had a misfire, I would have.
12 Essentially, I found that it operated the way it was
13 supposed to operate, that it was designed to
14 operate. That was my conclusion.
15    Q. And when did you do your testing?
16    A. Well, it was between April 5 and April 10.
17 And I have a bill from the rental agency, but
18 apparently I don't have it on here.
19    Q. Okay.
20    A. I'd have to look it up. But it was in that
21 time period and it was over a period of two days.
22    Q. Am I correct in my mathematics that except
23 for the one hour you had or one and a half hours you
24 had reading the Edwards deposition, you had done

Page 19

1  seven hours' worth of work on this case, right?
2     A. Yes, it looks that way.
3     Q. How long did your testing take?
4     A. I would say a total of less than an hour,
5  but in between it wasn't -- I think in total it was
6  probably setting up and getting the rental tool and
7  so on, but the actually testing was less than an
8  hour.
9     Q. And you've done no other testing?
10    A. No.
11    Q. You said that you rented another, identical
12 tool?
13    A. Yes.
14    Q. What kind of tool was that?
15    A. Well, it was the same numbered tool, N79WW.
16    Q. Where did you rent that from?
17    A. From Ace Hardware store.
18    Q. Where?
19    A. In New London, New Hampshire. And I rented
20 a compressor from them.
21    Q. You don't have a compressor in your home or
22 workshop?
23    A. I have a compressor for blowing up tubes
24 and things, but not 120 psi.

Page 20

1     Q. Have you ever worked with pneumatic nailers
2  building homes, woodworking or anything like that?
3     A. Yes, only on my two homes that I have
4  helped build.
5     Q. Which homes were they?
6     A. Well, one was in Andover, Massachusetts. I
7  forget the address, as I sit here. The one is the
8  one I live in now, five years ago.
9     Q. You actually did some of the construction
10 yourself?
11    A. Yes, quite a bit.
12    Q. What kind of pneumatic tools, pneumatic
13 nailers did you use?
14    A. Actually, the contractor had Hitachi tools.
15 I think he may have also had a Stanley tool. But at
16 the time I wasn't paying attention.
17    Q. Okay.
18    A. So, I'm not sure.
19    Q. Who is the contractor up in New Hampshire,
20 do you know?
21    A. Yes. That's horrible, because I still talk
22 to him. I'll have to get it to you.
23    Q. Would you do that?
24    A. Yes.

Page 21

1     Q. The same contractor that built the house in
2  Andover?
3     A. No.
4     Q. You wouldn't remember that one, would you?
5     A. No. But I have all the building records.
6  I should -- I can get you that also.
7     Q. Do you remember if they used Stanley
8  pneumatic tools in that house?
9     A. I have no idea.
10    Q. So the Hitachis that you remember were on
11 the New Hampshire home?
12    A. Yes.
13    Q. Do you remember the models?
14    A. No.
15    Q. You actually used them yourself?
16    A. Yes.
17    Q. What did you do?
18    A. I did both framing and roofing.
19    Q. And when you were doing the roofing, did
20 you use it in a contact mode or sequential trip
21 mode?
22    A. Contact mode.
23    Q. When you did the framing, what mode did yo
24 have it in?

Page 26

1   A. Not as I sit here, but I could probably
2   find out.
3   Q. If you would do that, I would appreciate
4   it.
5   A. Sure.
6   Q. Have you now told me, Doctor, all of your
7   experience with regard to the design or the
8   operation of pneumatic nailers?
9   A. Yes, specific to pneumatic nailers, yes.
10  Except, of course, that my education and teaching
11  involves design of pneumatic control systems, which
12  this is all about. With that, yes.
13  Q. Dr. Paul, did you attempt to reconstruct
14  this accident?
15  A. To some degree, yes.
16  Q. Is it necessary to understand how the
17  accident happened before you can evaluate the design
18  sufficiency of this tool, at least in determining
19  whether there was a problem with the tool that led
20  to the accident?
21  A. Not really. It depends what aspect of the
22  tool. You know, for example, if the trigger had
23  been taped down, I didn't really have to know the
24  details of the accident scenario to talk about that.

Page 27

1   In this case --
2   Q. Can I cut you off here?
3   A. Yes.
4   Q. Is there any evidence from any source
5   whatsoever that the trigger in this case had been
6   tied down or taped down?
7   A. No.
8   Q. Indeed, Mr. Beijar has said it was not tied
9   down; is that correct?
10  A. Well, I think he didn't think it was tied
11  down, but he didn't know. He didn't work with this
12  tool. He was a laborer.
13  Q. You would agree with me that that would be
14  a misuse of the tool, to tie down the trigger?
15  A. I would call it a foreseeable misuse, yes.
16  Q. I cut you off. I didn't mean to cut you
17  off.
18  A. Well, you know, depending on where I was in
19  looking at this scenario and this evaluation, the
20  scenario obviously enters the question of how did it
21  happen. My initial, I guess, descriptions and the
22  things I read was that it tripped, that it fired a
23  nail without the trigger being depressed.
24  Q. That was Mr. Beijar's claim?

Page 28

1   A. That was Mr. Beijar's description, that he
2   didn't hit the trigger. And I think that was part
3   of the description in the newspaper. And also in
4   Mr. Lang's letter, he said he talked to the
5   plaintiff, and he contradicted some of the
6   statements in the OSHA report, which was the only
7   other thing I had at that time.
8   Q. In other words, Mr. Beijar contradicted the
9   statements in the OSHA report.
10  A. Yes, in terms of having pulled down the
11  tool by the hose. My understanding is that in the
12  OSHA report, the home builders, and I forget their
13  name, they were cited for allowing tools to be
14  raised and lowered by the hose. That was one of the
15  citations they had. So even though OSHA didn't say
16  as far as I can recall, that it was pulled down by
17  the hose, they cited them for this practice.
18  Q. Are you aware of any witnesses to this
19  accident who claim that Mr. Beijar pulled the tool
20  down by the hose?
21  A. Sure. Well, my initial look into the
22  situation was if this particular tool either had a
23  problem with the double-trigger safety or not. And
24  I tested that. It did not seem to.

Page 29

1   Q. In other words, it can't fire without the
2   trigger being depressed.
3   A. That was my conclusion.
4       So then in either scenario, whether he
5   pulled it or didn't pull it, it couldn't fire
6   without the trigger being depressed. So at that
7   stage, I have to say -- you know, he was the closest
8   to the gun when it hit him. So he has a description
9   of how it happened.
10      There is another description by, you
11  know, two other people, three other people, although
12  only one of them was deposed, that indicate that he
13  pulled it with his left hand and caught it with his
14  right hand. So then I did have to get into some
15  reconstruction, A, to see, you know, whether either
16  scenario would allow the trigger to be depressed
17  accidentally while he is either catching or being
18  hit by the gun. So I essentially looked at the two
19  scenarios.
20  Q. Okay. When you say two scenarios, are you
21  talking about one scenario being the three
22  eyewitnesses and the other being that of Mr. Beijar?
23  A. The tool hitting him where it hit him,
24  according to the x-rays -- the x-rays are really the

Page 30

1  only, you know, physical evidence that's here. So
2  beyond that, I have to look at physical principles
3  and how the scenario could have developed.
4  Q. But when you said two scenarios --
5  A. Yes.
6  Q. -- the two scenarios you are talking about
7  are, one is Mr. Beijar's scenario, and the other
8  scenario is the scenario given by the three
9  eyewitnesses. Is that what you meant by the two
10 scenarios?
11 A. Well, as a starting point, yes.
12 Q. Okay.
13 A. The starting point being that one is that
14 he doesn't consciously pull on anything. Somebody
15 yells watch out, or he turns around and he sees this
16 thing coming towards him.
17 Q. That's Mr. Beijar's scenario?
18 A. That's Mr. Beijar's scenario.
19 Q. The three other eyewitnesses have a
20 different view?
21 A. Well, they all seem to have exactly the
22 same view, that he pulls the hose with his left
23 hand.
24 Q. To get the tool --

Page 31

1  A. -- off of the scaffolding. Well, the only
2  person who was questioned on this was Mr. Pinard.
3  His indication is that he saw from 20 feet away the
4  actual trigger on the gun, and even though the
5  plaintiff was facing away from him. And I have
6  problems with that in several respects. Because 20
7  feet is further than that wall. If you put that gun
8  20 feet from me, there's no way you are going to see
9  the trigger when the thing is falling during a
10 half-second period before it is hit by his body. So
11 I think there's a lot of intended or unintended
12 reconstruction that's part of that description by
13 Mr. Pinard.
14     Mr. Santos never gets examined on the
15 details. And the third gentleman, I only saw a
16 handwritten statement. And all these three
17 statements are very similar and questionable in the
18 same, similar circumstance.
19     But, as it turns out, my opinion on the
20 defect is not really dependent on the exact accident
21 scenario.
22 Q. Let me stop you there for a minute.
23 A. Yes.
24 Q. I want to get to your opinion on how the

Page 32

1  accident happened.
2  A. Yes.
3  Q. Then we'll talk about your opinions on the
4  design of the tool.
5  A. Okay.
6  Q. Before I do that, am I essentially correct
7  that all three of the eyewitnesses, Mr. Pinard,
8  Mr. Santos in his typed statement, signed, and
9  Mr. Cordeiro in his handwritten statement, signed --
10 A. Cordeiro.
11 Q. -- say that Mr. Beijar pulled the tool down
12 with his left hand and caught it in his right hand
13 as it was coming towards him and depressed the
14 trigger causing the tool to activate? That's
15 essentially what they all say; isn't that true?
16 A. Yes.
17 Q. So now we have the two scenarios from the
18 eyewitnesses in front of you, Mr. Beijar's on the
19 one hand and the eyewitness scenarios on the other?
20 A. Yes.
21 Q. Okay.
22 A. The general scenarios, yes.
23 Q. Are there any other eyewitness scenarios,
24 other than those two, as to -- as far as you know --

Page 33

1  as to how this accident happened?
2  A. No, not that I know of.
3  Q. Did you come to an opinion as to how the
4  accident happened as part of trying to reconstruct
5  this accident?
6  A. I have come to an opinion as to my opinion
7  how the accident most likely happened.
8  Q. I'm going to ask you to give that opinion.
9  I know that you mentioned that you wanted a break
10 after an hour. I think this is probably a good
11 time.
12 A. I can keep going.
13 Q. Okay. Great. Can you illustrate for me,
14 can you show me by using the tool -- and I brought a
15 hose here for you to use -- how you think this
16 accident happened.
17 A. Well, I think this accident happened
18 differently from either what Mr. Beijar says or what
19 the two eyewitnesses say. The reasons for that are
20 essentially the laws of physics and where the nail
21 entered his chest.
22 Q. Can you show me how you think the accident
23 happened?
24 A. Okay, sure. Essentially the tool --

Page 34

1  Q. You have the tool in front of you that is
2  marked as Beijar Exhibit Number 2?
3  A. Yes.
4  Q. You understand that is the tool that was
5  being used at the time of his accident?
6  A. That's my understanding.
7  Q. Okay. And you understand that it was
8  essentially a new tool at that time, in February of
9  2001?
10         MS. DAVIS: Objection.
11  A. Yes.
12  Q. And that the company continued to use it
13  for the next two and a half years, which is why the
14  paint is all chipped off?
15  A. Yes. It looks more worn than a month's
16  use.
17  Q. Okay. But otherwise the tool is in the
18  same configuration that it was on the day of
19  Mr. Beijar's accident?
20  A. Yes.
21  Q. Okay. Can you show me how you think this
22  accident happened?
23  A. Well --
24  Q. Do you want to use the hose?

Page 35

1  A. Well, it is going to be awfully awkward.
2  Q. I can help you hold it, if you like, or
3  Ms. Davis, if you like.
4  A. Also, we don't have a staging.
5  Q. All right.
6  A. I will tell you how I think it came at him
7  and why. Actually, I think that would happen
8  regardless of whether he pulled on the hose or not.
9  The nail entered his sternum here.
10  Q. In the configuration you're showing right
11  now?
12  A. Essentially.
13  Q. In other words, from his right -- with an
14  aspect from his right to his left?
15  A. Yes.
16  Q. Upside down?
17  A. Yes.
18  Q. The tool is upside down?
19  A. Yes. Because the hose is looped over the
20  staging bracket.
21  Q. Okay.
22  A. And as the tool falls off the staging
23  bracket, it actually swings on the hose towards him
24  like this (indicating). He's trying to ward it off

Page 36

1  with his right hand by grabbing the hose. Because
2  of the momentum of the tool -- and the tool may hav
3  actually been in this position as he grabs the
4  hose -- the tool keeps going. He tries to
5  essentially ward it off with his hand, with his arm
6  and elbow. He contacts the trigger, and the tool
7  continues into his chest, depresses and fires.
8  That's how I think it happened.
9  Q. Okay. Can you tell me, is there anywhere
10  from any of the sources that anybody says, including
11  Mr. Beijar, that he hit the trigger with his elbow?
12  A. No.
13  Q. In fact, they all deny that, don't they?
14         MS. DAVIS: Objection.
15  Q. Mr. Beijar denies that he hit it at all?
16  A. Yes.
17  Q. And the witnesses --
18  A. I didn't know who you met by "they all."
19  Q. And the eyewitnesses, Mr. Pinard,
20  Mr. Cordeiro and Mr. Santos say that he pulled the
21  trigger with his thumb, his hand, right?
22  A. I don't think they all say that. At least
23  Mr. Pinard says that he, he was catching -- the way
24  I understand Mr. Pinard's and the other

Page 37

1  eyewitnesses' description is that he pulls the gun,
2  pulls it by the hose -- incidentally, this staging
3  is about ceiling height here. He can't quite reach
4  the gun. So according to the two -- to the one
5  eyewitness who was actually examined on it under
6  oath, he pulls it down with his left hand and pulls
7  it toward him and catches it like a football, he
8  says. He says that he sees him catch it like that
9  (indicating), as it is coming down, and he hits the
10  trigger with his thumb and then pulls the thing in.
11  He had to actually pull it down like that
12  (indicating) and that's when it fired. I don't
13  think that's consistent with physical principles.
14  Q. Is there any witness who testifies whether
15  the trigger was depressed before or after the tip of
16  the tool hit him on the chest?
17  A. Well, I think actually both Mr. Pinard and
18  Mr. Edwards, who -- I think it was Wayne Edwards -
19  who says based on what he had heard -- he was
20  reconstructing it, and he says that probably the
21  trigger was depressed before -- it had to be
22  depressed before it hit his chest.
23  Q. Could you show me where in Mr. Pinard's
24  deposition he says that?

Page 38

1   A. First let me look at Mr. Edwards:
2   Q. We can agree that Mr. Edwards was not
3   present at the scene; is that true?
4   A. Right.
5       In his statement he says: As the gun
6   fell down, John grabbed the gun and apparently hit
7   the trigger with his right hand. The nose of the
8   gun hit his chest, depressed, and shot the nail into
9   the center of his chest.
10  Q. Right.
11  A. So that sequentially is essentially, he
12  hits the trigger and the gun continues in.
13      I think also in his deposition he says,
14  again this is paraphrased: Reached with left
15  hand -- this is about Page 10-plus. Reached with
16  left hand, pulled hose, caught gun with right hand
17  on handle pointing towards him. Pulled into chest
18  while thumb on trigger. So that, again, says to me
19  that the trigger is already pulled and he pulls the
20  gun into his chest. So I also tried to do that with
21  the gun. He catches it (indicating), and pulls it
22  into his chest.
23      (Discussion off the record.)
24  A. And then pulls it into his chest. It is

Page 39

1   essentially, pull trigger and then pulling into his
2   chest.
3       Now, I also don't --
4   Q. Before. I'm looking at your copy of
5   Mr. Pinard's deposition. You actually kindly enough
6   folded down the page on Page 38 to 41.
7   A. Okay.
8   Q. Don't you remember me asking Mr. Pinard the
9   question:
10      "QUESTION: Could you tell whether or
11  not his thumb hit the trigger before it hit his
12  chest?" On Page 41, his answer was:
13      "ANSWER: No, I couldn't."
14  A. Right, because his back was towards him.
15  Q. "QUESTION: He could have grabbed it on
16  the outside of the tool. His thumb hit the trigger.
17      "ANSWER: Yes."
18      And then I asked him whether he could
19  tell whether he depressed the trigger before or
20  after the tip of the tool hit his chest, and
21  Mr. Pinard said he couldn't; isn't that right?
22  A. I think yes. But if you go back to Page 10
23  where he initially describes it, he said he caught
24  gun with right hand on handle pointing towards him

Page 40

1   while thumb was on -- while thumb on trigger. He's
2   actually asked: Did you see all this from 20 feet?
3   And he says yeah. Eventually at 41 he says: Well,
4   the plaintiff's back was towards me, but I saw all
5   that before.
6       So if you physically are towards the
7   person in back and you catch this gun, if he saw him
8   catch the gun with his right hand on the handle and
9   depress the trigger, obviously the tip was not yet
10  on his chest.
11  Q. Could you hook up the hose here? I'm still
12  trying to figure out how this could have happened
13  from your description.
14  A. Let me do it on the floor.
15  Q. Do you need some help?
16  A. No.
17  Q. Now, you said, I think, that the hose was
18  looped around a bracket?
19  A. Yes.
20  Q. On what do you base that?
21  A. Only on physical principles. There's no
22  other way that that could swing toward him.
23  Q. Unless he pulls it down and brought it into
24  his chest, right?

Page 41

1   A. It still could not swing towards him.
2   Q. Right. But if he pulled it down with his
3   left hand and pulled it in with his right, that
4   would be another way the tool could get to his
5   chest; is that true?
6   A. Except, it is against physical principles.
7   If he pulled on the hose, then the gun would come
8   off the scaffolding not in the position that hit his
9   chest.
10  Q. Unless he pulled it into him.
11  A. Even if he pulled it into him. Because if
12  it is lying in any orientation on the plank and you
13  pull on the hose, the hose is going to be what's
14  towards you, not the tip of the gun. So if you pull
15  it down, there's no other way the gun can come off
16  the plank except hose first, because you are pulling
17  on the hose. So if it comes at you this way, if he
18  catches it this way, then he would have to turn it
19  around and bring it in like this. I just don't
20  think that can happen. Eyewitness or not, I mean,
21  he's 20 feet away facing the guy's back.
22  Physically, it cannot happen that way.
23  Q. Let me ask you a question, Doctor. Do you
24  think that it is a reasonable thing to do to pull

Page 42

1  the tool by the hose?
2      A. No, I don't think so.
3      Q. You think Mr. Beijar was unreasonable, in
4  your view, by pulling the tool by the hose?
5          MS. DAVIS: Objection.
6      A. Sure, but he certainly wasn't expecting to
7  get shot.
8      Q. Do you think that's a misuse of the tool,
9  to pull it by the hose?
10     A. I would call it a misuse, except that I
11 know that it is done all the time. And in fact, the
12 hose is used on most construction sites to lower the
13 tool and to take it up, actually. Because the
14 alternative is that you have to walk the tool up a
15 ladder with the hose behind it.
16     Q. Is there any evidence that there was a
17 ladder available for Mr. Beijar if he wanted to use
18 it?
19     A. I didn't see one in the photos, but the
20 photos were taken a day later. I think there was
21 some testimony that there was a ladder. I'm sure
22 there was a ladder leaning against something.
23     Q. Do you think that would have been an easier
24 and better way for Mr. Beijar to get the tool if he

Page 43

1  needed to get it down?
2      A. I think in retrospect it would be, but it
3  certainly wasn't a very foreseeable event.
4      Q. Have you now told me all of the ways and
5  described the way you think this accident happened?
6      A. Well, I think I've described to you what in
7  my opinion was the most probable way that the
8  accident happened by showing you eventually how the
9  tool hits him.
10     Q. Let me stop you there and ask you a
11 question about that.
12     A. Okay.
13     Q. So that I understand, it is your view that
14 Mr. Beijar took his right hand, pulled the tool off
15 of the scaffold over his head. The hose was looped
16 around a bracket. And as he was pulling it down, it
17 swung towards him and hit his right elbow as his
18 right elbow bent at about a 90-degree angle. Is
19 that basically what happened?
20         MS. DAVIS: Objection.
21     A. No.
22     Q. How is that wrong? How am I wrong?
23     A. I don't think he had -- in my opinion, I
24 believe him, that the gun came off either when he

Page 44

1  leaned the plank against what he thought was the
2  house -- I think he actually leaned it against the
3  house and the plank or just the plank -- and as per
4  the eyewitnesses, the gun was teetottering on the
5  edge of the plank. And that's according to
6  Mr. Pinard, why he told him to put the tool back and
7  said that he couldn't reach it. But that's not the
8  plaintiff's recollection.
9          The plaintiff's recollection is that he
10 turns around and the tool is coming towards him.
11 Now, I think that may very well have happened if his
12 foot got entangled with the hose. But it wouldn't
13 have pulled the tool down.
14     Q. What hose?
15     A. This hose, the air hose. If you look in
16 the pictures the next day, they have a tool lying up
17 there. It is to the right of the bracket. Now, I
18 don't know if they were trying to put the tool, you
19 know, in some position there like it was at the time
20 of the accident. But it is certainly consistent
21 with all the exhibits that they mark at their
22 deposition, that the tool was at the end of the
23 plank. So it was probably beyond the bracket.
24         And you see, you know, the hose coming

Page 45

1  down and Mr. Pinard said the hose was in front of
2  the plank. So if that tool falls off the plank, it
3  is going to go down like this, gravity will just
4  pull it straight down. But because of the hose up
5  there, it starts swinging towards him.
6          Now, where it hits his chest -- or where
7  he was pulling it as a football, the gun has already
8  fallen about 4 feet, it had fallen at least 4 feet.
9  So it had quite some energy. Now, even if he
10 reached up, according to Mr. Pinard, and caught the
11 gun up there, which was still about 1 1/2 feet after
12 it dropped from the plank, and then brought it down
13 and pulled it in, he already had his finger on the
14 trigger.
15         So either scenario, I don't think that
16 Mr. Pinard's scenario could have happened based on
17 physical evidence and physical principles. He could
18 have pulled it down, but then that's not how the gun
19 swung into his chest. He could have tried pulling
20 on it and the thing fell off and swung into him. He
21 could have just touched the, a hose while he was
22 going by. The thing was partially off the plank.
23 Or the plank could have started its drop.
24         Now, for any object to drop about 4 feet

WITNESS>
Volume VOLUME> - DATETEXT>

Page 46

1   -- okay? -- that chart is in there too, it takes
2   close to a second. So the time sequence was
3   certainly there, that the plaintiff turns around,
4   sees the thing coming towards him. Although he sees
5   it wrong as well. It couldn't have come at him this
6   way, the way the witnesses -- or one witness says.
7       Q. The way Mr. --
8       A. Mr. Picard (sic). It couldn't have come
9   this way if he pulled on the hose.
10      Q. I'm getting lost here. Let me try again.
11      A. Yeah.
12      Q. My first question was, in your
13  reconstruction, do you have a view whether or not
14  Mr. Beijar pulled on the hose?
15      A. I don't think he purposely pulled on the
16  hose near the plank. He may have stepped on the
17  hose on the ground and disturbed the hose.
18      Q. Is there any evidence from Mr. Beijar,
19  Mr. Pinard, from any of the witnesses, Mr. Cordeiro,
20  Mr. Santos, that Mr. Beijar stepped on the hose,
21  anywhere?
22      A. No.
23      Q. Is there any evidence that he pulled on the
24  hose?

Page 47

1       A. Well, there are statements that he pulled
2   on the hose.
3       Q. Three eyewitnesses have said that?
4       A. Yes. Three eyewitnesses say almost the
5   identical thing.
6       Q. And Mr. Beijar denies that he pulled on the
7   hose, right?
8       A. Yes.
9       Q. He denies that he touched the tool at all
10  before it went off, does he not?
11      A. That was his perception, yes. That's what
12  he says.
13      Q. So I'm going back now to the hose. Do you
14  have any factual basis at all, from any of the
15  witnesses, anything, to support your view that
16  Mr. Beijar did not pull on the hose, other than his
17  own statement?
18      A. And physical principles, the laws of
19  physics and Newton.
20      Q. If he pulled on the hose -- by the way, do
21  you know where his left hand was at the time of the
22  accident?
23      A. According to his perception, it was at his
24  left side.

Page 48

1       Q. Do you agree with that?
2       A. Yes, it is certainly consistent with my
3   scenario. That scenario is also consistent with his
4   hand being up.
5       Q. In your view of this accident, can you show
6   me where Mr. Beijar's right hand was just before
7   this accident?
8       A. When you say just before the accident,
9   before he contacts the tool or --
10      Q. Yes.
11      A. Well, I think it was generally at his right
12  side.
13      Q. Did he touch any part of the hose before
14  the accident happened, in your view?
15      A. In my view, yes.
16      Q. Which part of the hose did he touch?
17      A. Right above the tool.
18      Q. How much above the tool?
19      A. In looking at the dimensional data, his arm
20  to the elbow is about two inches shorter than mine.
21  So somewhere here.
22      Q. So you think that his hand was about 6
23  inches above the coupling?
24      A. Could have been 6 inches, could have been a

Page 49

1   little more. The thing swings in.
2       Q. 6 inches to 8 inches above the coupling?
3       A. I would actually start at the coupling to
4   maybe 8 inches above, yes.
5       Q. And it's your view --
6       A. And that depends on whether it was coming
7   straight on or at an angle and what kind of an
8   angle. Because I can even see that it is coming at
9   him almost perpendicular to his body. And then whe
10  he hits it, that turns it around and puts it into
11  the chest.
12      Q. Could you demonstrate that for me? I'm not
13  quite sure that I understand it.
14      A. Sure. It can be swinging like this towards
15  him, again from the thing. So instead of with the
16  point directly at him, it is at quite an angle like
17  this. So as he tries to stop the whole thing, he
18  reaches up, he tries to grab the hose --
19      Q. With his right hand?
20      A. With his right hand.
21          The thing is swinging towards him. It
22  continues into his arm because there's nothing else
23  that stops it. The only thing that stops it, tries
24  to stop it is the elbow.

WITNESS>
Volume VOLUME> - DATETEXT>

Page 50

1  Q. Now, at this point in your reconstruction
2  you said his elbow was bent about 90 degrees, right?
3  A. Well, he starts it straight out. But when
4  it hits the trigger, it is about 90 degrees. Or it
5  could be less. It could be like this (indicating).
6  Because it winds up hitting him at an angle like
7  this. So, he tries to stop it but the momentum is
8  carrying it into his chest, right here.
9  Q. In your view, as he has his right hand at
10 the coupling or just above the coupling?
11 A. At the coupling or just above the coupling.
12 Q. When he originally has his hand out, his
13 arm is straight and then he brings it in to bend his
14 elbow to 90 degrees?
15 A. He has to start bending his elbow, yes.
16 Q. Because if he leaves his elbow out
17 straight, the tool never reaches his body, right?
18 A. No. That's not true. Depending on where
19 he grabs it. If he grabs it up here, keeps it
20 straight, it keeps going.
21 Q. If it happened the way you just
22 illustrated, the tool will not drive a nail, will
23 it?
24 A. No. That's why I say that's not how it

Page 51

1  happened.
2  Q. So he had to have, in your view, grabbed
3  the tool by the air hose, bent his arm so that it
4  came towards him, his elbow touches the trigger and
5  remains on the trigger at the time the contact trip
6  hits his sternum. Is that basically it, in your
7  view?
8  A. Yes.
9  Q. The only way the accident could have
10 happened is that he actually had his finger on the
11 trigger at the time the tool discharged, right?
12 A. I don't understand your question.
13 Q. The only other way this accident could have
14 happened -- or another way this accident could have
15 happened is if he had his finger or his thumb on the
16 trigger as the tool was moving towards him.
17 A. Yes, I agree with that, sure.
18 Q. And the tool, the contact trip or the trip
19 hit his chest?
20 A. Yes. But still, the tool would have to be
21 in my opinion --
22 Q. Upside-down?
23 A. Upside-down. Because if it says this way,
24 the way they are describing it, you would have to

Page 52

1  wind up down here like this. It just -- in my
2  opinion, it is not possible.
3  Q. Have you now told me everything that you
4  wish to say about how you think this accident
5  happened, the reconstruction of it?
6  A. Well, everything I think responsive to your
7  question. You know, I must say, you know, that I
8  arrive at this scenario by looking at all kinds of
9  possibilities. And this scenario -- okay? -- could
10 also have happened by pulling it with his left hand.
11 When the thing falls, it becomes a pendulum. Then
12 he's trying to stop it with his right hand. So I
13 realize, you know, that there are -- the eyewitness
14 scenario says that he actively pulls it with his
15 left hand. After that, their description I don't
16 believe, because it couldn't happen that way
17 physically due to the laws of nature. But I cannot
18 exclude that he actually does start pulling it,
19 tries to pull it with his left hand.
20 But in terms of the design of the tool,
21 that's not relevant to me. Because whether he does
22 it consciously or accidentally, you know, he wasn't
23 the user of the tool. He wasn't the one who was
24 supposed to disconnect it. And even if I were to

Page 53

1  accept the scenario that Mr. Pinard describes, the
2  same defects and the same remedies would have
3  prevented this accident.
4  Q. Have you now told me all the facts in your
5  reconstruction?
6  A. I think so.
7  Q. I may have a couple more questions about
8  the tool but I don't think we need the hose anymore.
9  Can you disconnect the hose.
10 A. (Witness complies.)
11 Q. You don't have to put it on the ground.
12 A. The problem is you have to use two hands to
13 pull it off.
14 Q. Is this a good time for a break?
15 A. Sure.
16 THE VIDEOGRAPHER: The time is 11:5!
17 We are off the record.
18 (A recess was taken.)
19 THE VIDEOGRAPHER: The time is 12:0!
20 p.m. This is the beginning of Cassette Number 2 in
21 the deposition of Dr. Igor Paul. We are on the
22 record.
23 Q. Dr. Paul, I want to talk now about your
24 evaluation of the design of this tool that you have

WITNESS>
Volume VOLUME> - DATETEXT>

Page 78

1  Q. In fact, you can do it in less than a
2  second?
3  A. You could.
4  Q. How long does it take to disconnect it?
5  A. Probably the same. But why do it? In the
6  field, they don't do it. Why do it?
7  Q. Other than what you've talked about so far,
8  do you have any other criticisms of this tool as it
9  relates to this accident?
10  A. No. I think it is a nice tool.
11       MR. DUGGAN: Can I have a minute?
12       THE VIDEOGRAPHER: The time is 12:53.
13  We are off the record.
14       MR. DUGGAN: I have no further
15  questions.
16       MS. DAVIS: I have no questions.
17       (All exhibits are in the custody of
18  Christopher Duggan.)

Page 80

INDEX

EXAMINATIONS
IGOR PAUL
  BY MR. DUGGAN                4
EXHIBITS MARKED
1, notice of deposition           3
2, active file                    3
3, photos and manual, et cetera   3
4, file, design ergonomics        3
5, OSHA documents                 3
6, Xeroxes of photos              3
7, article, Cape Cod Times        3
8, medicals                       3
9, deposition transcripts         3
10, x-rays                        3
2 A and B, invoices              13
3 A and B, drawings              64
11, Igor Paul hand-drawn design  76

Exhibits retained by Christopher A. Duggan, Esq.

Page 79

1       CERTIFICATE OF COURT REPORTER
2       I, David A. Arsenault, Registered
3  Professional Reporter, do certify that the
4  deposition of IGOR PAUL, in the matter of Beijar v
5  Stanley, on September 6, 2005, was stenographically
6  recorded by me; that the witness provided
7  satisfactory evidence of identification, as
8  prescribed by Executive Order 455 (03-13) issued by
9  the Governor of the Commonwealth of Massachusetts,
10  before being sworn by me, a Notary Public in and for
11  the Commonwealth of Massachusetts; that the
12  transcript produced by me is a true and accurate
13  record of the proceedings to the best of my ability;
14  that I am neither counsel for, related to, nor
15  employed by any of the parties to the above action;
16  and further that I am not a relative or employee of
17  any attorney or counsel employed by the parties
18  thereto, nor financially or otherwise interested in
19  the outcome of the action.

22  _____  9/15/05
23  David A. Arsenault, RPR

Page 81

WITNESS: IGOR PAUL
CASE: Beijar v Stanley
SIGNATURE PAGE/ERRATA SHEET
PAGE   LINE   CHANGE OR CORRECTION AND REASON

I have read the transcript of my deposition taken September 6, 2005. Except for any corrections or changes noted above I hereby subscribe to the transcript as an accurate record of the statements made by me.
Signed under the pains and penalties of perjury.

_____DATE_____
Deponent, IGOR PAUL

On this _____ day of _____, 200__, before me, the undersigned notary public, personally appeared IGOR PAUL, who presented satisfactory evidence of identification, to wit, _____, and signed this document in my presence.

Notary Public in and for_____
My commission expires_____